1
2
3          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
4
5   MICHAEL MALONE and BARBARA MALONE,
    husband and wife;
6                            Plaintiffs,
7                    v.                                    08 CV 7277 (PKL)
    BAYERISCHE HYPO-UND VEREINSBANK, AG—
8   NEW YORK BRANCH; BAYERISCHE HYPO-UND
    VEREINSBANK US FINANCE, f/k/a BAYERISCHE
9   HYPO-UND VEREINSBANK STRUCTURED           COMPLAINT
    FINANCE, INC.; KATTEN MUCHIN ROSENMAN,
10  PPP, f/k/a ROSENMAN COLIN, LLP; and DOES 1  PLAINTIFFS DEMAND
    through 50,                                JURY TRIAL
11                           Defendants.
12

13                      **I. INTRODUCTION**

14      **1.**     Defendants HVB and Katten, along with other unnamed third-parties

15  designed, promoted, and implemented an illegal, fraudulent, and abusive investment scheme

16  named the Coastal Trading Common Trust Fund Series III and the Coastal Trading Common

17  Trust Fund Series IV (collectively "Common Trust Fund" or "CTF") which Plaintiffs

18  Michael and Barbra Malone were induced into investing in, and which caused Plaintiffs

19  Michael and Barbra Malone to suffer damages.  Plaintiffs Michael and Barbra Malone,

20  through the undersigned counsel, file this Complaint against Defendants for damages,

21  equitable relief, and attorneys' fees and costs.  Plaintiffs' claims are based upon the laws of

22  the State of New York for (1) fraud, (2) breach of fiduciary duty, (3) aiding and abetting

23  breach of fiduciary duty, (4) breach of contract, (5) professional negligence, and (6) unjust

24
    enrichment.
25
26

COMPLAINT - 1

## II. PARTIES

2.      Plaintiffs Michael J. Malone and Barbara C. Malone (collectively "Plaintiffs," "the Malones," or "Malone") are husband and wife, respectively, and are residents of King County, State of Washington.

3.      Bayerische Hypo-und Vereinsbank, AG, is a German-based bank and financial institution that operated in the United States through a branch located at 150 East 42nd Street, New York, New York.   Bayerische Hypo-und Vereinsbank, AG, was and is the parent to various subsidiaries, including HVB U.S. Finance, Inc. (formerly known as HVB Structured Finance, Inc.) and Bayerische Hypo-und Vereinsbank, AG—New York Branch. Collectively, Bayerische Hypo-und Vereinsbank, AG—New York Branch and HVB U.S. Finance, Inc. (formerly known as HVB Structured Finance, Inc.) are referred to herein as "HVB."

4.      Defendant Bayerische Hypo-und Vereinsbank, AG—New York Branch (referred to alternatively herein as "HVB" and "HVB-NY") is registered with the New York Department of Banking with employees and offices transacting business in New York at 150 East 42nd Street, New York, New York 10017.  Defendant HVB-NY is a branch of Bayerische Hypo-und Vereinsbank AG, a corporation organized and existing under the laws of the Republic of Germany with its principal place of business at Am Tucherpark 16, 80538 Munich, Germany.

5.      Defendant HVB US Finance, Inc., f/k/a HVB Structured Finance, Inc. (referred to alternatively herein as "HVB" and "HVB Finance") is a Delaware corporation having a principal place of business at 150 E. 42nd Street, New York, New York 10017.

COMPLAINT - 2

Defendant HVB Finance is a subsidiary of its parent company, Bayerische Hypo-und Vereinsbank, AG.

6.    Defendant Katten Muchin Rosenman, LLP, f/k/a/ Rosenman Colin, LLP, ("Katten" or "Rosenman") is an Illinois limited liability partnership with employees and offices transacting business in New York at 575 Madison Avenue, New York, New York 10022.

### III. JURISDICTION & VENUE

7.    Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because Plaintiffs are residents of a different state than Defendants HVB and Katten.

8.    Venue in this district is proper pursuant proper to 28 U.S.C. § 1391 because a substantial part of the events or omissions which the claim is based occurred in the Southern District of New York.

### IV. FACTUAL BACKGROUND

9.    In 2001 Malone received substantial income and capital gains from the sale and merger of his company, AEI.

10.    Following the sale and merger of AEI, Malone went to Clark Nuber for investment and tax planning advice. As of 2001, the accounting firm of Clark Nuber had been Malone's accountants for approximately ten years. Over the course of that time, a long-standing fiduciary relationship had developed between Malone and Clark Nuber, built on trust, confidence and individualized investment and tax planning advice.

11.    In 2001, HVB NY and HVB Finance through their agents, Coastal Trading LLC, Multinational Strategies, LLC, Michael Schwartz, and David Schwartz assisted promoted to Malone the Coastal Trading Common Trust Fund investment program,

COMPLAINT - 3

(hereinafter "CTF") which was to be financed through a loan which originated from HVB HVB Finance and which was to be managed and supervised by HVB NY.  HVB NY and HVB Finance offered an economic reward to Clark Nuber and Malone's personal accountants, Tom Sedlock and Jim Dubeck, for convincing Malone to invest in the CTF investment program and to agree to pay fees for the loan which was to originate from HVB Finance.

12.    In exchange for the promise of an economic benefit by HVB NY and HVB Finance, Coastal Trading LLC, Multinational Strategies, LLC, Michael Schwartz, and David Schwartz, Clark Nuber and Sedlock and Dubeck agreed to use their longstanding personal relationship to convince Malone to invest in the CTF transaction and agree to pay fees for a loan of $15,600,000 which was to originate from HVB Finance.  In order to promote this transaction, HVB NY and HVB Finance, Coastal Trading LLC, MultiNational Strategies, LLC, Michael Schwartz, and David Schwartz assisted Clark Nuber, Sedlock and Dubeck in the preparation of a Memorandum to Malone in which they purported to summarize CTF, explain the transaction and outline the risks.

13. HVB-NY, HVB Finance and Katten and third parties Clark Nuber, Sedlock, Dubeck, Enterprise Trust, Vogel, MultiNational Strategies, LLC, Coastal Trading, LLC, Michael Schwartz, David Schwartz, Ahrens & DeAngeli, and Ahrens owed a duty to Plaintiff, as fiduciaries because of their special knowledge and information regarding the CTF transaction and because they used Clark Nuber's longstanding relationship to convince Malone to invest in the CFT transaction by promising an economic benefit to Sedlock, Dubeck, and Clark Nuber if Malone would invest in the CTF transaction and pay loan origination fees to HVB finance.

COMPLAINT - 4

**14.** HVB-NY, HVB Finance and Katten and third parties Clark Nuber, Sedlock, Dubeck, Enterprise Trust, Vogel, MultiNational Strategies, LLC, Coastal Trading, LLC, Michael Schwartz, David Schwartz, Ahrens & DeAngeli, and Ahrens reached an agreement to participate in the common scheme of promoting the CTF transaction and HVB Finance program which was to be used in the CTF transaction to Malone in exchange for an economic benefit which they agreed would be concealed from Malone.

**15.** HVB-NY, HVB Finance and Katten and third parties Clark Nuber, Sedlock, Dubeck, Enterprise Trust, Vogel, MultiNational Strategies, LLC, Coastal Trading, LLC, Michael Schwartz, David Schwartz, Ahrens & DeAngeli, and Ahrens concealed that the HVB Finance loan was a sham and they failed to disclose all of the material facts regarding the investment program and the existence of the agreement, common scheme, and joint venture conspiracy to conceal that the loan was a sham.

**16.** HVB-NY, HVB Finance and Katten and third parties Clark Nuber, Sedlock, Dubeck, Enterprise Trust, Vogel, MultiNational Strategies, LLC, Coastal Trading, LLC, Michael Schwartz, David Schwartz, Ahrens & DeAngeli, and Ahrens fraudulently charged fees based upon the false representation that the loan from HVB Finance of $15,600,000 was an asset under management.

**17.** HVB-NY, HVB Finance and Katten, and third parties Clark Nuber, Sedlock, Dubeck, Enterprise Trust, Vogel, MultiNational Strategies, LLC, Coastal Trading, LLC, Michael Schwartz, David Schwartz, Ahrens & DeAngeli, and Ahrens, in committing the acts and omissions alleged here, acted with full knowledge and awareness that the CTF investment scheme was designed to give the false impression that a complex series of financial transactions were legitimate business investments, when in fact they were not.

COMPLAINT - 5

**18.** Defendants HVB-NY, HVB Finance and Katten, and third parties Clark Nuber, Sedlock, Dubeck, Enterprise Trust, Vogel, MultiNational Strategies, LLC, Coastal Trading, LLC, Michael Schwartz, David Schwartz, Ahrens & DeAngeli, and Ahrens acted in their respective roles as described herein according to a predetermined and commonly understood and accepted plan of action, all for the purposes of obtaining professional fees, commissions, interest payments and other transactional fees from investors, including Malone.

**19.** The acts of the Defendants HVB-NY, HVB Finance and Katten, were contrary to numerous provision of law, as further alleged herein.

**20.** Defendants HVB-NY, HVB Finance and Katten, are liable for the wrongful acts and omissions of each of the other partners in the agreement, common scheme and joint venture conspiracy, as described herein.

**21.** As a consequence of the acts and omissions of Defendants HVB-NY, HVB Finance and Katten, Malone has suffered injury in his business and property in that he has incurred losses in excess of $2 million; has incurred or will incur interest; has incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

**22.** It was the common purpose of Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy to claim to Malone and other investors that the CTF transaction was a legitimate investment program and concealing from Malone that it was an abusive tax shelter, consisting of a sham loan, totally lacking in economic substance, with little or no likelihood of either making a profit or, if it lost money and the investor claimed a tax write-off on his income tax return, of having the loss deduction upheld by the IRS in the event of an audit.

COMPLAINT - 6

23.    Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy knew that the investment program was centered upon a sham loan that was not in fact a bona fide loan. Plaintiffs did not know this. Defendants HVB-NY, HVB Finance and Katten and other third-party members of their conspiracy concealed this fact from him.  The fact that the CTF transaction was based upon a sham loan is a material fact.  If Malone had known that the CTF transaction was based upon a sham loan, he would not have invested in the program. Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy conspired to conceal from Malone their knowledge that CTF transaction was based upon a sham loan to induce him to participate in the transaction, for which they would receive economic benefits.

24.    Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy purported to Plaintiff that they played an important and independent role in the CTF transaction.

25.    Despite the foregoing representations by the Defendants of their roles in the CTF transaction, Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy concealed from Malone that an agreement, common scheme and joint venture conspiracy existed between them to design, promote, sell and implement CTF by making it appear to have economic substance and a legitimate investment loan, when in actuality it lacked economic substance, it consisted of a sham loan, and any deductions that Malone might claim for any losses generated from the CTF investment would stand little if any chance of being upheld by the IRS.

26.    Evidence of the close relationship "behind the scenes" that existed between Defendants HVB-NY, HVB Finance and Katten and other third-party members of the

COMPLAINT - 7

conspiracy (which was never revealed to Plaintiffs) can be seen through email exchanges between the parties, the transaction working group list, and the Brandonton / Braxton Closing Checklist. E-mails between HVB and their representatives, MultiNational Strategies, LLC, Bradonton/Braxton and their representatives, and Enterprise Bank, reveal that these individuals and entities were not working independently to fulfill different roles as Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy. Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy were working closely and in concert to perpetuate the appearance that the loan, at the heart of the CTF transactions, was legitimate. In actuality, Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy knew that the loan was in fact a sham loan.

27.    In 2003 there was an investigation by the United States Senate Permanent Subcommittee on Investigations of the Committee of Governmental Affairs ("Senate Subcommittee") of the tax shelter industry. The Senate Subcommittee found that a close collaboration existed between accounting firms, law firms, investment advisory firms, and banks, regarding the aggressive marketing, development and implementation of generic tax products.

28.    The Senate Subcommittee investigation found that these professional firms worked in concert with other banks, investment advisors, accountants and lawyers, including HVB and Sidley, Austin, Brown & Wood and others, whose common purpose and interest it was to design, promote, market and implement abusive tax shelters, including the investment program of the same type as sold to Malone, known as CTF.

COMPLAINT - 8

**29.**    In August 2003, the IRS issued Notice 2003-54 entitled "Common Trust Fund Straddle Tax Shelter," which stated "the claimed tax benefits purportedly generated by these transactions are not allowable for federal income tax purposes. CTF is the transaction described in Notice 2003-54. In disallowing deductions for CTF, the IRS took the position that the "offsetting positions entered into by the CTF transaction did not have any effect on the CTF's net economic position or non-tax objectives. . ." This lack of economic substance rendered the CTF invalid as a tax shelter. It can be assumed that at the time the IRS published Notice 2003-54, it did not know that the CTF transaction consisted of a sham loan because if the IRS knew this, it would have disclosed that fact in Notice 2003-54. In August 2003, Malone did not know that the CTF loan was a sham either, and Notice 2003-54 did not inform him of that fact.

**30.**    Following the Senate Investigation, several criminal indictments were filed against individuals and firms for their participation in the design, promotion, marketing, selling and implementation of abusive tax shelters.

**31.**    In September and October 2005, criminal indictments were filed in U.S. District Court for the Southern District of New York against nineteen individuals, including R.J. Ruble and Sidley Austin, who were each named in the lawsuit filed by Malone in the U.S. District Court.[1] The criminal indictments charge that the Defendants (a) concocted tax shelter transactions as well as false and fraudulent factual scenarios to support them; (b) prepared false and fraudulent documents, including engagement letters, transactional documents, representation letters, and opinion letters; (c) prepared and provided to their

---

[1] Plaintiffs have settled their claims with Defendants R.J. Ruble and Sidley Austin, who have since been dismissed.

COMPLAINT - 9

clients false and fraudulent representations that the clients were required to make in order to obtain opinion letters that purported to justify using the phony tax shelter losses to offset income or gain; and (d) prepared and caused to be prepared tax returns that were false and fraudulent because they incorporated the phony tax losses and therefore substantially understated the tax owed by the clients.

32.    The United States Attorney for the Southern District of New York launched a criminal investigation against HVB and Sidley Austin, among others, for their role in numerous illegal tax shelters. United States v. Bayerische Hypo-Und Vereinsbank AGI, No. 1:06-CR-00162 (S.D.N.Y. 2006). In February 2006, in that criminal case, HVB entered into a deferred prosecution agreement in which HVB admitted, in pertinent part, that :

> . . . between 1996 and 2002 HVB participated in a number of fraudulent tax shelter transactions derived by others including . . . "common trust fund," . . . transactions. HVB's activities in connection with these . . . transactions included: (i) participating in loans that were not bona fide loans, (ii) participating in trading activities on instructions from promoters that was intended to create the appearance of investment activity but that had no real substance; (iii) participating in creating documentation that contained false representations concerning the purpose and design of the transactions; and (iv) engaging in activity with others, including . . . investment advisory firms, various individuals affiliated with those entities. . . lawyers, and clients. . . all directed toward the implementation of the tax shelters designed to defraud the United States . . . (emphasis added)

Exhibit 1.

33.    In August 2005, the co-head of HVB's financial group in New York, Domenick DeGiorgio, pleaded guilty to two counts of conspiracy to defraud the IRS. In connection with that plea, DeGiorgio admitted that in the course of HVB's participation in tax shelters from 1999 to 2001 he knowingly participated in HVB's making sham loans in which no money left the bank, that the loans were never funded, that false paperwork was created. Exhibit 2.

COMPLAINT - 10

**34.** In February 2006, HVB entered into a deferred prosecution agreement, agreeing to pay nearly $30 million in fines, restitution, and penalties in relation to its participation in the implementation of fraudulent tax shelters. Exhibit 1.

**35.** On May 23, 2007, the IRS announced that it had reached a settlement with Sidley Austin over the firm's role in promoting illegal tax shelters. In particular, the opinion letters written by R.J. Ruble, who wrote the opinion letter here, were noted to be improper. In its press release, the IRS said Sidley Austin agreed to pay a civil tax shelter promoter penalty of $39.4 million. Furthermore, a criminal case is presently pending against Ruble individually for conspiracy to defraud the IRS and tax evasion arising out of the abusive tax shelters in which he is alleged to have participated. *United States v. Stein, et al.*, S 05 Cr. 888 (LAK).

**36.** HVB and other promoters of the CTF investment program sold to Malone have been sued by other investors for selling them the same investment program. In *Williams v. Sidley Austin Brown & Wood, LLP*, 38 A.D.3d 219, 823 N.Y.S.2d 9 (N.Y.A.D. 2007), the appellate division of the New York Supreme Court held that taxpayers stated a cause of action for fraud against the defendants who had induced them to invest in a scheme like the one here.

**37.** What the HVB deferred prosecution agreement, the DeGiorgio guilty plea and other facts as alleged herein reveal is that Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy concealed from Malone and falsely denied that they were agents of each other and members in a joint venture conspiracy with common purpose and community of interests.

COMPLAINT - 11

**38.**    In 2001 Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy formed an agreement to design, promote, market, and implement the CTF investment program to prospective and actual investors, including Malone and to create agreements and other documents which would be provided to each investor which would misrepresent the economic substance of the CTF investment program and would misrepresent that the loan that was provided in connection with the investment program was a sham.

**39.**    In 2001 Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy formed an agreement to make it appear by design and to misrepresent to investors that the CTF investment program was a legitimate investment program with genuine economic substance with a reasonable opportunity to make a profit, when in fact HVB-NY, HVB Finance and Katten knew at all times that the investment program lacked economic substance and HVB-NY, HVB Finance and Katten further knew at the time the investment program was sold to Malone that the representations about the economic substance of the loan were negotiated in advance and concealed from Malone.

### HVB and Katten's Role In The Preparation Of Fraudulent Organizational Documents

**40.**    Defendants HVB-NY and HVB Finance are among the most renowned and trusted banks and financial institutions in the country and Defendant Katten is one of the most renowned and trusted law firms in the country.  Plaintiffs invested in CTF in reliance on the involvement of HVB and Katten, in whom Plaintiffs reposed their trust and confidence.

**41.**    Defendants HVB-NY, HVB Finance and Defendant Katten concealed from Malone that in 2001, Defendant HVB Finance, through its employees Domenick DeGiorgio,

COMPLAINT - 12

Alexandre Nouvakhov, Richard Pankuch, and Sylvie Demetrio and Defendant Katten designed and approved all of the Offering documents and agreements which were provided to investors in connection with the Coastal Trading Common Trust Fund Program Series III and Series IV investment Programs, including the same documents utilized in the Malone CTF transaction.

42.    Defendants HVB-NY and HVB Finance and Katten, by virtue of their design and approval of the CTF documents before Malone ever invested in the CTF transaction, acquired special knowledge regarding the CTF transaction.

43.    Defendants HVB-NY and HVB Finance and Katten, played vital roles in the implementation of the CTF transaction.

44.    Defendants HVB-NY and HVB Finance provided the purported lending for the investment, but concealed from Malone the fact that the loan was a sham.  Defendants HVB-NY and HVB Finance also concealed from Malone that HVB received fees and other compensation from the investment money paid by Malone for HVB's role in the design and implementation of CTF and for its participation in the agreement, common scheme and joint venture conspiracy.

45.    Defendants HVB-NY and HVB Finance owed a fiduciary duty to Malone, by virtue of its special knowledge and the role it played in the design and implementation of CTF, its participation in the conspiracy and its self-interest in collecting fees and other compensation from the investment money paid by Malone for CTF.  Defendants HVB-NY and HVB Finance breached their fiduciary duty to Malone by concealing its special knowledge from Malone, including concealing that the loan was a sham, that HVB received fees and other compensation from the investment money paid by Malone for HVB's role in

COMPLAINT - 13

the design and implementation of CTF and the existence of and HVB's participation in the agreement, common scheme and joint venture conspiracy regarding CTF.

46.    Defendant Katten sent an opinion letter ("Katten Opinion Letter") to Plaintiffs attesting to the legitimacy of the CTF Program offered by Coastal Trading. The Katten Opinion Letter represented and concluded that, based on Katten's review of the Plan and such other instruments as Katten considered pertinent, and on the Federal income tax law as currently in effect, including the Code, existing judicial decisions and administrative regulations, rulings, procedures and practice, that it was Katten's opinion that the Fund will be classified as a common trust fund under Code Section 584 and the income tax regulations thereunder, and, as such, will not be subject to Federal income taxation and will not be treated as a corporation for Federal income tax purposes.

47.    Defendant Katten had a fiduciary relationship and owed a fiduciary duty to Malone by virtue of the Katten Opinion Letter that Katten prepared for Malone regarding the CTF transaction.

48.    Defendant Katten's Opinion Letter was also issued to R. J. Ruble of Sidley Austin to be used and relied upon in an opinion letter by Sidley Austin ("Sidley Austin Opinion Letter"). The Sidley Austin Opinion Letter with reference to Katten's opinion letter, was sent by Sidley Austin, as an agent for Defendants HVB and Katten and other co-conspirators, to Plaintiffs on March 8, 2002.

49.    The Sidley Austin Opinion Letter cited to the Katten Opinion Letter's key conclusions to bolster its opinion that "it is more likely than not that the Transactions will have the requisite economic substance and business purpose to be respected" as a tax shelter under legal authorities cited therein.

COMPLAINT - 14

50.  Defendant Katten breached its fiduciary duty to Malone by concealing its special knowledge and the role it played in the design and implementation of CTF, its participation in the conspiracy and its self-interest in collecting fees and other compensation from the investment money paid by Malone for CTF.

51.  Defendant Katten breached it fiduciary duty to Malone by falsely representing that the CTF Program would be classified as a tax-exempt common trust fund, when in fact Defendant Katten knew that the CTF Program was based upon a sham HVB loan and lacked the true economic substance necessary to qualify for such beneficial tax treatment.

52.  Defendant Katten breached its fiduciary duty by concealing its role in the design of the CTF Program when advising Plaintiffs about the validity of the Program by omitting and failing to disclose that its review of the Plan and other instruments was actually a review of a plan Katten designed, and instruments Katten itself drafted.

53.  Defendant Katten breached its fiduciary duty by concealing from Malone that it had a pecuniary interest in the CTF Program, which Katten also omitted and failed to disclose when advising Plaintiffs about the validity of the Program.

54.  Plaintiffs reasonably relied on the representation made to them by Defendant Katten directly or through their agents when making the decision to invest in the CTF Program.

55.  Katten played a significant role in the design of CTF, including, in particular, the fraudulent loan.

56.  Peter Molyneux, now deceased, was the owner of Braxton, one of the entities involved in the implementation of the CTF transaction.

COMPLAINT - 15

**57.** Molyneux signed a declaration that was filed in the Williams case, in which Molyneux describes Katten's role in the design of the CTF loan structure:

> The Rosenman [Katten] firm assisted in establishing the transaction structure and prepared the structures legal documentation, including the structure's offering document and the loan documents for Bradonton and Braxton.
>
> For this transaction HVB US Finance, Inc. retained Shearman & Sterling, which worked with the Purrington and Rosenman firms, including preparing checklists for organizing the loan.

**58.** On December 3, 2001, after Plaintiff Malone had executed Common Trust Fund transactional documents, the document titled the "Bradonton/Braxton Transaction Closing Checklist" (hereinafter "Closing Checklist") was compiled to describe the party responsible for the preparation of Common Trust Fund Documents, the signatories, and the status of the signatures of each of these documents.

**59.** The Closing Checklist was prepared or approved by the following parties: Kevin Kops of MultiNational Strategies, LLC; individuals at HVB Structure Finance; individuals at Sherman & Sterling, LLP (Counsel to HVB Structure Finance); Peter Molyneux of Bradonton Management, Inc, and Braxton Management, Inc,; individuals at Rosenman & Collin, LLP (Defendant Katten) (Counsel to Bradonton Management, Inc., and Braxton Management, Inc.,); individuals at Purrington, Moody, Weil, LLP (Counsel to Bradonton Management, Inc, and Braxton Management, Inc,); and individuals at Enterprise Bank.

**60.** The Closing Checklist and relevant email correspondence provides a roadmap as to how Kevin Kops of MultiNational Stratagies, LLC; individuals at HVB Structure Finance; individuals at Sherman & Sterling, LLP (Counsel to HVB Structure

COMPLAINT - 16

Finance); Peter Molyneux of Bradonton Management, Inc, and Braxton Management, Inc.;

individuals at Rosenman & Collin, LLP (Defendant Katten) (Counsel to Bradonton

Management, Inc, and Braxton Management, Inc,); individuals at Purrington, Moody, Weil,

LLP (Counsel to Bradonton Management, Inc, and Braxton Management, Inc,); and

individuals at Enterprise Bank participated in the creation of sham transactional documents

to create the appearance of loans which were not bona fide loans and the appearance

investment activity, which in reality had no real substance, and in creating documentation

that contained false representations concerning the purpose and design of the transactions.

61.    The Closing Checklist lists eleven Investors in the Common Trust Fund

Transaction, including Malone.  All of the investors used the same transaction documents

prepared by HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY

Branch, Braxton Management, Inc., Peter Molyneux, Nick Purrington, Shearman & Sterling,

Bradonton Management, Inc, MultiNational Strategies, LLC, Coastal Trading Common

Trust, and Defendant Katten.  These investors were Independent Broadcasting Corporation,

Bay Head Trading Inc., Belmar Trading Inc. (Malone), Barnegat Trading Inc., Normandy

Trading Inc., Spring Lake Trading Inc., Surf Trading Inc., Seaview Trading, LLC, Salt Aire

Trading, LLC, Seaview Trading LLC, and Asbury Trading Inc.

**Main Transactional Documents listed in Closing Checklist.**

62.    The Closing Checklist lists the following the following transactional

documents as main transactional documents for the Common Trust Fund: (1) The loan

agreement (HVB and Braxton), (2) Promissory Notes (a) Loan A, (b) Loan B, (c) Loan C,

(3) Borrower Security and Pledge Agreement, (4) Guarantor Pledge Agreement, (5)

COMPLAINT - 17

Shareholder Pledge Agreement, (6) Guaranty by Bradonton, (7) Borrower Control

Agreement, (8)Guarantor control Agreement, (9) Amendment to Loan Documents.

### (1)    The Loan Agreement (HVB and Braxton).

63.    The Closing Checklist lists as a main CTF transactional document, a Loan

Agreement between HVB and Braxton. The Closing Checklist states that the responsible

party for this document was Shearman & Sterling, Counsel to HVB.  The Closing Checklist

states that the status of this document is that it was executed from Braxton Management,

Inc., and HVB Structured Finance, Inc.  Since Peter Molyneux was the sole shareholder of

Braxton Management, Inc., Peter Molyneux executed this document on behalf of Braxton

Management, Inc.

64.    HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY

Branch, Braxton Management, Inc., Peter Molyneux, Nick Bradonton Management, Inc,

MultiNational Strategies, LLC, Coastal Trading Common Trust, and Rosenman & Colin,

LLP (Defendant Katten) participated in creating documentation that contained false

representations concerning the purpose and design of the transactions.

65.    HVB, Braxton and Molyneux executed the loan agreement with knowledge

that the document was intended to create the appearance of a loan which had no economic

substance.  HVB and Braxton and Molyneux created this loan agreement to present to

potential investors in the Common Trust Fund knowing that the investors would rely upon

the Agreement as evidence that HVB and Braxton had committed to have funds available to

lend to prospective investors to be used in the Common Trust Fund.

COMPLAINT - 18

### (2)    Promissory Notes (a) Loan A, (b) Loan B, (c) Loan C

66.    The Closing Checklist lists Promissory Notes for Loan A, Loan B, and Loan C as main CTF transactional documents. The Closing Checklist states that the responsible party was Shearman & Sterling, Counsel to HVB. The Closing Checklist states that the status of this document is that the signature pages were executed from Braxton Management, Inc. Since Peter Molyneux was the sole shareholder of Braxton Management Inc., Peter Molyneux executed this document on behalf of Braxton Management, Inc.

### (3)    Borrower Security and Pledge Agreement

67.    The Closing Checklist lists as a main CTF transactional document, a Borrower Security and Pledge Agreement between HVB and Braxton. The Closing Checklist states that the responsible party for this document was Shearman & Sterling, Counsel to HVB. The Closing Checklist states that the status of this document is that it was executed from Braxton Management, Inc., and HVB Structured Finance, Inc. Since Peter Molyneux was the sole shareholder of Braxton Management, Inc., Peter Molyneux executed this document on behalf of Braxton Management, Inc.

### (4)    Guarantor Pledge Agreement

68.    The Closing Checklist lists as a main CTF transactional document, a Guarantor Pledge Agreement between HVB and Bradonton Management, Inc. The Closing Checklist states that the responsible party for this document was Shearman & Sterling, Counsel to HVB. The Closing Checklist states the status of this document is that it was executed from Bradonton Management, Inc and HVB Structured Finance, Inc.

COMPLAINT - 19

### (5)    Shareholder Pledge Agreement

69.    The Closing Checklist lists as a main CTF transactional document, a Shareholder Pledge Agreement between HVB and Peter Molyneux. The Closing Checklist states that the responsible party for this document was Shearman & Sterling, Counsel to HVB. The Closing Checklist states that the status of this document is that it was executed from Bradonton Management, Inc and HVB Structured Finance Inc.

### (6)    Guaranty by Bradonton

70.    The Closing Checklist lists as a CTF transactional document, a Guarantee by Bradonton. The Closing Checklist states that the responsible party for this document was Shearman & Sterling, Counsel to HVB. The Closing Checklist states that the status of this document is that it was executed from Bradonton Management, Inc.

### (7)    Borrower Control Agreement

71.    The Closing Checklist lists as a main CTF transactional document, a Borrower Control Agreement between Braxton Management Inc., HVB Structured Finance, Inc., and Bayerische Hypo- und Verinsbank, AG, NY Branch. The Closing Checklist states that the responsible party for this document was Shearman & Sterling, Counsel to HVB. The Closing Checklist states that the status of this document is that it was executed from Braxton Management Inc., HVB Structured Finance, Inc., and Bayerische Hypo- und Verinsbank, AG, NY Branch. Since Peter Molyneux was the sole shareholder of Braxton Management Inc., Peter Molyneux executed this document on behalf of Braxton Management, Inc.

COMPLAINT - 20

### (8)    Guarantor Control Agreement

72.    The Closing Checklist dated December 3, 2001 lists as a main CTF

transactional document, a Guarantor Control Agreement between Bradonton Management

Inc., HVB Structured Finance, Inc., and Bayerische Hypo- und Verinsbank, AG, NY

Branch.  The Closing Checklist states that the responsible party for this document was

Shearman & Sterling, Counsel to HVB.  The Closing Checklist states that the status of this

document is that the signature pages were executed from Bradonton Management, Inc.,

HVB Structured Finance, Inc., and Bayerische Hypo- und Verinsbank, AG, NY Branch.

### (9)    Amendment to Loan Documents

73.    The Closing Checklist lists as a main CTF transactional document, an

Amendment to the Loan Documents.  The signatories to this document were Peter

Molyneux, Braxton Management, Inc., Bradonton Management, Inc., HVB Structured

Finance, Inc., and Bayerische Hypo- und Verinsbank, AG, NY Branch.  The Closing

Checklist states that the responsible party for this document was Shearman & Sterling,

Counsel to HVB.  The Closing Checklist states that the status of this document is that the

signature pages were executed from Peter Molyneux, Braxton Management Inc.,

Brandonton Management, Inc., HVB Structured Finance, Inc., and Bayerische Hypo- und

Verinsbank, AG, NY Branch.

74.    The main transactional documents for the Common Trust Fund: (1) The loan

agreement (HVB and Braxton), (2) Promissory Notes (a) Loan A, (b) Loan B, (c) Loan C,

(3) Borrower Security and Pledge Agreement, (4) Guarantor Pledge Agreement, (5)

Shareholder Pledge Agreement, (6) Guaranty by Bradonton, (7) Borrower control

COMPLAINT - 21

Agreement, (8) Guarantor control Agreement, (9) Amendment to Loan Documents were all created by Shearman & Sterling as counsel to HVB Structured Finance, Inc., and Bayerische Hypo- und Verinsbank, AG, NY Branch. HVB Structured Finance, Inc., and Bayerische Hypo- und Verinsbank, AG, NY Branch knew that each of these documents were intended to create the appearance of a loan which had no real substance.

75.    Peter Molyneux, Braxton Management, Inc., Bradonton Management, Inc., HVB Structured Finance, Inc., and Bayerische Hypo- und Verinsbank, AG, NY Branch knowingly, intentionally, and recklessly created the main transactional documents to create the appearance that the loan and investment activity referenced in the Coastal Trading Common Trust Fund Program Series III and Series IV Private Offering Memorandums had economic substance, but had no real substance.

76.    HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY Branch, Braxton Management, Inc., Peter Molyneux, Bradonton Management, Inc, MultiNational Strategies, LLC, Coastal Trading Michael Schwartz, and David Schwartz, Sidley Austin Brown & Wood and Defendant Rosenman & Colin, LLP knew that Malone would rely upon the legitimacy of the main transactional documents to make a determination that the representation in the Common Trust Fund Series II and III Offering memorandums that the loan was legitimate.

77.    The representations in the transactional documents that the loans issued in connection with the common trust fund by Peter Molyneux, Braxton Management Inc., Bradonton Management Inc., Defendants HVB Structured Finance, Inc., and Bayerische Hypo- und Verinsbank, AG, NY Branch were fraudulent misrepresentations committed with scienter because HVB admitted to prosecutors in New York that the loans in connection

COMPLAINT - 22

with the common trust fund were not bona fide loans and that the documents contained false representations concerning the purpose and design of the transactions.

78.    Defendants HVB-NY, HVB Finance and Katten and third parties Braxton Management, Inc., Peter Molyneux, Bradonton Management, Inc, MultiNational Strategies, LLC, Coastal Trading Michael Schwartz, and David Schwartz, Sidley Austin Brown & Wood, Enterprise Trust/Enterprise Bank, and Paul Vogel knew that Malone would rely upon the legitimacy of the main transactional documents for the representation in the Common Trust Fund Series II and III Offering memoranda that the loan was legitimate when he executed the ancillary transactional documents.

79.    Defendants HVB-NY, HVB Finance and Katten and third parties Braxton Management, Inc., Peter Molyneux, Bradonton Management, Inc, MultiNational Strategies, LLC, Coastal Trading Michael Schwartz, and David Schwartz, Sidley Austin Brown & Wood, Enterprise Trust/Enterprise Bank, and Paul Vogel committed Fraud in the preparation of the ancillary transactional documents, which included the $15,600,000 loan document between Braxton and Malone because they knew that the main transactional documents for the Common Trust Fund, which included (1) The loan agreement (HVB and Braxton), (2) Promissory Notes (a) Loan A, (b) Loan B, (c) Loan C, (3) Borrower Security and Pledge Agreement, (4) Guarantor Pledge Agreement, (5) Shareholder Pledge Agreement, (6) Guaranty by Bradonton, (7) Borrower control Agreement, (8)Guarantor control Agreement, (9) Amendment to Loan Documents, were created to contain false representations concerning the purpose and design of the transaction, namely to create the appearance of a loan which was not a bona fide loan.  HVB has admitted that the loans in

COMPLAINT - 23

1  connection with the common trust fund were not bona fide loans and that the documents

2  contained false representations concerning the purpose and design of the transactions.

3  **80.**    The Closing Checklist establishes that Defendants HVB-NY, HVB Finance

4  and Katten and third parties Braxton Management, Inc., Peter Molyneux, Bradonton

5  Management, Inc, MultiNational Strategies, LLC, Coastal Trading Michael Schwartz, and

6  David Schwartz, Sidley Austin Brown & Wood, Enterprise Trust/Enterprise Bank, and Paul

7  Vogel jointly contributed to the preparation and approval of the $15,600,000 loan agreement

8
9  between Malone and Braxton.

10  **81.**    The Closing Checklist and the representations in the Coastal Trading

11  Common Trust Fund Series III and Series IV Private Offering Memorandum establishes that

12  Defendants HVB-NY, HVB Finance and Katten and third parties Braxton Management,

13  Inc., Peter Molyneux, Bradonton Management, Inc, MultiNational Strategies, LLC, Coastal

14  Trading Michael Schwartz, and David Schwartz, Sidley Austin Brown & Wood, Enterprise

15
16  Trust/Enterprise Bank, and Paul Vogel collectively and fraudulently omitted to inform

17  Malone that the documents were created to falsely create the appearance of a loan which

18  was not a bona fide loan.

19  **82.**    On November 2, 2001, David Schwartz of Coastal Trading, LLC mailed to

20  Michael Malone at his address in Seattle, Washington the Coastal Trading Program

21  Common Trust Fund Document booklet for his review.  Exhibit 3. Defendants HVB-NY and

22  HVB Finance reached an agreement with Coastal Trading LLC whereby Coastal Trading

23
24  would act as an agent for HVB for the purpose of soliciting customers for the fraudulent

25  loan transactions. In his cover letter, David Schwartz stated,

26

COMPLAINT - 24

I have listed the different sections for you to make it easier for you to read and understand all the documents. Please sign and date the areas where I have left the please sign or please sign or date" tags. They are as follows:

Section 1 – the information in this section is for you to keep

- Coastal Trading Program Private Offering Memorandum Series III and Series IV
- Plan of Trust of the coastal Trading Common Trust Fund Series III and Series IV
- Summary of confidential Private Offering of the Warrants Linked to the Performance of the Wimbledon Multi Strategy Fund

Section 2 – Enterprise Trust Documents

- Solicitation Letter to Enterprise Trust (please Sign where indicated)
- Investors Allocation Letter to Enterprise Bank (please sign on page 2 where indicated)
- Plan of Trust of the Coastal Trading Common Trust fund – Please see section 1
- Revocable Trust Agreement (Please sign cover page where indicated) and (Please Sign Page 6 where indicated)

Section 3 – Assignment Documents

- Investors Assignment document to S Corporation (Please SIGN where indicated on page 1 and Two Times on Page 2)
- S Corporation Assignment Document to Revocable Trust Agreement (Please sign cover page where indicated) and (Please Sign Page 6 where indicated on page 1 and page 2

Section 4 – Coastal Trading Documents

- Coastal Trading Private Offering Memorandum – Please see Section 1
- Coastal Trading Subscription Document – Please review and make sure all information is correct. (Please Sign page D-6 and Sign and Date page D-15).
- Coastal Trading Non-Confidentiality Letter – Please Sign where indicated
- IRS Form 2553 Election by a Small Business corporation (Please SIGN and DATE 2 Times as indicated)
- Unanimous Written Consent of the Sole Director of Belmar Trading, Inc. (Please SIGN where indicated on Page 3).

Section 5 – Braxton Documents

- Braxton Recourse Loan Document (Please sign page 14 where indicated)
- Braxton Drawdown Notice (please Sign where indicated)

- Braxton Secured Promissory Note (Please SIGN where indicated)
- Braxton Pledge Agreement (Please SIGN where indicated on Page 13)Revocable Trust Agreement (Please sign cover page where indicated) and (Please Sign Page 6 where indicated)

Section 6 – Other Financing Documents

- Recourse Loan Agreement – Investor to S Corporation (Please SIGN page 15, Two Times as indicated)
- Drawdown Notice (please Sign where indicated)
- Secured Promissory Note (Please SIGN where indicated)
- S Corporation Pledge Document (Please SIGN 2 times as indicated on Page 12)
- Recourse Loan Agreement – S Corporation to Grantor Trust (Please SING page 15, 2 times as indicated)
- Drawdown Notice (please Sign where indicated)
- Secured Promissory Note (please Sign where indicated)

Section 7 – This Section is for Hypo Vereinsbank – This Section contains the necessary documents for opening your three accounts.  (Individual Account, S corporation Account, and Trust Account)Braxton Documents

- Signature Cards (two cards) (Please SIGN and DATE both cards where indicated)
- Customer's Agreement (six signature pages)  Please SIGN all six pages where indicated
- Form W-9 (three copies) Please SIGN and DATE where indicated
- Account opening Request Form – Review information and verify it is correct.
- Hypo Vereinsbank Representation Letter (Please SIGN where indicated)
- Stock Power Executed in Blank (Please SIGN where indicated in the Presence of another person and have that person Sign and Print their name in the space provided)
- Balance Sheet (Please SIGN and DATE the enclosed Balance Sheet and Please answer the questions on Page 2)

83.    The Documents were mailed to Michael Malone by Coastal Trading LLC on November 2, 2001 on behalf of and pursuant to the agreement and common scheme of the other members of a joint venture conspiracy, which consisted of Defendants HVB-NY, HVB Finance and Katten and third parties Braxton Management, Inc., Peter Molyneux, Bradonton Management, Inc, MultiNational Strategies, LLC, Coastal Trading Michael

COMPLAINT - 26

Schwartz, and David Schwartz, Sidley Austin Brown & Wood, Enterprise Trust/Enterprise Bank, and Paul Vogel.

84.    The Documents mailed to Michael Malone by Coastal Trading LLC on November 2, 2001 were developed jointly by Defendants HVB-NY, HVB Finance and Katten and third parties Braxton Management, Inc., Peter Molyneux, Bradonton Management, Inc, MultiNational Strategies, LLC, Coastal Trading Michael Schwartz, and David Schwartz, Sidley Austin Brown & Wood, Enterprise Trust/Enterprise Bank, and Paul Vogel.

85.    As one of the parties responsible for these "ancillary transaction documents" to the investors, Defendant Katten breached its fiduciary duty to Malone by making intentional, knowing, and reckless misrepresentations of material facts in the above-described documents.

86.    Defendant Katten intended for the "ancillary transaction documents" to contain material misrepresentations to be made to Plaintiffs, and for Plaintiffs to rely upon these misrepresentations.

87.    Defendant Katten committed fraud in the preparation of the $15.6 million loan document because Defendant Katten knew that the main transactional documents for the CTF Scheme were created to contain false representations concerning the purpose and design of the transaction, namely to create the appearance of a legitimate loan, when in fact that loan was a sham.

88.    Defendant Katten prepared the $15.6 million loan agreement between Plaintiffs and Braxton and fraudulently omitted to inform Plaintiffs that the documents were created to create the appearance of a loan which was not a bona fide loan.

COMPLAINT - 27

**89.** Defendant Katten fraudulently and intentionally obtained fees from Plaintiffs through their co-conspirators.

**Breach of Written Contract**

**90.** The documents mailed to Michael Malone by Coastal Trading LLC on November 2, 2001 were intentionally designed by Defendants HVB-NY, HVB Finance and Katten and third parties Braxton Management, Inc., Peter Molyneux, Bradonton Management, Inc, MultiNational Strategies, LLC, Coastal Trading Michael Schwartz, and David Schwartz, Sidley Austin Brown & Wood, Enterprise Trust/Enterprise Bank, and Paul Vogel to create the appearance of loan financing and investment activity which had no real economic substance. The loans were not bona fide loans. The documentation contained false representations concerning the purpose and design of the transactions.

**91.** On information and belief, at some time after the documents were mailed to Michael Malone by Coastal Trading LLC on November 2, 2001, they were signed by Malone and Malone paid for the investment, Defendants HVB and Katten and other members of the joint venture conspiracy were paid transactional fees or received an economic benefit from the Malone payment pursuant to an agreement, common scheme or joint venture conspiracy.

**92.** On November 1, 2001, HVB-NY mailed a contract to Malone's address at Seattle, Washington. (Exhibit 3, p. 4) The written contract states:

Dear Mr. Malone:

We understand that you may participate in an investment strategy (the "Transaction") proposed and organized by MultiNational Strategies LLC. As part of the Transaction, Braxton Management, Inc. ("Braxton") will borrow funds from HVB Structured Finance, Inc. pursuant to a loan agreement (the "HVB LOAN"). As a further part of the Transaction, Braxton will then on lend the proceeds from the

COMPLAINT - 28

HVB Loan to you (the "Individual Loan"), and it is understood that you will invest the proceeds of the Individual Loan in a corporation wholly owned by you, as agreed with Braxton.

Please indicate your agreement to the above by countersigning and returning to us a copy of this letter, which shall be governed by, and construed in accordance with, the internal laws of the State of New York.

Very truly yours,
Bayerische Hypo-und VereinsBank AG.

**93.** Malone signed the Agreement referenced in the preceding paragraph not knowing that the representation that the transaction proposed by Multinational Strategies, that Braxton would borrow funds from HVB Structured Finance and would then lend the proceeds to Malone, was a fraudulent representation. The HVB Defendants concealed from Malone the fact that they did not intend to make a bona fide loan. HVB only intended to create the appearance that there was a legitimate loan in place as part of the Common Trust fund Investment Program and to fraudulently charge loan origination fees and interest for a loan without economic substance.

**94.** In addition to signing the contract with HVB, Malone responded with a letter addressed to Hypo Vereinsbank, 150 East 42nd Street, New York, NY  10017 which stated:

Dear Sirs:

I have entered into this specific transaction in an effort to realize earnings over an extended period of years.  In anticipate some capital appreciation over the life of the investment and feel this investment includes the proper relationship of risk and reward that fit my personality.

Very truly yours,

Michael Malone

(Exhibit 3, p.4)

95. On or about November 1, 2001, Malone entered into a CUSTOMER AGREEMENT with Bayerische Hypo-und Vereinsbank AG, 150 East 42nd Street New York, NY. (Exhibit 3, p. 5). The agreement states:

> These Terms and Conditions apply to all type$^5$ of accounts and deposits with the New York Branch of HVB. The relevant branch is referred to herein as the "Bank," "we," "HVB" or "us." The Bank will maintain one or more accounts (an "Account" or "Accounts") for you and will credit and debit your Accounts in accordance with the procedures described in these Terms and Conditions.
>
> These Terms and Conditions, together with all applicable laws, customs and practices, govern the relationship between you and HVB.

96. HVB breached its contract to maintain Malone's accounts in accordance with applicable laws, customs, and practices of the banking industry. Rather than lending funds to Braxton Management Inc, which would in turn be lent to Malone as promised, HVB merely created false paperwork to document a loan transaction which had no real substance. HVB omitted to inform Malone that the loan was not a bona fide loan. This omission was a material omission because Malone would not have entered into a loan agreement with Braxton if he had known that the HVB loan to Braxton was a sham.

97. In reliance upon the November 1, 2001 HVB contract to provide a legitimate loan to Braxton which would in turn be loaned to Malone, (Exhibit 3, p. 4), Malone entered into a loan agreement dated as of December 3, 2001 with Braxton Management, Inc.

98. In the loan agreement dated as of December 3, 2001 with Braxton Management, Inc., Braxton agreed to establish a credit Facility in the amount of $15,600,000 for the purpose of providing the financing requested by Malone. (Exhibit 3) Malone would not have entered into this loan agreement but for the failure of HVB-NY to inform Malone and the concealment from Malone that the loan to Braxton was not a bona

COMPLAINT - 30

fide loan. As a result of entering into the Braxton loan agreement, Malone incurred

HVB/Braxton loan origination fees of $195,000.

99.     In reliance upon the November 1, 2001 Bayerische Hypo-und Vereinsbank

AG, NY Branch contract to provide a legitimate loan in the amount of $15,600,000 to

Braxton, which would in turn be lent to Malone, Malone also entered into a Subscription

Agreements to invest $1,700,000 in the Coastal Trading Common Trust Fund Series III and

the Coastal Trading Common Trust Fund Series IV investments. (Exhibit 3)

100.     Malone's reliance upon HVB's contract as a basis for investing in the Coastal

Trading Common Trust Fund Program Series III and Series IV investment programs was

foreseeable by Defendants HVB-NY, HVB Finance and Katten and other third-party

members of the conspiracy because the loan was promoted as an integral part of the Coastal

Trading Common Trust Fund Program Series III and Series IV Private Offering

Memorandums. The Coastal Trading Common Trust Fund Program Series III and Series

Private Offering Memoranda contained representation regarding the Braxton loan:

> Each Investor may elect to borrow funds (the "Loan") from Braxton Management,
> Inc. (the "Lender"), the sole owner of which (Peter Molyneux) also is a principal of
> Deerhurst and its affiliate, NorthBridge Capital Management, Inc ("Northbridge"), of
> up to an amount agreed upon between the Investor and the Lender (the "Loan
> Amount") in connection with the Investor's participation in the Program (subject to
> appropriate credit checks by the Lender)(the form of Loan and Pledge Agreement is
> attached as Exhibit B).

101.     Defendants HVB-NY, HVB Finance and Katten and other third-party

members of the conspiracy had knowledge and intended that this misrepresentation about

the legitimacy of the Braxton loan, which was contained in the Coastal Trading Common

Trust Fund Program Series III and Series Private Offering Memoranda, would reach

prospective investors because they participated in the creation and review of the

COMPLAINT - 31

CommonTrust Fund transactional documents before any document was sent to a prospective borrower or investor.

102.    Defendants HVB-NY and HVB Finance breached their contractual duties to act in good faith. Defendants HVB-NY, HVB Finance and Katten participated in creating documentation in connection with the Common Trust Fund that contained false representations concerning the purpose and design of the Common Trust Fund Transactions. Defendants HVB-NY, HVB Finance and Katten reviewed and approved all of the transactional documents which were created for the Common Trust Fund Series III and Series IV Private Offering, but fraudulently omitted to disclose that the loans to Braxton were not bona fide loans.

103.    As a result of Defendants HVB-NY, HVB Finance and Katten's failure to disclose that the loan was a sham, Malone entered into a loan agreement with Braxton Management Inc for a $15,600,000 credit facility and entered into a Subscription Agreements to invest $1,700,000 in the Coastal Trading Common Trust Fund Series III and the Coastal Trading Common Trust Fund Series IV investments. Malone would not have invested $1,700,000 if Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy had correctly represented that the loan did not have economic substance.

104.    Based upon information and belief, Defendants HVB-NY and HVB Finance and Braxton Management, Inc., Peter Molyneux, Bradonton Management, Inc, Multinational Strategies, LLC, Coastal Trading Michael Schwartz, and David Schwartz, and Enterprise Trust/Enterprise Bank, and Paul Vogel also charged Malone management fees for the management of a loan which did not exist.

COMPLAINT - 32

**105.** Malone suffered damages because HVB charged an HVB/Braxton loan origination fee of $195,000 from a loan which was not a bona fide loan. In addition, Malone lost $850,119 on his investment in the common trust fund due to the misrepresentations by Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy about the nature of the loan. Malone also suffered damages in the form of lost income which could have been earned form investment of $850,119 in other investment opportunities since November, 2001 and attorney fees to recover his investment, in amounts to be determined at trial.

**106.** Malone would not have entered into the Coastal Trading Common Trust Fund Program Series III and Series IV Subscription Agreements but for the failure of Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy to inform Malone that the loan to Braxton was not a bona fide loan.

**The Role of MultiNational Strategies, Michael Schwartz, and David Schwartz**

**107.** In 2001, HVB Structured Finance, Inc., through its employees Domenick De Giorgio, Alexandre Nouvakhov, Richard Pankuch, and Sylvie Demetrio reached an agreement with MultiNational Strategies LLC to provide an economic benefit to MultiNational Strategies LLC in exchange for MultiNational Strategies LLC's agreement to (1) assist HVB to market and promote the HVB loan by making false representations about the loan, (2) to make false representations to investors about the economic nature of the loan in the Coastal Trading Common Trust Fund Series III and Series IV Private Offering Memorandum , (3) to produce false documentation for the purpose of concealing for the term of the loan that the loans which were issued in connection with the Coastal Trading Common Trust Fund Investment Program were not bona fide loans.

COMPLAINT - 33

**108.** Based on information and belief, HVB Structured Finance Inc., offered an agreement to MultiNational Strategies LLC's to become an agent and a broker for HVB Structured Finance Inc, and Coastal Trading accepted that agreement. Based on information and belief, MultiNational Strategies LLC was also authorized to offer finder's fees to other brokers and agents. HVB Structured Finance Inc. authorized MultiNational Strategies LLC's to make false representations about the economic substance of the loans issued in connection with the Coastal Trading Common Trust Fund Series III and Series IV Private Offering Memorandums.

**109.** MultiNational Strategies, LLC's, role was to create false and misleading documentation in connection with the Common Trust Fund Program Series III and Series IV which would assist in closing the investment transaction. The role of MultiNational Strategies, LLC, was also to provide false representations to agents and intermediaries in Washington state to help the agents to earn a fee for persuading clients to invest in the Coastal Trading Common Trust Fund Program Series III and Series IV investment program.

**110.** Among other things, the MultiNational Strategies defendants promoted the CTF transaction, solicited Malone's investment in the Fund. Coastal, an affiliate of MultiNational Strategies, designed, implemented, and executed the CTF transaction, collected fees in connection with the CTF transaction, and also rendered monthly reports on the CTF Fund and related tax issues. A MultiNational Strategies, employee, David Schwartz, was named Secretary of Malone's subchapter S corporation, Belmar Trading, and was the day-to-day administrative contact at Coastal and MultiNational Strategies for Malone. The precise nature and extent of the fees obtained by these defendants is not known

COMPLAINT - 34

to Malone but include at least the direct fees charged by Coastal as well as these defendants' share of certain other fees including those paid to one or more of the Deerhurst entities.

111.   The Closing Checklist states that MultiNational Strategies, LLC and Rosenman & Colin, LLP, were responsible for the following  so-called "ancillary transactional documents" for the Coastal Trading Common Trust Fund Program: (1) the loan document between Braxton an Investor, (2) the Pledge Agreement between Investor and Braxton (S corp stock and interest/rights of II loan to S corp), (3) documentation of Investment in S Corp on or before closing date, (4) Loan Agreement between II and S Corp, (5) Pledge Agreement between S corp and II, (6) loan agreement between S corp. and Grantor Trust, (7) Documentation of Investment by S corporation and Grantor Trust, (8) Pledge agreement between Grantor Trust and S corp, (9) Documentation of Grantor Trust investment in common Trust Fund ($[   ] million) and receipt by Grantor Trust of commensurate interest in Common Trust Fund, (10) Structured notes between common Trust Fund and Bradonton, (11) $[   ] million Investment by Common Trust Fund in Investor LLC.

112.   As the parties responsible for these "ancillary transaction documents" to the investors, MultiNational Strategies, LLC, along with and Rosenman & Colin, LLP, made intentional, knowing, and reckless misrepresentations of material facts in the above-described documents.   MultiNational Strategies, LLC, directly or through its agents, intended for these misrepresentations to be made to Malone.  Plaintiff Malone relied upon those representations, without which he would not have entered into the transactions described therein.

COMPLAINT - 35

113.    For example, the Closing Checklist lists the loan document between lender Braxton Management, Inc., and borrower Michael Malone (Belmar Trading Inc.) as an ancillary transactional document.  The Closing Checklist states that the responsible parties for this document are MultiNational Strategies, LLC and Rosenman & Colin LLP, and that the status of this document is that the signature pages were executed from Mike Malone and Braxton Management, Inc.  Since Peter Molyneux was the sole shareholder of Braxton Management Inc., Peter Molyneux executed this document on behalf of Braxton Management, Inc.

114.    The signed loan agreement dated as of December 3, 2001, between Plaintiff Malone as borrower and Braxton Management, Inc., as lender (for which MultiNational Strategies, LLC, and Rosenman & Colin, LLP were responsible) warrants and represents that Braxton Management, Inc., agreed to establish a credit facility in Malone's favor in the amount of $15,600,000. This loan, however, was not a bona fide loan.  Examples in the loan agreement between Plaintiff Malone and Braxton Management, Inc., (for which MultiNational Strategies, LLC, and Rosenman & Colin, LLP were responsible) of references that falsely portrayed the loan as legitimate, when it was in fact a sham, include the following :

115.    Under Section 2.1 describing the loan, the loan document states that "Upon the terms and subject to the conditions of this Agreement, Braxton shall make the Loan available to Borrower [Malone] on the Drawdown Date in an aggregate principle amount not to exceed the Facility Amount [of $15,600,000]."  This representation omitted that the material fact that the loan was a sham, and misrepresented the loan as legitimate.

COMPLAINT - 36

- Under Section 2.3 describing the loan note, the loan document states that "The Loan shall be evidenced by the Note dated on the Drawdown Date, and which shall mature on the Repayment Date or upon acceleration of the Loan in accordance with Section 7 and 10 hereof." This representation omitted that the loan was a sham, and misrepresented the loan as legitimate.

- Concurrently with the above-referenced loan document, Plaintiff Malone agreed to sign a Pledge Agreement granting Braxton a security interest in 100% of his shares in Belmar Trading, Inc., and certain other collateral as further described in the Borrower Pledge Agreement as collateral for the loan. This pledge agreement was based upon a loan documents which misrepresented that there was a bona fide economic loan.

- On February 10, 2003, an addendum to the loan agreement between Plaintiff Malone and Braxton Management, Inc., was executed, stating that "Notwithstanding anything to the contrary herein, the obligation under each Loan Document shall be non-recourse." This representation omitted that the loan was a sham, and misrepresented the loan as legitimate.

116.    These misrepresentations regarding the sham loan were perpetuated throughout the series of execution documents for which MultiNational Strategies, LLC, and Rosenman & Collin, LLP, were responsible, including the following:

- A loan agreement between Belmar Trading, Inc., as borrower and Plaintiff Malone as lender executed December 3, 2001, states: "Upon the terms and subject to the conditions of this Agreement, the Lender shall make the Loan available to Borrower on the Drawdown Date in an aggregate principle amount not to exceed the Facility

COMPLAINT - 37

Amount [of $15,600,000]." This representation omitted that the material fact that the loan was a sham, and misrepresented the loan as legitimate.

- Concurrently with loan document between Belmar Trading Inc and Plaintiff Malone, Belmar Trading, Inc., granted Plaintiff Malone a security interest in its interest as a grantor under a Revocable Trust Agreement set up by Enterprise Trust, a division of Enterprise Bank, and certain other collateral as further described in the Borrower Pledge Agreement as collateral for the loan. This pledge agreement was based upon a loan documents which misrepresented that there was a bona fide economic loan.

- Concurrently with loan document between Belmar Trading Inc and Plaintiff Malone, Plaintiff Malone assigned its account at Deerhurst Management Co., Inc., over to Belmar Trading, Inc., with Andrew Krieger signing off on this assignment as chairman of Deerhurst Management Co., Inc. This pledge agreement was based upon a loan documents which misrepresented that there was a bona fide economic loan.

- A loan agreement between Belmar Investment Trust as borrower and Belmar Trading, Inc., as lender executed December 3, 2001, states: "Upon the terms and subject to the conditions of this Agreement, the Lender shall make the Loan available to Borrower on the Drawdown Date in an aggregate principle amount not to exceed the Facility Amount [of $15,600,000]." This representation omitted that the material fact that the loan was a sham, and misrepresented the loan as legitimate.

- Concurrently with loan document between Belmar Investment Trust and Belmar Trading Inc, Belmar Investment Trust granted Belmar Trading, Inc., a security interest its share of the Coastal Trading Common Trust Fund trust set up by

COMPLAINT - 38

Enterprise Trust, a division of Enterprise Bank, and certain other collateral as further described in the Borrower Pledge Agreement as collateral for the loan. This pledge agreement was based upon a loan documents which misrepresented that there was a bona fide economic loan.

- Concurrently with loan document between Belmar Investment Trust and Belmar Trading Inc, Belmar Trading, Inc., assigned its account at Deerhurst Management Co., Inc., over to Belmar Investment Trust, with Andrew Krieger signing off on this assignment as chairman of Deerhurst Management Co., Inc. This pledge agreement was based upon a loan documents which misrepresented that there was a bona fide economic loan.

117.   MultiNational Strategies, LLC, committed fraud in the preparation of the $15,600,000 loan document because MultiNational Strategies, LLC, knew that the main transactional documents for the Common Trust Fund were created to contain false representations concerning the purpose and design of the transaction, namely to create the appearance of a legitimate loan, when in fact that loan was a sham. These documents include: The loan agreement between HVB and Braxton, Promissory Notes A, B, and C, and other documents referenced in the Closing Checklist.

118.   MultiNational Strategies, LLC, prepared the $15.6 million loan agreement between Malone and Braxton and fraudulently omitted to inform Malone that the documents were created to create the appearance of a loan which was not a bona fide loan. Malone relied upon the validity of the $15.6 million loan transactional document when he entered into the loan agreement.

COMPLAINT - 39

119.    From September to November of 2001, MultiNational Strategies, LLC, Michael Schwartz, and David Schwartz solicited Ahrens & DeAngeli, PLLC, through its partner Edward Ahrens and Clark Nuber through its employees Tom Sedlock and Jim Dubeck to identify high net worth individuals to invest in the Coastal Trading Common Trust Fund Investment Program in Washington State.

120.    MultiNational Strategies, LLC, Michael Schwartz, and David Schwartz offered Ahrens & DeAngeli, PLLC , Edward Ahrens, Clark Nuber, Sedlock, and Dubeck an economic benefit if they could persuade Plaintiff Malone to invest in the Coastal Trading Common Trust Fund.   On information and belief, Ahrens & DeAngeli, PLLC, Edward Ahrens Clark Nuber, Sedlock, and Dubeck accepted that offer.

121.    MultiNational Strategies, LLC, Michael Schwartz, and David Schwartz with Ahrens & DeAngeli, PLLC, and Edward Ahrens lobbied Clark Nuber to be the primary spokesperson to Malone in connection with the promotion and sale of the Coastal Trading Common Trust Fund Tom Series III and Series IV investment programs.   Based upon information and belief, Clark Nuber, Sedlock, and Dubeck not only accepted the offer to receive an economic benefit, but also agreed to become the primary spokespersons to Malone in connection with the promotion and sale of the Coastal Trading Common Trust Fund Series III and Series IV investment programs.   As the primary spokesperson, Clark Nuber, Sedlock, and Dubeck became as an agent for MultiNational Strategies, LLC, Michael Schwartz, and David Schwartz while purporting to represent Malone as a fiduciary.

122.    Multinational Strategies LLC, Michael Schwartz, and David Schwartz directed their actions at Plaintiff Malone in Washington State by soliciting Clark Nuber, Sedlock, and Dubeck to act in the role of a dual agency because they knew that Clark Nuber,

COMPLAINT - 40

Sedlock, and Dubeck also represented Plaintiff Malone and would be influential in persuading Malone to invest in the Coastal Trading Common Trust Fund Program Series III and Series IV as an investment in a security. Multinational Strategies LLC, Michael Schwartz, and David Schwartz used Clark Nuber, Sedlock and Dubeck as their agents, intermediary, and spokespersons, and they acted with the intent and knowledge that their actions would be directed into Washington State and that their actions would be directed toward Plaintiff Malone in Washington State. Clark Nuber, Sedlock and Dubeck accepted the role as a dual agent and did not disclose its role as a dual agent to Malone.

123.   For example, David Schwartz of MultiNational Strategies, LLC, sent an email to Jim Dubeck of Clark Nuber on October 24, 2001, with promotional material and transactional documents for the Coastal Trading Common Trust Fund Program that was intended to be reviewed and forwarded by Clark Nuber to Plaintiff Malone. This email contained "all documents for the Coastal Trading Common Trust Fund Program." Furthermore, this email discussed the critical "Assumption of Risk issue," which was essential to Plaintiff Malone's participation in the program and the tax deductions that would purportedly result from the program. Regarding the assumption of risk, David Schwartz of MultiNational Strategies indicated to Jim Dubeck of Clark Nuber that "we don't have anything drafted yet, but when your client decides that he wants to go forward with this transaction we will then draft up a document to meet his desire. Dubeck's "client" as referenced by David Schwartz is Plaintiff Malone. Dubeck of Clark Nuber then sent these documents to Sedlock of Clark Nuber the same day, noting that "Attached is the blue print tax shelter execution documents." MultiNational Strategies, LLC, used Clark Nuber,

COMPLAINT - 41

Sedlock, and Dubeck as agents by which MultiNational strategies, LLC, solicited and conducted business with Plaintiff Malone.

124.   MultiNational Strategies, LLC, Michael Schwartz, and David Schwartz further directed their actions to Washington State by representing through Clark Nuber that they would be responsible for reducing Malone's risk of loss in the event that Malone were to invest in the Coastal Trading Common Trust Fund Program Series III and Series IV investment programs.   MultiNational Strategies, LLC, Michael Schwartz, and David Schwartz instructed and conferred with Clark Nuber, Sedlock, and Dubeck regarding material misrepresentations that would later be contained in a memorandum sent to Plaintiff Malone.  In the memorandum dated October 31, 2001, which was prepared by Clark Nuber, Sedlock, and Dubeck as agent for Defendants HVB-NY and HVB Finance, MultiNational Strategies, LLC, Michael Schwartz, and David Schwartz, the following fraudulent representations were made as to MultiNational Strategies, LLC's role in reducing Malone's risk if he were to invest in the Coastal Trading Common Trust fund Program:

> MultiNational Strategies, LLC (MNS) has indicated they have made an arrangement to provide "insurance" for 95% of the recourse debt for the anticipated six-month period of time until you file your 2001 tax return (presumable by June 2002). The "insurance" premium payment is approximately $14,000. In the event of default, the lender has the right of set-off to the pledged assets (Deerhurst account) before requesting payment from you.
> MSN indicated that they will provide all tax reporting information by March to facilitate the conversion of the debt to nonrecourse.  There is no assurance that the tax reporting information will be received at that time.
>
> MNS indicates that the recourse loan can be converted to non-recourse in six months or at the time you file your tax return, whichever is later.  You have no contractual right, but MNS has assured us that a conversation will occur.  MNS has yet to provide details on the transaction.  The conversion may result in additional loan fee charges.

COMPLAINT - 42

MNS had indicated that certain losses from straddles and strangles will be allocated to you in 2001. There is no contractual right; it is assumed the loss will be allocated to your.

MNS has represented that the hedge funds utilized have very high rates of return. The purpose of the memorandum was to persuade Malone to invest in the Coastal Trading Common Trust Fund Private Offering Memorandum for both the Series III and Series IV private offering. The memorandum was mailed to Malone at his address in Seattle, Washington by Clark Nuber acting as agent on behalf of MultiNational Strategies, LLC. The memorandum contained the representations from MultiNational Strategies, LLC, Michael Schwartz, and David Schwartz which they knew were material and false. MultiNational Strategies, LLC, Michael Schwartz, and David Schwartz directed and intended for these material misrepresentations to reach Plaintiff Malone in Washington through its agents Clark Nuber, Sedlock, and Dubeck. Malone relied on these material misrepresentations, and would not have invested in the common trust fund if he had known that these misrepresentations were false. These false assertions were used to persuade Malone to invest $1,712,500 in the Coastal Trading Common Trust Fund Series III and Series IV investment program.

125.    The drafting of this addendum to the loan agreement executed on February 10, 2003, also further shows the intermediary relationship played by Clark Nuber on behalf of all parties involved in this transaction, including MultiNational Strategies, LLC, and how MultiNational Strategies, LLC, David Schwartz, and Michael Schwartz directed their activities towards Plaintiff Malone in Washington. This addendum was initiated by Sedlock at Clark Nuber acting as an intermediary between all parties involved. Sedlock billed Plaintiff Malone in December 2002 for initiating discussions with representatives from

COMPLAINT - 43

Coastal Trading regarding the addendum. On February 25, 2003, Dubeck of Clark Nuber indicated to Plaintiff Malone's asset manager Jody Sherman that he had spoken "with David Schwartz at Multi-national Strategies. David followed up on our non-recourse financing documentation. You should receive a Fed-X package tomorrow from [sic] Deerhurst with all the required documents to convert the loan to non-recourse." Pursuant to his conversations with Sedlock and Dubeck at Clark Nuber, David Schwartz sent Peter Molyneux the addendum, instructing him to sign it on behalf of Braxton Management, Inc., and then forward it on to Plaintiff Malone. Peter Molyneux forwarded the document to Plaintiff Malone at his address in Washington.

126. MultiNational Strategies, LLC, continued to make fraudulent representations directly until at least February 24, 2005. On February 24, 2005, Michael Schwartz sent a letter to Plaintiff Malone at his address in Washington regarding an Schedule K-1 (IRS Form 1120S) for 2004 from MultiNational Strategies, LLC. The enclosed Schedule K-1 was prepared by MultiNational Strategies, contains fraudulent misrepresentations, such references to a "Common Trust Fund Investment" of $15,566,324 at the end of the tax year on Form 1120S, Schedule L, Line 14. This IRS form was prepared by MultiNational Strategies, LLC, and indicated to Plaintiff Malone his "loan" was still in place, when in fact the loan was a sham.

### The Role of Coastal Trading, LLC, Michael Schwartz, and David Schwartz

127. In 2001, HVB Structured Finance, Inc., through its employees Domenick De Giorgio, Alexandre Nouvakhov, Richard Pankuch, and Sylvie Demetrio reached an agreement with Coastal Trading LLC in exchange for Coastal Trading LLC agreement to provide an economic benefit to Coastal Trading LLC in exchange for Coastal Trading

COMPLAINT - 44

LLC's agreement to (1) assist HVB to market and promote the HVB loan by making false representations about the loan, (2) to make false representations to investors about the economic nature of the loan in the Coastal Trading Common Trust Fund Series III and Series IV Private Offering Memorandum , (3) to produce false documentation for the purpose of concealing for the term of the loan that the loans which were issued in connection with the Coastal Trading Common Trust Fund Investment Program were not bona fide loans.

128.   Based on information and belief, HVB Structured Finance Inc., offered an agreement to Coastal Trading LLC to become an agent and a broker for HVB Structured Finance Inc, and Coastal Trading accepted that agreement.  HVB Structured Finance Inc., knew and authorized Coastal Trading LLC to make false representations about the economic substance of the loans issued in connection with the Coastal Trading Common Trust Fund Series III and Series IV Private Offering Memorandums.

129.   On behalf of HVB Structured Finance Inc., Coastal Trading LLC agreed to become the asset allocator to the Coastal Trading Common Trust Fund investment program. In that capacity, Coastal Trading LLC agreed to be responsible to (1) monitor the trading activities of Deerhurst, NorthBridge, and the Wimbledon Fund, advise the Trustee on the allocation and reallocation of the Assets (including Deerhurst and NorthBridge), and recommend to the Trustee the appropriate level of leverage for the Trust Fund, and (2) assisting Enterprise Trust in reconciling the net asset value of the Trust Fund's trading accounts, preparing monthly account statements, and providing any additional information to the Trustee (Enterprise Trust) with respect to the Trust Fund's investment and trading

activities, which would include the preparation of monthly account statements which would falsely represent that the HVB loan was a bona fide loan.

130.    Coastal Trading LLC agreed to act as an agent and a broker for HVB Structured Finance Inc.  As a result of its agreement as an agent and broker with HVB Structured Finance Inc., Coastal Trading LLC was responsible for the delivery of both the Coastal Trading Common Trust Fund Program Series III and Series IV Private Offering Memorandum and the HVB Financing Documents to Malone in Washington State.

## Breach of Contract of Coastal Trading, LLC

131.    Coastal Trading, LLC, Michael Schwartz, and David Schwartz breached the Coastal Trading Program Private Offering Memorandum Series III and Series IV.  This Memorandum was sent to Plaintiff Malone on in Washington State on November 2, 2001, by David Schwartz of Coastal Trading, LLC, who was acting in his corporate and individual capacity, and also acting on behalf of the other conspirators of the Common Trust Fund, including Enterprise Financial Services, a Division of Enterprise Bank, Sedlock, Dubeck, HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY Branch, Braxton Management, Inc., Peter Molyneux, , Bradonton Management, Inc, Multinational Strategies, LLC, Coastal Trading Common Trust.  The Coastal Trading Program Private Offering Memorandum Series III and Series IV set forth

> the structure, investment objectives, and investment strategies to be pursued […], certain risks, other than the tax and tax-related risks, associated with the purchase of investments in and by the Program (the "Investments"), and the terms on which such purchase may be made and other pertinent information.

These Private Offerings were made pursuant to a Subscription Agreement sent to Plaintiff Malone in Washington State on October 29, 2001, by Michael Schwartz of Coastal Trading, LLC, which was subsequently signed and returned by Plaintiff Malone.

COMPLAINT - 46

132.    Coastal Trading, LLC, contracted with Plaintiff Malone to supervise the Trust Fund. Specifically, in the Coastal Trading Program Private Offering Memorandum Series III and Series IV, Coastal Trading, LLC, agreed to be

> the asset allocator to the Trust Fund. In that capacity, it will monitor the trading activities of Deerhurst and NorthBridge, and supervise the purchase of the Warrant, advise the Trustee on the allocation and reallocation of the Assets (including among Deerhurst, NorthBridge and the Warrant), and recommend to the Trustee the appropriate level of leverage for the Trust Fund.

Implied in this provision of the contract is that these services will be performed in good faith and with fair dealing.

133.    However, Coastal Trading, LLC, breached its contract to supervise the Trust Fund in good faith by failing to reveal to Plaintiff Malone that the entities under its supervision were not in fact managing a loan of over $15 million, as purported.

Coastal Trading, LLC, also agreed to help Enterprise Trust calculate the value of the assets under management and to prepare statements reflecting that value. Specifically, in the Coastal Trading Program Private Offering Memorandum Series III and Series IV, Coastal Trading, LLC stated that:

> Coastal will assist Enterprise Trust in reconciling the net asset value of the Trust Fund's trading accounts, preparing monthly account statements, and providing any additional information to the trustee with respect to the Trust Fund's investment and trading activities.

Implied in this provision of the contract is that these services will be performed in good faith and with fair dealing.Test

134.    However, Coastal Trading, LLC, breached their contract to help Enterprise Trust calculate the value of the Trust Fund's assets and prepare monthly statements in good faith by helping Enterprise Trust calculating a false value for a loan that was a sham and helping Enterprise Trust prepare and deliver statements that reflected that false value.

COMPLAINT - 47

**135.** Coastal Trading, LLC, received compensation under the in the Coastal Trading Program Private Offering Memorandum Series III and Series IV, Coastal Trading, LLC, which stated that Coastal Trading, LLC, will receive "a "Coastal also will share in the fees received by Deerhurst, NorthBridge and the Lender."

**136.** Because Coastal Trading, LLC, breached each provision of this contract, as alleged above, Coastal Trading, LLC, was unjustly enriched, Plaintiff Malone is entitled to recover any fees paid for those services, and for other damages as alleged more fully below.

**137.** Coastal Trading LLC made fraudulent representations in the Coastal Trading Common Trust Fund Program Series III and Series IV Private Offering Memorandums and to provided falsified account statements to support the those representations. Examples of such fraudulent representations contained include:

- David Schwartz of Coastal Trading, LLC, delivered Copy # 026 of the Coastal Trading Common Trust Fund Program Series III and Series IV Private Offering Memorandums dated September 4, 2001, to Tom Sedlock of Clark Nuber in Washington State, who received these documents on or about September or October of 2001. David Schwartz of Coastal Trading, LLC, also delivered Copy # 040 of these same documents dated October 16, 2001, to Plaintiff Malone on November 2, 2001, to his address in Washington. Enterprise Bank is listed as Trustee of the Coastal Trading Common Trust Fund Program Series III and Series IV Private Offering Memorandums.

- Coastal Trading, LLC, David Schwartz, and Michael Schwartz made fraudulent representations in the Coastal Trading Common Trust Fund Program Series III and Series IV Private Offering Memorandums, including the following representations:

COMPLAINT - 48

- Under the section describing "The Corporation and the Revocable Trust," the documents states that,

> Each Investor may elect to borrow funds (the "Loan") from Braxton Management, Inc. (the "Lender"), the sole owner of which (Peter Molyneux) also is a principal of Deerhurst and its affiliate, NorthBridge Capital Management, Inc ("Northbridge"), of up to an amount agreed upon between the Investor and the Lender (the "Loan Amount") in connection with the Investor's participation in the Program (subject to appropriate credit checks by the Lender)(the form of Loan and Pledge Agreement is attached as Exhibit B).

This written statement is a material misrepresentation because the loans referenced were not bona fide loans.

- Under the same section describing "The Corporation and the Revocable Trust," the documents also states that,

> The Revocable Trust will contribute all of its assets (the capital Commitment") to a common trust fund organized on March 1, 2001 in the State of Missouri for which the Trustee acts as the trustee (the Common Trust Fund Agreement is attached as Exhibit C, the investment objective of which is to generate a superior risk adjusted return).

This written statement is a material misrepresentation because the investment activity insofar as the loan amount of $15.6 million had no real substance. In addition, HVB admitted in the deferred prosecution agreement in United States v. Bayerische Hypo-Und Vereinsbank AGI, No. 1:06-CR-00162 (S.D.N.Y. 2006) that they participated in trading activities on instructions from promoters that was intended to create the appearance of investment activity but that had no real substance. Because the appearance of investment activity that had no real substance is different from the objective to produce a superior risk adjusted return, the stated investment objective to produce a superior economic return was falsified. Exhibit 1.

COMPLAINT - 49

- Under the section describing "The Loan," the documents states that,

> The loan will be recourse to the investor, will be secured by the Investor's stock in the Corporation, and will be guaranteed by the Revocable Trust pursuant to a pledge agreement among the Lender, the Investor and the Revocable Trust ( the Pledge Agreement")(the form of the loan agreement and Pledge Agreement is attached as Exhibit B).

This written statement is a material misrepresentation because the loans were not bona fide loans and the documents contained false representations about the purpose and design of the transactions, namely that the pledge agreement was used to create the appearance of a loan which did not exist. The pledge agreement, however, was secured by Malone's capital contribution of $1,721,500. The conspirators of the Common Trust Fund, including including HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY Branch, Braxton Management, Inc., Peter Molyneux, , Bradonton Management, Inc, Multinational Strategies, LLC, and Coastal Trading Common Trust fraudulently charged fees for assets under management based upon the misrepresentation that they had $15,600,000 in loan proceeds under management. Their fees were essentially secured by the pledge agreement.

- Under the section describing "Risk Factors," the documents states that "An investment in the Program is speculative and involves substantial risks, including the risk of loss of the Investor's entire investment, including his obligation under the loan." This written statement is a material misrepresentation because HVB has admitted that the loans in connection with the common trust fund were not bona fide loans and that the documents contained false representations concerning the purpose and design of the transactions. Exhibit 1.

COMPLAINT - 50

- Under the section describing "Repayment of Loan," the documents state that

> For each Investor who finances part of his Capital commitment from a Loan, the principal amount outstanding under that Loan will be repaid (together with the applicable amount of accrued interest) on the date upon which the Revocable Trust's interest in the Trust Fund is redeemed (and in the case of a partial redemption, a corresponding proportion of the Loan shall become repayable). Repayment of the Loan may be accelerated should there be an "event of default" (as defined in the loan agreement).

This written statement is a material misrepresentation because HVB has admitted that the loans in connection with the common trust fund were not bona fide loans and that the documents contained false representations concerning the purpose and design of the transactions. Exhibit 1.

- In bold capitalized letters in the 28th page of the loan documents "THE LOAN WILL BE RECOURSE TO THE INVESTOR. CONSEQUENTLY, IT IS POSSIBLE FOR THE INVESTOR TO LOSE MORE THAN HIS CASH INVESTMENT IN THE PROGRAM." This written statement is a material misrepresentation because HVB has admitted that the loans in connection with the common trust fund were not bona fide loans and that the documents contained false representations concerning the purpose and design of the transactions.

138.    From September to November of 2001, Coastal Trading, LLC, Michael Schwartz, and David Schwartz solicited Ahrens & DeAngeli, PLLC and Edward Ahrens and Clark Nuber through its employees Tom Sedlock and Jim Dubeck to identify high net worth individuals to invest in the Coastal Trading Common Trust Fund Investment Program in Washington State. On information and belief, Coastal Trading, LLC, Michael Schwartz, and David Schwartz offered Ahrens & DeAngeli, PLLC , Edward Ahrens, Clark Nuber, Sedlock, and Dubeck an economic benefit if they could persuade Malone to invest in the

COMPLAINT - 51

Coastal Trading Common Trust Fund.  On information and belief, Ahrens & DeAngeli, PLLC, Edward Ahrens Clark Nuber, Sedlock, and Dubeck accepted that offer.

139.    Coastal Trading, LLC, Michael Schwartz, and David Schwartz directed their business activities into Washington State by soliciting Clark Nuber to be the agent, intermediary, and spokesperson to Malone in connection with the promotion and sale of the Coastal Trading Common Trust Fund Tom Series III and Series IV investment programs. Clark Nuber, Sedlock, and Dubeck accepted the role of agent, intermediary and spokesperson for Coastal Trading LLC.  Clark Nuber, Sedlock, and Dubeck agreed to become the primary spokespersons to Malone in connection with the promotion and sale of the Coastal Trading Common Trust Fund Series III and Series IV investment programs. As the primary spokesperson to Malone on behalf of Coastal Trading LLC, Clark Nuber became as an agent and intermediary for Coastal Trading, LLC, Michael Schwartz, and David Schwartz while purporting to represent Malone as a fiduciary.

140.    Coastal Trading, LLC, Michael Schwartz, and David Schwartz directed their actions into Washington State by soliciting Clark Nuber, Sedlock, and Dubeck to act in the role of a dual agency because they knew that Clark Nuber, Sedlock, and Dubeck also represented Malone and would be influential in persuading Malone to invest in the Coastal Trading Common Trust Fund Program Series III and Series IV as an investment in a security.  Coastal Trading, LLC, Michael Schwartz, and David Schwartz were careful to appear not to invoke the jurisdiction of Washington State by using Clark Nuber, Sedlock and Dubeck as their agent, intermediary, and spokespersons, but they acted with the intent and knowledge that their actions would be directed into the jurisdiction of Washington State and that their actions would be directed toward Malone in Washington State.  Clark Nuber,

COMPLAINT - 52

Sedlock and Dubeck accepted the role as a dual agent and did not disclose its role as a dual agent. Clark Nuber, Sedlock and Dubeck were offered a fee or an economic benefit for its role as a dual agent. In a letter dated November 13, 2001, Clark Nuber indicated that it had earned a fee consisting of 1% of the transaction amount.

141. Coastal Trading, LLC, Michael Schwartz, and David Schwartz further invoked the jurisdiction of Washington State by assisting Clark Nuber, Sedlock, and Dubeck in the preparation of a memorandum dated October 31, 2001, which was prepared by Clark Nuber, Sedlock, and Dubeck and an agent for Coastal Trading, LLC. This memorandum misrepresented the Coastal Trading Common Trust Fund Program Series III and Series IV investment programs. The purpose of the memorandum was to persuade Malone to invest in the Coastal Trading Common Trust Fund Private Offering Memorandum for both the Series III and Series IV private offering. The memorandum was mailed to Malone at his address in Seattle Washington by Clark Nuber acting as agent on behalf of Coastal Trading, LLC. The memorandum contained the misrepresentations from Coastal Trading, LLC, Michael Schwartz, and David Schwartz which they knew were false. Malone would not have invested in the common trust fund if he had known that these misrepresentations were false. These false assertions were used to persuade Malone to invest $1,712,500 in the Coastal Trading Common Trust Fund Tom Series III and Series IV investment program. Malone would not have invested in the common trust fund if he had known that these misrepresentations were false.

142. Furthermore, Coastal Trading, LLC, Michael Schwartz, and David Schwartz clearly directed their actions towards Plaintiff Malone in Washington by contacting him materially and directly or through agents on many occasions, and by soliciting Plaintiff

COMPLAINT - 53

Malone directly or through agents to participate in the Common Trust Fund transactions. For examples of direct and indirect contacts and solicitations.

### The Role of the Enterprise Defendants

**143.** Enterprise, through its Enterprise Trust division, acted as the trustee of the grantor trust created by Belmar Trading, as grantor. It also created and acted as the trustee of the Fund, the "Coastal Trading Common Trust Fund Series III," which it established by Plan of Trust dated as of October 24, 2001. Accordingly, Enterprise played a role in the implementation and execution of the CTF transaction. Enterprise played a role in the design of the CTF transaction. Enterprise earned fees in connection with the CTF transaction at least in the amount already disclosed to plaintiffs.

### HVB's agreement with Enterprise Bank to use Enterprise Bank as a marketing agent and to conceal that the loans in Connection with the Common Trust Fund were not bona fide loans

**144.** In 2001, HVB Structured Finance, Inc., through its employees Domenick De Giorgio, Alexandre Nouvakhov, Richard Pankuch, and Sylvie Demetrio reached an agreement with Enterprise Trust, a division of Enterprise Bank to act as Trustee for the Coastal Trading Common Trust Fund Program Series III and Series IV investment Programs. HVB Structured Finance, offered an economic benefit to Enterprise Trust in exchange for Enterprise Trust's agreement to (1) assist HVB to market and promote the HVB loan by making false representations about the loan, (2) by making false representations to investors in the Coastal Trading Common Trust Fund Series III and Series IV Private Offering Memorandum, (3) by concealing for the term of the loan that the loans which were issued in connection with the Coastal Trading Common Trust Fund

COMPLAINT - 54

Investment Program were not bona fide loans.   Based on information and belief, Enterprise Trust accepted that agreement.

145.    Enterprise Trust and Paul Vogel acted as trustees for Malone while providing Malone with false and misleading material information in connection with its' role as Trustee for the Coastal Trading Common Trust Fund, upon which Malone reasonably relied, and as a result of which Malone was injured.

146.    The Revocable Trust Agreement was attached as an exhibit to Copy #040 of the Coastal Trading Common Trust Fund Program Series III and Series IV Private Offering Memorandums dated October 16, 2001.  Enterprise Bank and Patrick Andre caused this document to be sent to Plaintiff Malone in Washington through David Schwartz of Coastal Trading, LLC, acting as its agents, and through Sedlock of Clark Nuber, also acting as its agents.   This Agreement was signed by Patrick Andre of Enterprise Bank, and contained fraudulent misrepresentations. One such misrepresentation is that "Enterprise Trust as trustee shall maintain appropriate records of property held in the Trust estate, including all purchases and sales, and provide Grantor with periodic statements of income and principal transactions." Enterprise trust fraudulently made the representation that it would maintain accurate records of property held in the trust estate, but intentionally omitted to disclose that it would misrepresent the records by concealing to Malone that the loans in connection with the common trust fund were not bona fide loans and that the documents contained false representations concerning the purpose and design of the transactions.

147.    Enterprise Bank was a primary participant in the Common Trust Fund Investment program because it was the trustee of the Common Trust Fund.  Enterprise Bank's role defrauding Malone in connection with the common trust fund, was to receive

COMPLAINT - 55

an economic benefit by entering into agreements with HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY Branch, Braxton Management, Inc., Peter Molyneux, , Bradonton Management, Inc, Multinational Strategies, LLC, and Coastal Trading Common Trust to conceal that the loan was not a bona fide loan.

**148.** Enterprise Bank intentionally misrepresented that the loan was a bona fide loan on the account statements it caused to be issued to Malone as Trustee of the Common Trust Fund. The concealment of the fraudulent nature of the loan was gross negligence and willful misconduct on the part of Enterprise Bank.

**Enterprise Trust – Breach of Contract**

**149.** Enterprise Trust, a division of Enterprise Bank, and Paul Vogel breached several contracts held with Plaintiff Malone.

**150.** One contract that was violated, as set forth in detail below, is the Plan of the Coastal Trading Common Trust Fund Series III and Series IV by Enterprise Trustee, a Division of Enterprise Bank, dated October 24, 2001.

**151.** This contract was signed by Paul Vogel of Enterprise Bank, and was sent to Malone in Washington State by Coastal, LLC, Trading on behalf of the other conspirators of the Common Trust Fund, including Enterprise Financial Services, a Division of Enterprise Bank, Sedlock, Dubeck, HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY Branch, Braxton Management, Inc., Peter Molyneux, , Bradonton Management, Inc, Multinational Strategies, LLC, Coastal Trading Common Trust.

**152.** Another contract that was violated, as set forth in detail below, was the Coastal Trading Program Private Offering Memorandum Series III and Series IV.

COMPLAINT - 56

**153.**    This contract was sent to Plaintiff Malone in Washington State on November 2, 2001, by David Schwartz of Coastal Trading, LLC, on behalf of the other conspirators of the Common Trust Fund, including Enterprise Financial Services, a Division of Enterprise Bank, Sedlock, Dubeck, HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY Branch, Braxton Management, Inc., Peter Molyneux, , Bradonton Management, Inc, Multinational Strategies, LLC, Coastal Trading Common Trust.

**154.**    A third contract that was violated, as set forth in detail below, is the Revocable Trust Agreement attached as Exhibit A to the Coastal Trading Common Trust Fund Program Series III and Series IV Private Offering Memorandums executed on December 3, 2001.

**155.**    This contract was signed by Patrick Andre of Enterprise Bank, and was mailed to Malone in Washington State by Coastal Trading, LLC, on behalf of the other conspirators of the Common Trust Fund, including Enterprise Financial Services, a Division of Enterprise Bank, Sedlock, Dubeck, HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY Branch, Braxton Management, Inc., Peter Molyneux, , Bradonton Management, Inc, Multinational Strategies, LLC, Coastal Trading Common Trust.

**156.**    Enterprise Trust contracted to serve as a fiduciary to Plaintiff Malone, violated that contract by failing to fulfill their fiduciary duty, and Plaintiff Malone was injured as a result.

**157.**    In the Coastal Trading Program Private Offering Memorandum Series III and Series IV, under a section describing "The Program," Enterprise Trust's role is described as such: "The Trustee of the Revocable Trust and the Trust Fund is Enterprise Trust." In the Plan of the Coastal Trading Common Trust Fund Series III and Series IV, Enterprise Bank

COMPLAINT - 57

explicitly declared that "it will hold as trustee hereunder such assets of the Participants, together with the income therefrom, the proceeds thereof and any other income thereon." By contracting acting as trustee for the benefit of Plaintiff Malone, Enterprise also asserts a fiduciary duty towards Plaintiff Malone.

158.    Enterprise Trust violated their fiduciary duty, and as a result violated their contract, by failing to disclose to Plaintiff Malone that the "loan" that Enterprise Trust "managing" was in fact a sham loan.  As a direct and proximate result of Enterprise Trust failing to fulfill its contractual fiduciary duty, Plaintiff Malone was injured.

159.    Enterprise Trust contracted with Plaintiff Malone to manage, administer, and issue account statements for the Trust Fund.  Implied in each of these contracts is a covenant of good faith and fair dealing, and as such, Enterprise Trust agreed to accurately, fairly, and in good faith perform these dealings.

160.    In the Plan of the Coastal Trading Common Trust Fund Series III and Series IV, Enterprise Bank also agreed that "The Fund shall be held, managed, administered, and maintained by the Trustee pursuant to the terms of this Plan of Trust." In the Coastal Trading Program Private Offering Memorandum Series III and Series IV, under the section describing the "Operation of the Trust Fund," it was noted that "[f]ollowing the end of each year, the Trustee [Enterprise Trust] will send the Investor an annual report with respect to the prior year reviewed by Coastal under the supervision of the Trustee, as well as certain information for the preparation of the Investor's income tax returns and financial compilation. Article 3 of the Revocable Trust Agreement states that Enterprise Trust shall "[m]aintain appropriate records of property held in the Trust Estate, including all purchases

COMPLAINT - 58

1   and sales, and provide Grantor with periodic statements of income and principle

2   transactions."

3       **161.**    However, Enterprise Trust breached their agreement to Plaintiff Malone to

4   manage, administer, and issue account statements for the Trust Fund.  Enterprise Trust

5   purported to manage and administer assets when there were in fact none under their

6   management.  Enterprise Trust issued false account statements to Plaintiff Malone (in some

7   cases through its agents and conspirators), which violated its implied covenant to issue

8   accurate and true account statements.  Enterprise Trust created false account statements

9   which falsely represented that there were over $15 million under management, when in fact

10  there were no such funds under management.  These account statements were sent to

11  Plaintiff Malone by Enterprise Trust through Coastal Trading, LLC, who was acting as their

12  agent.[2]  As a direct and proximate result of Enterprise Trust failing to fulfill its contractual

13  duty, Plaintiff Malone was injured.

14

15      **162.**    In the Coastal Trading Program Private Offering Memorandum Series III and

16  Series IV, it was noted that "The Trustee will receive an annual fee of 1.1% of the Trust

17  Fund's Net Asset Value."  In addition, in the Plan of the Coastal Trading Common Trust

18  Fund Series III and Series IV, Enterprise Trust also ensured that they would be compensated

19  for "[a]ll reasonable expenses of administration" and to be "entitled to charge and collect

20  from the Fund a fee for the management of the Fund" for their role as trustee.   The

21

22

23

24  _____

[2] The Coastal Trading Program Private Offering Memorandum Series III and Series IV
25  stated that "Coastal will assist Enterprise Trust in reconciling the net asset value of the Trust
Fund's trading accounts, preparing monthly account statements, and providing any
26  additional information to the trustee with respect to the Trust Fund's investment and trading
activities."  (emphasis added).

COMPLAINT - 59

Revocable Trust Agreement states that Enterprise Trust "will receive compensation for its services from the Trust Estate."

163.    Because Enterprise Trust breached each of these contracts, as alleged above, Enterprise Trust was unjustly enriched, Plaintiff Malone is entitled to recover any fees paid for those services, and for other damages as alleged more fully below.

### Enterprise Trust – Fraudulent Misrepresentation

164.    Enterprise Trusts and Paul Vogel acted as trustees for Malone while providing Malone with false and misleading material information in connection with its' role as   Trustee for the Coastal Trading Common Trust Fund, upon which Malone reasonably relied, and as a result of which Malone was injured.

165.    Enterprise Bank was a primary participant in the Common Trust Fund Investment program because it was the trustee of the Common Trust Fund.  Enterprise Bank's role defrauding Malone in connection with the common trust fund, was to receive an economic benefit by entering into an agreement with HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY Branch, Braxton Management, Inc., Peter Molyneux, , Bradonton Management, Inc, Multinational Strategies, LLC, and Coastal Trading Common Trust to conceal that the loan was not a bona fide loan.  Enterprise Bank intentionally misrepresented that the loan was a bona fide loan on the account statements it caused to be issued to Malone as Trustee of the Common Trust Fund.   The concealment of the fraudulent nature of the loan was gross negligence and willful misconduct on the part of Enterprise Bank.

166.    The Plan of Trust of the Coastal Trading Common Trust Fund was attached as an exhibit to Copy #040 of the Coastal Trading Common Trust Fund Program Series III

COMPLAINT - 60

and Series IV Private Offering Memorandums dated October 16, 2001. Enterprise Bank and

Patrick Andre caused this document to be sent to Plaintiff Malone in Washington through

David Schwartz of Coastal Trading, LLC, acting as its agents, and through Sedlock of Clark

Nuber, also acting as its agents. This Plain of Trust was signed by Paul Vogel of Enterprise

Bank, and contained fraudulent misrepresentations, including the following fraudulent

misrepresentations:

> Any investment by a Participant in the Fund shall be in conformity with the
> provisions of all applicable laws and regulations, including § 584 of the Internal
> Revenue Code of 1986, and Part 9.18 of the Regulations of the Office of the
> Comptroller of the Currency. The Plan of trust was prepared to give the appearance
> of satisfying § 584 which Enterprise Bank used to convince Malone to invest in the
> Common Trust Fund.

Enterprise Bank, Enterprise Trust and Paul Vogel fraudulently, negligently, intentionally

and knowingly misrepresented their intention to satisfy § 584 which requires that the

Common Trust Fund be maintained by a bank in conformity with the rules and regulations

prevailing from time to time, of the Board of Governors of the Federal Reserve System or

the Comptroller of the Currency pertaining to the collective investment of trust funds by

national banks. Enterprise Trust violated the Regulations of the Comptroller of the currency

by representing that it was managing loans which were not bona fide loans.

167. Enterprise Bank, Enterprise Trust, and Vogel created false account statements

which concealed the fraudulent nature of the loan and which charged loan fees and interest

to Malone for a loan which did not exist. The Plan of Trust was designed to give the

appearance of satisfying § 584 when Enterprise Bank had no intention of complying with

the requirement s of § 584.

COMPLAINT - 61

**168.**    The Plan of the Trust also fraudulently represented that "Not less frequently than once monthly and on any other day selected by the trustee prior thereto (the "Valuation Date"), the Trustee shall determine the value of each Fund as provided hereinafter." Enterprise Bank, Enterprise Trust and Paul Vogel fraudulently, negligently, intentionally and knowingly misrepresented their intention to accurately determine the value of each fund. Enterprise Trust violated the Regulations of the Comptroller of the currency by representing that it was managing loans which were not bona fide loans.  Enterprise Bank, Enterprise Trust, and Vogel created false account statements which concealed the fraudulent nature of the loan and which charged loan fees and interest to Malone for a loan which did not exist.

**169.**    As trustee, Enterprise Bank, Enterprise Trust, and Vogel caused Malone to be charged loan fees for loans which were not bona fide loans and management fees for assets which were represented to be under management but which were not under management.  In its role as trustee, Enterprise Bank concealed the fraudulent nature of the loan and acted in concert with HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY Branch, Braxton Management, Inc., Peter Molyneux, ,Enterprise Financial Services, a Division of Enterprise Bank, Bradonton Management, Inc, Multinational Strategies, LLC, Coastal Trading, LLC, to further the course of the fraud by allowing these entities to charge loan fees and management fees to Malone based of the false representation that the loan was bona fide and by assisting these entities to conceal that the fees they were charging to Malone was based upon a loan which was a sham. Enterprise Bank, Enterprise Trust, and Vogel obtained an economic benefit from HVB Structured Finance, Inc., Bayerische Hypo-und Verinsbank, AG, NY Branch, Braxton Management, Inc., Peter Molyneux, Bradonton Management, Inc, Multinational Strategies, LLC, Coastal Trading LLC by furthering  the

COMPLAINT - 62

course of the fraud by also allowing these entities to charge loan fees and management fees to Malone based of the false representation that the loan was bona fide.

170. From September to November of 2001, Enterprise Trust, a Division of Enterprise Bank directed its agents Michael Schwartz, David Schwartz, MultiNational Strategies, LLC, Coastal Trading LLC, to direct business activity to Washington State as a Trustee of the Coastal Trading Common Trust Fund Program Series III and Series IV investment programs of which Enterprise Bank was to act as Trustee. Through the introduction of Michael Schwartz, David Schwartz, MultiNational Strategies, LLC, Coastal Trading LLC, Edward Ahrens and Ahrens & DeAngeli, PLLC, Enterprise Bank agreed to allow Seldock, Dubeck, and Clark Nuber as agents, intermediaries, and spokespersons in Washington State to identify high net worth individuals in Washington State to invest in the Coastal Trading Common Trust Fund Investment Program with Enterprise Trust acting as trustee. On information and belief, Enterprise Trust offered Michael Schwartz, David Schwartz, MultiNational Strategies, LLC, Coastal Trading LLC Ahrens & DeAngeli, PLLC , Edward Ahrens, Clark Nuber, Sedlock, and Dubeck an economic benefit as a finder if they could persuade Malone to invest in the Coastal Trading Common Trust Fund in which Enterprise Trust would act as trustee. On information and belief, Michael Schwartz, David Schwartz, MultiNational Strategies, LLC, Coastal Trading LLC Ahrens & DeAngeli, PLLC, Edward Ahrens Clark Nuber, Sedlock, and Dubeck accepted that offer.

171. Enterprise Trust directed their business activities into Washington State by soliciting Michael Schwartz, David Schwartz, MultiNational Strategies, LLC, Coastal Trading LLC to solicit Edward Ahrens, Clark Nuber, Sedlock, and Dubeck to be the agent, intermediary, and spokesperson to Malone in connection with the promotion and sale of the

COMPLAINT - 63

Coastal Trading Common Trust Fund Tom Series III and Series IV investment programs of which Enterprise Trust acted as Trustee. Clark Nuber, Sedlock, and Dubeck accepted the role of agent, intermediary and spokesperson tor Enterprise Trust. Clark Nuber, Sedlock, and Dubeck agreed to become the primary spokespersons to Malone in connection with the promotion and sale of the Coastal Trading Common Trust Fund Series III and Series IV investment programs of which Enterprise Bank was to act as Trustee. As the primary spokesperson to Malone on behalf of Coastal Trading LLC, Clark Nuber became as an agent and intermediary for Enterprise Trust, while purporting to represent Malone as a fiduciary.

172. Enterprise Trust directed their actions into Washington State by soliciting Clark Nuber, Sedlock, and Dubeck to act in the role of a dual agency because they knew that Clark Nuber, Sedlock, and Dubeck also represented Malone and would be influential in persuading Malone to invest in the Coastal Trading Common Trust Fund Program Series III and Series IV as an investment in a security. Enterprise Trust was careful to appear not to invoke the jurisdiction of Washington State by using Clark Nuber, Sedlock and Dubeck as their agent, intermediary, and spokespersons, but they acted with the intent and knowledge that their actions would be directed into the jurisdiction of Washington State and that their actions would be directed toward Malone in Washington State. Clark Nuber, Sedlock and Dubeck accepted the role as a dual agent and did not disclose its role as a dual agent. Clark Nuber, Sedlock and Dubeck were offered a fee or an economic benefit for its role as a dual agent. In a letter dated November 13, 2001, Clark Nuber indicated that it had earned a fee consisting of 1% of the transaction amount.

173. Enterprise Trust, further directed their activities toward Washington State by assisting Clark Nuber, Sedlock, and Dubeck in the preparation of a memorandum which

COMPLAINT - 64

misrepresented the Coastal Trading Common Trust Fund Program Series III and Series IV investment programs. The memorandum dated October 31, 2001 was prepared by Clark Nuber, Sedlock, and Dubeck in part as agents for Enterprise Trust. The purpose of the memorandum was to persuade Malone to invest in the Coastal Trading Common Trust Fund Private Offering Memorandum for both the Series III and Series IV private offering. The memorandum was mailed to Malone at his address in Washington by Clark Nuber acting as agent on behalf of Enterprise Trust and Vogel. The memorandum contained the misrepresentations conveyed to Clark Nuber, Sedlock, and Dubeck by from Enterprise Trust and Paul Vogel which Enterprise Trust and Paul Vogel knew were false, and which Enterprise Trust and Vogel intended to reach Plaintiff Malone through Clark Nuber. Plaintiff Malone reasonably relied upon these representations, and would not have invested in the common trust fund if he had known that these representations were false. These false assertions were used to persuade Malone to invest $1,712,500 in the Coastal Trading Common Trust Fund Tom Series III and Series IV investment program of which Enterprise Trust acted as trustee.

174. One example of such fraudulent representations includes the statements that "The S Corp will set up a grantor turst with the contribution of one of the Deerhurst account and Braxton loan. The grantor trust is required since only a trust can invest in a common trust fund" and that "The Trust will place the Deerhurst account and Braxton Loan (less fees described below) with a common trust fund (CTF)." Enterprise Bank had positioned itself to set up the referenced grantor trust and to conduct referenced in the memo, and conduct transactions on the "Braxton Loan" when in fact the loan was a sham. This was fraudulent and material misrepresentation was conveyed to Coastal Trading, LLC, Clark Nuber,

COMPLAINT - 65

Sedlock, and Dubeck to convey on to Plaintiff Malone. Plaintiff Malone reasonably relied upon these misrepresentations, would not have entered into the transaction had he known they were false, and was injured as a result.

**175.** Furthermore, the documents sent from David Schwartz of Coastal Trading, LLC, on November 2, 2001, to Plaintiff Malone's address in Washington contained a pre-drafted solicitation letter to Enterprise Trust, which upon information or belief was drafted by Enterprise Trust. Plaintiff Malone was instructed in bold letters to "please Sign where indicated" on the solicitation letter to Enterprise Trust. This letter was drafted (not by Plaintiff Malone) to give the appearance that Plaintiff Malone had solicited Enterprise Trust, Enterprise Trust had actually solicited Plaintiff Malone through Coastal Trading, LLC, acting as its agent.

**176.** Defendant HVB also knew and fraudulently and intentionally omitted to Plaintiffs that Bradonton, Beckenham, Deerhurst, Northbridge, and Braxton would fraudulently charge Plaintiffs fees for loan proceeds under management for a sham loan issued by HVB.

**177.** When Defendants HVB-NY and HVB Finance and Katten entered into their respective fiduciary relationships with Malone, they represented to Malone that they did so to render independent professional services for his benefit when, in fact, Defendants HVB-NY and HVB Finance and Katten knew that the investment program that Malone had purchased and thought was legitimate was a fraudulent scheme that Defendants HVB-NY and HVB Finance and Katten had a hand in designing, promoting, marketing, selling and implementing. Defendants HVB-NY and HVB Finance and Katten have reaped the profits of their agreement, common scheme and joint venture conspiracy, at Malone' expense.

COMPLAINT - 66

**178.** On April 25, 2005, the Commissioner of the Internal Revenue Service issued a summons to Enterprise Bank in the matter of Michael and Barbara Malone. Specifically, the Commissioner requested all documents substantiating the gains or losses reported on Part II of Form 4797 and Statement 6 of the Costal III Form 1065 respecting a Swedish Kroner currency call on December 4, 2001 for a loss of $136,215,160.00 and a Swedish Kroner currency call on November 11, 2001 for a loss of $85,064,667.00. On information and belief, the Commissioner denied the losses allocated to the Malone's because Enterprise Bank as trustee was not able to substantiate the losses.

**179.** The Commissioner also issued a summons to Bayerische Hypo- und Veriensbank AG (HVB) in the matter of Michael and Barbara Malone on June 20, 2005. The Summons requested all documents to any loans or extension of credit to Braxton during the period between January 1, 2001 and December 31, 2004, the proceeds of which were directly or indirectly loaned or extended by Braxton to the Malones, Belmar Trust, or Belmar Trading. On information and belief, the penalty was also imposed because HVB was not able to substantiate the loan to the Commissioner's satisfaction. These were Malone's first indication that something was amiss regarding the CTF transaction. However, these events in 2005 did not put Malone on notice that the loan was a sham and that he had been paying management fees for funds that were not under management and interest on a sham loan.

**180.** As a result of the audit, Malone has paid a deficiency of $3,649,066, and a penalty of $364,907. The Commissioner has also requested that Malone pay additional interest in the amount of $388,785.

COMPLAINT - 67

**181.**   Plaintiffs continued to receive correspondence, account statements, and other communications from conspirators of the CTF Scheme, acting as agents of Defendants HVB and Katten, which continued to conceal the the fraudulent nature of the CTF Scheme through at least February 24, 2005.

**182.**   Ultimately, the IRS disallowed Plaintiffs' deductions arising out of the CTF transactions and Plaintiffs resolved their issues with the IRS by filing an amended return and loosing any offset to his capital gains tax obligation and paying deficiencies, interest, and penalties as a result.

**183.**   The IRS audit of Plaintiffs' 2001 tax return in 2005 and other public notices alerted Plaintiffs that the CTF Program would fail in its capacity as a tax shelter, but Plaintiffs remained unaware that representations they had relied upon by Defendant Katten and other conspirators which induced Plaintiffs to enter into the CTF transaction were false, that the loan purportedly issued by Defendant HVB was actually a sham loan, or that the CTF Program was actually fraudulent in nature.

**184.**   Plaintiffs did not know that they had relied upon false and misleading representations made by Defendants Katten and HVB and their agents and conspirators in connection with the CTF Program and did not know that the "loan" issued by HVB at the center of the CTF transactions was actually a sham loan until March 16, 2007, upon the retention of and discovery by present Counsel.

COMPLAINT - 68

# V. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Fraud as to HVB-NY, HVB Finance and Katten)

**185.** Plaintiffs repeat, reallege, and incorporate each of the allegations set forth above as if fully set forth herein.

**186.** HVB-NY and HVB Finance had special knowledge or information regarding the economic substance of the loan which it promised to lend to Braxton, which HVB promised would be utilized in the CTF investment program. HVB knew that the legitimacy of Malone's tax deductions would be based upon HVB's representation that the loan would have economic substance. Malone would not have invested in the CTF transaction had he known that the HVB loan did not have economic substance. In addition, if HVB had disclosed that the loan was a sham, Malone would not have incurred penalties to the IRS in the amount of $364,904 and investment losses of $850,911 or loan origination fees of $195,000.

**187.** There was an agreement or common scheme among Defendants HVB-NY, HVB Finance and Katten and third parties Clark Nuber, Sedlock, Dubeck, Enterprise Trust, Vogel, MultiNational Strategies, LLC, Coastal Trading, LLC, Michael Schwartz, David Schwartz, Ahrens & DeAngeli, and Ahrens, to design the CTF transaction to make it appear to prospective investors, including Malone, that it consisted of a legitimate loan and that it had economic substance when it fact it consisted of a sham loan and CTF lacked economic substance. As part of the same agreement or common scheme, Defendants HVB-NY, HVB Finance and Katten and third parties Clark Nuber, Sedlock, Dubeck, Enterprise Trust, Vogel, MultiNational Strategies, LLC, Coastal Trading, LLC, Michael Schwartz, David

COMPLAINT - 69

Schwartz, Ahrens & DeAngeli, and Ahrens induced Malone to invest $1.7 million in CTF by falsely representing that it consisted of a legitimate loan and that it had economic substance.

**188.** Defendants HVB and Katten created transactional documents to falsely represent that the loan transactions had economic substance, when in fact they did not.

**189.** As set forth herein, Defendants HVB and Katten knowingly and/or recklessly engaged and participated in a continuous course and scheme of fraudulent conduct to market and sell the abusive CTF Program to Plaintiffs.

**190.** In 2001 Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy formed an agreement to represent to prospective and actual investors in the investment programs, including Malone that the loans that were to be used to execute the Common Trust fund Investment program were sham loans in that the loan proceeds were never intended to be at risk by the lender and HVB effectively had the right to terminate the investment program as it retained the right to approve or disapprove all trading activity in the investment account, which meant that the investment program lacked economic substance.

**191.** In 2001 Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy formed an agreement to conceal from prospective and actual investors in the investment programs, including Malone, that the joint venture partners knew from the beginning, before Malone purchased the investment program, that it had reached an agreement with others including Enterprise Trust, MultiNational Strategies, LLC, Coastal Trading, LLC, and others to charge fees to Malone based on the false representation that the sham loan constituted an asset under management.

COMPLAINT - 70

**192.**    In 2001 Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy formed an agreement to conceal from and deny to prospective and actual investors in the investment programs, including Malone that they were representing Malone's interests as a fiduciary with special knowledge of the Common Trust Fund transaction when they were also involved in the proparation of transactional documentations that contained false representations about the economic nature of the loan.

**193.**    In 2001 Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy formed an agreement to conceal from prospective and actual investors in the investment programs, including Malone, that a special relationship, fiduciary in nature, existed between HVB-NY, HVB Finance and Katten and Malone's other advisors, which includeds Clark Nuber, Enterprise Trust, Vogel, MultiNational Strategies, Coastal Trading, LLC, David Schwartz, Michael Schwartz, Ahrens & DeAngeli and Ahrens, Sidley Austin Brown & Wood by virtue of the fiduciary nature by reason of their agreement with Malone to provide to Malone loans, opinion letters and other documents associated with the investment program prepared and approved ahead of time by HVB-NY, HVB Finance and Katten and provided to Malone.

**194.**    In 2001 Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy formed an agreement to conceal from and deny to prospective and actual investors in the investment programs, including Malone, that there would be a complete loss of investment principal as a result of the excessive fees paid directly or indirectly to In 2001 Defendants HVB-NY, HVB Finance and Katten and others including Defendants Clark Nuber, Sedlock, Dubeck, Enterprise Trust, Vogel, MultiNational

COMPLAINT - 71

Strategies, Coastal Trading, LLC, David Schwartz, Michael Schwartz, Ahrens & DeAngeli and Ahrens.

195.    In 2001 Defendants HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy formed an agreement to conceal from prospective and actual investors in the investment programs, including Malone, that HVB-NY, HVB Finance and Katten and other third-party members of the conspiracy including Clark Nuber, Sedlock, Dubeck, Enterprise Trust, Vogel, MultiNational Strategies, Coastal Trading, LLC, David Schwartz, Michael Schwartz, Ahrens & DeAngeli and Ahrens formed an agreement to cause each investor, including Malone, to lose their entire initial capital contribution in the investment program and further to conceal that the members of the conspitacy agreed to share the profits of the agreement, common scheme, joint venture by dividing the investors' initial capital contribution among themselves.

196.    Defendants HVB and Katten engaged in acts, practices and a course of conduct that included the development, marketing and implementation of the CTF Program. Katten participated in the fraudulent loan scheme by (1) creating the fraudulent CTF loan documentation, (2) providing an opinion letter addressed to the Plaintiffs stating that Plaintiffs were entitled rely upon its conclusions wherein Katten warranted that they reviewed the CTF plan and instruments, and (3) knowingly, intentionally and fraudulently omitting [or failing] to disclose that the loan documentation contained false representations.

197.    It is reasonable to infer that Katten knew of the fraudulent nature of the loan because they prepared the loan documentation.

198.    Defendants HVB and Katten made, or participated in the making of, untrue and misleading statements of material fact regarding the economic substance of the loan and

COMPLAINT - 72

omitted to state material facts necessary in order to make their statements not misleading. The purpose and effect of misrepresenting that the loan had economic substance was to induce Malone to invest $1.7 million in the CTF Program which would be used to directly and indirectly pay fees to HVB and Katten and their co-conspirators. HVB and Katten knew that Malone would not have invested in the CTF transaction but for the representation that the loan was legitimate because his promised tax benefits based upon the fraudulent representation that the loan was legitimate.

**199.**    Defendants HVB and Katten engaged in this course of business knowing or recklessly disregarding the facts that CTF Program was an abusive tax shelter, that it was highly unlikely that the IRS would approve the tax treatment sought thereby, and that the tax shelter would not withstand a challenge by the IRS

**200.**    Defendants HVB and Katten caused Plaintiffs to invest in the CTF Program by falsely assuring Plaintiffs that they were legitimate and would likely survive a challenge by the IRS.

**201.**    In the course of marketing and implementing the CTF Program to Plaintiffs, Defendants HVB and Katten, directly and through co-conspirators acting as agents, made and participated in the making of false and misleading statements of material facts, and omitted to make material disclosures to Plaintiffs representing that the CTF Program was a legitimate investment and it would more likely than not survive a challenge by the IRS. These defendants knew or recklessly disregarded the falsity of those representations.

**202.**    The intentional omissions of material fact and/or affirmative representations made by Defendants HVB and Katten, either directly or through co-conspirators acting as agents, as alleged herein were false when made.

COMPLAINT - 73

**203.** Defendants HVB and Katten knew these representations to be false when made with the intention that Plaintiffs rely upon them in entering into the CTF transaction and pay them substantial fees.

**204.** HVB has plead guilty to making intentional misrepresentations and engaging in a fraud that encompassed the activity alleged herein including but not limited to:

a. HVB's participation in loans that were not bona fide loans (e.g. the $15,000,000.00 loan to Braxton);

b. HVB's participation in trading activity on instructions from promoters that was intended to create the appearance of investment activity but that had no real substance; and

c. HVB's participation in creating documentation that contained false representations concerning the purpose and design of the CTF transactions.

**205.** In reasonable reliance on the false affirmative representations and intentional omissions of material facts made by Defendants HVB and Katten directly or through co-conspirators acting as agents regarding the CTF transaction, Plaintiffs entered into the CTF transaction, continued their investment in the CTF transaction, paid substantial fees to the Defendants and filed federal tax returns for the tax year 2001 that reflected improper deductions for losses resulting from the CTF transaction.

**206.** But for the intentional misrepresentations and material omissions described above, Plaintiffs would never have engaged in the CTF transaction and/or failed to avail themselves of other legitimate tax savings opportunities.

**207.** As a result of Defendants HVB's and Katten's conduct, as alleged herein, including but not limited to Defendants HVB's and Katten's fraud and fraudulent

COMPLAINT - 74

misrepresentations, Plaintiffs have suffered injury in their business and property, lost money on their CTF investment, paid substantial fees, was required to pay substantial interest and penalties to the IRS, and incurred substantial accounting and attorneys fees in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty & Aiding and Abetting
### Breach of Fiduciary Duty as to HVB-NY, HVB Finance and Katten)

208.    Plaintiffs repeat, reallege, and incorporate each of the allegations set forth above as if fully set forth herein.

209.    Defendants HVB-NY and HVB Finance had a fiduciary duty to Plaintiffs arising out of its special knowledge and the role it played in the design and implementation of CTF obligating Defendant HVB to act with a high degree of good faith.

210.    Defendant Katten had a the fiduciary relationship with Plaintiffs arising out of their superior knowledge of the facts and their role in advising Plaintiffs and drafting legal documents for Plaintiffs' benefit regarding highly technical legal matters pertaining to the CTF Transaction, implying a high level of confidence and trust placed by Plaintiffs in Defendant Katten.

211.    Defendant Katten had a fiduciary relationship with Malone because they acted as Malone's attorney by providing an opinion letter with respect to CTF, which Defendant Katten agreed would be relied upon by Malone's attorneys at Sidley Austin in preparing an opinion on the CTF transaction.

212.    As fiduciaries of Plaintiffs, Defendants HVB and Katten were obligated with fiduciary duties of good faith, undivided loyalty, candor and full and truthful disclosure of all material facts to Plaintiffs pertaining to the investment program.

COMPLAINT - 75

213.    Defendants HVB and Katten breached their fiduciary duties to Plaintiffs by numerous acts and omissions, including, but not limited to, the following:

a. Defendants HVB and Katten knew that the HVB loan upon which the CTF Program was based was a sham, that the entire CTF Program lacked economic substance, and that the opinion letters issued by Katten and Sidley Austin contained fraudulent misrepresentation that the loan proceeds were intended to be used to facilitate the investment plan and that there was a profit motive associated with the plan, but did not disclose these facts to Plaintiffs;

b. Defendants HVB and Katten knew or should have known that Plaintiffs did not know the truth, and as fiduciaries to Plaintiffs with this superior knowledge, and should have disclosed these facts to Plaintiffs, but did not;

c. Defendants HVB and Katten failed to act in good faith and with honesty and candor towards Plaintiffs, by placing their own interests ahead of Plaintiffs' interests to gain benefits for themselves at Plaintiffs' expense; and

d. Defendants HVB and Katten placed themselves in a position where their self-interest conflicted with their obligations as fiduciaries by failing to disclose all material information to Plaintiffs concerning transactions that affected Plaintiffs' interests, and by making other material omissions or misrepresentations of facts to Plaintiffs, upon which Plaintiffs relied to their detriment.

214.    Defendants HVB and Katten, as partners and co-conspirators of the fraudulent CTF Scheme, aided and abetted others who owed a fiduciary duty to Plaintiff to breach their fiduciary duty as well.

COMPLAINT - 76

**215.**    Defendants HVB and Katten gave substantial assistance and encouragement and aided and abetted others who owed a fiduciary duty to Plaintiffs, including Enterprise Trust, Clark Nuber, Sidley Austin, Ahrens & DeAngeli, MultiNational Strategies, Coastal Trading, Deerhurst, and NorthBridge, by concealing and misrepresenting facts to Plaintiffs regarding the investment program, in breach of the fiduciary duty other defendants owed to Plaintiff.

**216.**    At the Defendants HVB and Katten aided and abetted other fiduciaries of Plaintiffs in breach their own fiduciary duties owed to Plaintiff, Defendants HVB and Katten knew that the conduct of the other fiduciaries was wrongful and in breach of their fiduciary duties to Plaintiffs.

**217.**    Defendants HVB and Katten, who aided and abetted other fiduciaries of Plaintiff in breaching their fiduciary duties to Plaintiff, are liable to Plaintiff for the damages caused by those breaches.

**218.**    Plaintiff suffered damage as a result of the breach of fiduciary duty by Defendants HVB and Katten and as a result of Defendants HVB and Katten aiding and abetting the breach of fiduciary duty owed to Malone by their co-conspirators, Enterprise Trust, Clark Nuber, Sidley Austin, Ahrens & DeAngeli, MultiNational Strategies, Coastal Trading, Deerhurst and NorthBridge, in that Malone was induced by their breach of fiduciary duty to invest in CTF and incurred penalties to the IRS in the amount of $364,904 and investment losses of $850,911 and loan origination fees of $195,000, plus attorney fees, interest and costs, according to proof.

**219.**    In *Malone v. Clark Nuber*, P.S., et al, Case No C07-2046RSL Document 118, Order Granting in Part Motions to Dismiss and Granting Leave to Amend, Filed 6/23/2008, pg. 20, the United States District Court for the Western District of Washington sustained the

COMPLAINT - 77

allegation in the Amended Complaint that Malone had a fiduciary relationship with Clark

Nuber. (Exhibit 4) The Court also found that the allegations in the Amended Complaint

were sufficient to state a claim for breach of fiduciary duty against the MSN defendants.

(Exhibit 4).

### THIRD CLAIM FOR RELIEF
**(Breach of Contract as to HVB-NY and HVB Finance)**

**220.**    Plaintiffs repeat, reallege, and incorporate each of the allegations set forth above as if fully set forth herein.

**221.**    Defendant HVB-NY had a written contractual Customer Agreement with Plaintiffs to open and maintain an account for Plaintiffs. (Exhibit 3, p. 5).

**222.**    Defendant HVB Finance had a written contract with Plaintiffs to loan funds to Braxton Management, Inc. as part of the CTF transaction, with the further agreement and understanding that Braxton would then loan the money to Plaintiffs ("Loan Agreement"). (Exhibit 3, p. 4).

**223.**    Plaintiffs fully performed their obligations to Defendants HVB-NY and HVB Finance under the terms of the Customer Agreement and the Loan Agreement.

**224.**    Defendant HVB-NY breached their Customer Agreement with Plaintiffs by failing to adequately maintain Plaintiffs' account by virtue of not actually issuing funds to Braxton to loan to Plaintiffs as it had warranted it would do.

**225.**    Defendant HVB Finance breached its Loan Agreement with Plaintiffs because loan was a sham.

**226.**    Implied in the Customer Agreement and Loan Agreement is a covenant of good faith to perform upon its terms.

COMPLAINT - 78

227.    Defendants HVB-NY and HVB Finance breached the Customer Agreement's and the Loan Agreement's implied covenant of good faith by not acting in good faith by virtue of their role in the fraudulent scheme, issuing the fraudulent loan, and creating or approving fraudulent documents for Plaintiffs to rely upon.

228.    Defendant HVB-NY and HVB Finance's conduct also constituted a breach of their duty of good faith and fair dealing, in that they, among other things, promised performance that they knew or should have known they could not deliver, structured the affairs of the transaction in a manner that guaranteed that it would fail in its essential purpose, withheld information from Plaintiffs that they had a duty to disclose in the bargaining and contracting process, and unlawfully took advantage of superior knowledge where they had a duty to disclose such information to Plaintiffs.

229.    As a result of Defendant HVB's conduct, as alleged herein, including but not limited to Defendants HVB's breach of contract and breach of their duty of good faith and fair dealing, Plaintiffs have suffered injury in their business and property, lost money on their CTF investment, paid substantial fee and were required to pay substantial interest and penalties to the IRS, to wit:  Malone had to pay penalties to the IRS in the amount of $364,904 and investment losses of $850,911 and loan origination fees of $195,000, plus attorney fees, interest and costs, according to proof.

### FOURTH CLAIM FOR RELIEF
### (Professional Negligence as to Katten)

230.    Plaintiffs repeat, reallege, and incorporate each of the allegations set forth above as if fully set forth herein.

COMPLAINT - 79

**231.**    Defendant Katten held themselves out to Plaintiffs as experts in the field of tax law advice and purported to advise Plaintiffs as to the validity of the CTF Program.

**232.**    Katten acted as attorney to Malone by preparing the Katten Opinion Letter for Plaintiffs, which Katten had agreed would be relied upon by Malone's attorney at Sidley Austin Brown & Wood, and by attesting to the legitimacy of the CTF Program.

**233.**    The Katten Opinion Letter represented and concluded that, that it was Katten's opinion that the Fund will be classified as a common trust fund under Code Section 584 and the income tax regulations thereunder, and, as such, will not be subject to Federal income taxation and will not be treated as a corporation for Federal income tax purposes.

**234.**    Defendant Katten's advice to Plaintiffs was negligent in many ways, including, but not limited to, the following:

 a. They knew, or in the exercise of reasonable care, should have known, that the CTF transactional documents contained false representations;

 b. They knew, or in the exercise of reasonable care, should have known, that the loan was a sham;

 c. They knew, or in the exercise of reasonable care, should have known, that the CTF Program would not be classified as a common trust fund for income tax p purposes;

 d. They knew, or in the exercise of reasonable care, should have known, that Plaintiffs investment in the CTF Program would actually be subject to federal income taxation;

 e. They knew, or in the exercise of reasonable care, should have known, that the CTF Program lacked the required economic substance and business purpose required for a legal-reducing strategy;

COMPLAINT - 80

1    f. They knew but did not disclose that Sidley Austin would use their opinion to

2  bolster the "legitimacy" of their own fraudulent opinion that the CTF Program's purported

3  tax benefits would withstand IRS scrutiny;

4    g. They did not disclose that they were not truly "independent" legal advisors,

5  but instead were working with the other parties to the transaction to perpetuate a false

6  impression that there was a bona fide loan issued and that the CTF Program was legitimate;

7    h. They did not disclose their role in preparing the very documents they were

8  purporting to review for Plaintiff's benefit;

9

10    i. They did not reveal their pecuniary interest in the CTF Program.

11    **235.**    As a result of Defendant Katten's negligence in providing services to Plaintiffs,

12  Plaintiffs decided to and continued to invest in the CTF Program, paid the associated fees,

13  and filed tax returns for the year 2001 claiming losses associated with the CTF Program.

14    **236.**    As a result of Defendant Katten's conduct, as alleged herein, including but not

15  limited to Defendants Katten's negligence in providing professional services to Plaintiffs,

16
17  Plaintiffs have suffered injury in their business and property, lost money on their CTF

18  investment, paid substantial fees, was required to pay substantial interest and penalties to the

19  IRS, to wit: Malone had to pay penalties to the IRS in the amount of $364,904 and

20  investment losses of $850,911 and loan origination fees of $195,000, plus attorney fees,

21  interest and costs, according to proof.

22                    **FIFTH CLAIM FOR RELIEF**
                **(Unjust Enrichment as to HVB-NY and HVB Finance)**
23    **237.**    Plaintiffs repeat, reallege, and incorporate each of the allegations set forth above

24  as if fully set forth herein.

25

26

COMPLAINT - 81

238.    Defendants HVB-NY and HVB Finance were unjustly enriched by the loan origination fees and interest they charged and which Plaintiffs have paid, in that they benefited, at Plaintiff's expense, by collecting fees and interest that were excessive, unreasonable, and improper because no loan was ever actually issued.

239.    Equity and good conscience demand the return of all fees and interest paid to Defendants.

240.    Accordingly, Plaintiff is entitled to restitution or recoupment of the fees and interest that have been paid to Defendants HVB-NY and HVB Finance in connection with this loan.

241.    As a result of the Defendants HVB-NY and HVB Finance's wrongful conduct, for which Defendants HVB-NY and HVB Finance have been unjustly enriched, Plaintiffs have suffered injury in their business and property in that they have paid Defendants fees and have incurred losses and interest in an amount to be proven at trial, but believed to be in excess of $2 million, which Defendants must disgorge.

242.    As a result of Defendants HVB-NY and HVB Finance's wrongful conduct, as alleged herein, including but not limited to Defendant HVB-NY and HVB Finance's unjust enrichment, Plaintiffs have suffered injury in their business and property, lost money on their CTF investment, paid substantial fees, was required to pay substantial interest and penalties to the IRS, and incurred substantial accounting and attorneys fees in an amount to be proven at trial.

COMPLAINT - 82

238.     Defendants HVB-NY and HVB Finance were unjustly enriched by the loan origination fees and interest they charged and which Plaintiffs have paid, in that they benefited, at Plaintiff's expense, by collecting fees and interest that were excessive, unreasonable, and improper because no loan was ever actually issued.

239.     Equity and good conscience demand the return of all fees and interest paid to Defendants.

240.     Accordingly, Plaintiff is entitled to restitution or recoupment of the fees and interest that have been paid to Defendants HVB-NY and HVB Finance in connection with this loan.

241.     As a result of the Defendants HVB-NY and HVB Finance's wrongful conduct, for which Defendants HVB-NY and HVB Finance have been unjustly enriched, Plaintiffs have suffered injury in their business and property in that they have paid Defendants fees and have incurred losses and interest in an amount to be proven at trial, but believed to be in excess of $2 million, which Defendants must disgorge.

242.     As a result of Defendants HVB-NY and HVB Finance's wrongful conduct, as alleged herein, including but not limited to Defendant HVB-NY and HVB Finance's unjust enrichment,  Plaintiffs have suffered injury in their business and property, lost money on their CTF investment, paid substantial fees, was required to pay substantial interest and penalties to the IRS, and incurred substantial accounting and attorneys fees in an amount to be proven at trial.

243.     PLAINTIFFS DEMAND JURY TRIAL.

COMPLAINT - 83

1

2                                    **PRAYER FOR RELIEF**

3

4    WHEREFORE, Plaintiffs pray for judgment in their favor as follows:

5

6        1.  Against all Defendants, jointly and severally, for equitable relief in the form of a

7            constructive trust, rescission and restitution in amount to be proven at trial, but

8            believed to be in excess of $2 million;

9

10       2.  Against all Defendants, jointly and severally, for actual damages arising from the

11           joint conspiracy to commit fraud and misrepresentation, plus interest, in an amount

12           to be proven at trial, and believe to include the following: (1) Malone's initial loss on

13           investment totaling over $850,119, (2) Loan origination fees totaling $295,000, (3)

14           Clark Nuber accounting fees totaling over $120,000, (4) Representation for IRS

15           settlement totaling over $25,000, plus interest, attorney fees and costs according to

16           proof;

17

18       3.  Against all Defendants, jointly and severally, for equitable relief arising from breach

19           fiduciary duties, and aiding and abetting the breach of fiduciary duties, the damages

20           listed above, or in the alternative, imposition of a constructive trust; and

21

22

23

24

25

26

COMPLAINT - 83

1

2      4.  For such other relief as the Court deems just and equitable.

3

4  DATED this _____ day of August, 2008.

5

6

7

8                               Jenice L. Malecki, Esq.
                                    Malecki Law

9                                11 Broadway, Suite 715
                                New York, NY 10004

10                             (212) 943-1233 phone
                             (212) 943-1238 facsimile

11

12                           ISAACSON & WILSON, P.S.
                           Brian G. Isaacson, Esq.

13                         Mark J. Wilson, Esq.
                         701 Fifth Avenue, Suite 5810

14                         Seattle, Washington 98104
                         (206) 448-1011 phone

15                         (206) 448-1022 facsimile

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT - 84

Exhibit 2

1

```
58BMDEGP                    Plea
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,
3
4              v.
4
5    DOMENICK DEGIORGIO,
5
6                   Defendant.
6
7    ------------------------------x
7
8                                    New York, N.Y.
8                                    August 11, 2005
9                                    11:30 a.m.
9
10
10   Before:
11
11                    HON. BARBARA S. JONES,
12
12                                    District Judge
13
13
14                         APPEARANCES
14
15   DAVID N. KELLEY
15        United States Attorney for the
16        Southern District of New York
16   STANLEY OKULA
17   JUSTIN WEDDLE
17   KEVIN DOWNING
18        Assistant United States Attorneys
18
19   HOLLAND & KNIGHT
19        Attorneys for Defendant
20   JASON BROWN
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

```
58BMDEGP                    Plea
1         (Case called)
2         (In open court).
3         MR. OKULA:  Stanley Okula for the United States.  Good
4    morning, your Honor.
5         THE COURT:  Good morning, Mr. Okula.
```

```
 6          MR. OKULA:  I'm accompanied by Justin Weddle and Kevin
 7  Downing, Assistant United States Attorneys.
 8          MR. BROWN:  Jason Brown for defendant Domenick
 9  DeGiorgio.
10          THE COURT:  Good morning, Mr. Brown.
11          I understand that the defendant wants to enter a plea
12  of guilty this morning, is that right?
13          MR. BROWN:  Yes, your Honor.
14          THE COURT:  Mr. DeGiorgio, would you please stand and
15  raise your right hand.
16          (Defendant sworn).
17          THE COURT:  First of all, do you understand that
18  you're now under oath and that if you answer any of my
19  questions falsely, your false or untrue answers can later be
20  used against you in another different prosecution for perjury
21  or making a false statement?
22          THE DEFENDANT:  Yes, your Honor.
23          THE COURT:  Let me begin, tell me your full name,
24  please.
25          THE DEFENDANT:  Domenick Mario DeGiorgio.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

3

```
    58BMDEGP                    Plea
 1          THE COURT:  How old are you?
 2          THE DEFENDANT:  42.
 3          THE COURT:  How far did you go in school?
 4          THE DEFENDANT:  Four-year undergraduate degree.
 5          THE COURT:  Are you now or have you recently been
 6  under the care of a doctor or psychiatrist?
 7          THE DEFENDANT:  No; I have not.
 8          THE COURT:  Have you ever been hospitalized or treated
 9  for any mental illness or any type of addiction, drug or
10  alcohol addiction?
11          THE DEFENDANT:  No, I have not.
12          THE COURT:  Have you had any drugs, medicine or pills
13  or had any alcoholic beverages within the last 24 hours?
14          THE DEFENDANT:  No, I have not.
15          THE COURT:  As you sit here today, do you understand
16  what's happening?
17          THE DEFENDANT:  Yes, I do.
18          THE COURT:  Is your mind clear?
19          THE DEFENDANT:  Yes, it is.
20          THE COURT:  Are you feeling physically well?
21          THE DEFENDANT:  Yes, I am.
22          THE COURT:  Mr. Brown, do you have any doubt as to
23  your client's competence to plead at this time?
24          MR. BROWN:  No, your Honor.
25          THE COURT:  On the basis of my observations of this
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

4

```
    58BMDEGP                    Plea
 1  defendant and his responses to my questions, I find he is
 2  competent to enter a plea of guilty at this time.
```

```
 3              Mr. DeGiorgio, did you wish to enter a guilty plea
 4      today?
 5              THE DEFENDANT:  Yes, I do.
 6              THE COURT:  Have you had a sufficient opportunity to
 7      talk about your case with Mr. Brown and in particular what the
 8      consequences of entering a guilty plea are?
 9              THE DEFENDANT:  In great detail.
10              THE COURT:  Let me ask you, are you satisfied with
11      your attorney's representation of you?
12              THE DEFENDANT:  Yes, I am.
13              THE COURT:  I am going to explain certain
14      constitutional rights to you now that you give up when you
15      enter a plea of guilty.  Please listen to what I have to say.
16      If you have any questions, either of myself or your lawyer will
17      explain them to you.
18              Under the Constitution and laws of the United States,
19      you're entitled to a speedy and public trial by a jury on the
20      charges that are contained in the information that we're about
21      to file this morning.
22              Do you understand that?
23              THE DEFENDANT:  Yes, I do.
24              THE COURT:  If there were a trial, you would be
25      presumed innocent and the government would be required to prove
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

'5

```
        58BMDEGP                    Plea
 1      that you were guilty by competent evidence and beyond a
 2      reasonable doubt before you could be found guilty.  You would
 3      not have to prove that you were innocent and a jury of 12
 4      people would have to agree unanimously that you were guilty.
 5              Do you understand that?
 6              THE DEFENDANT:  Yes, I do.
 7              THE COURT:  At that trial, if you decided you wanted
 8      one, and at every stage of your case you would be entitled to
 9      be represented by a lawyer; and if you could not afford one,
10      one would be appointed to represent you free of cost.
11              Do you understand that?
12              THE DEFENDANT:  Yes, I do.
13              THE COURT:  During a trial the witnesses for the
14      government would have to come into court and testify in your
15      presence and your lawyer could cross-examine the witnesses for
16      the government, he can object to evidence offered by the
17      government, and if you wanted him to, he could issue subpoenas
18      and compel the presence of witnesses to testify on your behalf
19      or compel other evidence, such as documents.
20              Do you understand that?
21              THE DEFENDANT:  Yes, I do.
22              THE COURT:  At a trial, although you would have the
23      right to testify in your own behalf if you chose to do so, you
24      would also have the right not to testify.  And if you decided
25      not to testify, no inference or suggestion of guilt could be
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

6

58BMDEGP                    Plea
1   drawn from that fact.
2              Do you understand that?
3              THE DEFENDANT: Yes, I do.
4              THE COURT: Do you understand that right now as you're
5   entering this plea you have the right to change your mind,
6   plead not guilty and go to trial?
7              THE DEFENDANT: Yes, I do.
8              THE COURT: Do you have any questions about any of
9   these rights?
10             THE DEFENDANT: No, I do not.
11             THE COURT: Do you understand that by entering a plea
12  of guilty you are giving up your rights to a trial and the
13  other rights that I have just described?
14             THE DEFENDANT: Yes, I do.
15             THE COURT: Do we have a copy of the information in
16  front of the defendant?
17             MR. BROWN: Yes, your Honor.
18             THE COURT: Have you read this information and
19  discussed it with your lawyer?
20             THE DEFENDANT: Yes, I have.
21             THE COURT: Now, Mr. DeGiorgio, this document in front
22  of you which contains the charges that you intend to plead
23  guilty to is an information and it's been issued by the United
24  States Attorney. Do you understand you have a constitutional
25  right to be charged by an indictment rather than an
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                7
58BMDEGP                    Plea
1   information?
2              THE DEFENDANT: Yes, I do.
3              THE COURT: You understand that an indictment will be
4   a charge that came from the grand jury?
5              THE DEFENDANT: Yes, I do.
6              THE COURT: Do you wish to give up your right to be
7   charged by a grand jury?
8              THE DEFENDANT: Yes, I do.
9              THE COURT: And do you knowingly and voluntarily give
10  up your right to be indicted by a grand jury?
11             THE DEFENDANT: Yes, I do.
12             THE COURT: Is that your signature? I have some
13  waiver forms up here. Did you sign these forms and is that
14  your signature?
15             Denise, let the defendant take a look at these.
16             THE DEFENDANT: Yes, it is.
17             THE COURT: Did anyone threaten you in any way or make
18  you any promises to get to you waive indictment in this case?
19             THE DEFENDANT: No.
20             THE COURT: I find your waiver was knowing and
21  voluntary. I accept the waiver and accept the information and
22  order that it be filed.
23             I'm now going to explain to you, Mr. DeGiorgio, what
24  you're charged with in the information and what the maximum
25  possible penalties are for this crime. Before I do that,
                   SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

8

58BMDEGP                        Plea
1   however, I see that I have before me an original of a plea
2   agreement which has been marked as Court Exhibit 1.
3           Denise, would you give that to the defendant for his
4   use during the allocution.
5           MR. OKULA:  Do you need an extra copy, your Honor?
6           THE COURT:  I'm looking for one.  I thought I had an
7   extra copy.  I'll be happy to take one.
8           MR. OKULA:  Here it is.
9           THE COURT:  Thank you.
10          Mr. DeGiorgio, there are four counts in this
11  information.
12          Count 1 charges you with a violation of Title 18
13  United States Code Section 371, in connection with your
14  participating in a conspiracy to defraud the Internal Revenue
15  Service involving tax shelter transactions promoted by and
16  participated in by your employer, Hypo und Vereinsbank, HVB,
17  including the tax shelter known as BLIPS.
18          Do you understand that's the charge in Count 1?
19          THE DEFENDANT:  Yes.
20          THE COURT:  Count 2 charges you with another violation
21  of 18 U.S. Code Section 371, the conspiracy statute, in
22  connection with your participation in a conspiracy to defraud
23  the IRS involving the payment to various participants in tax
24  shelter transactions of compensation that was obtained through
25  and as a result of certain tax shelter transactions involving
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

9

58BMDEGP                        Plea
1   HVB and which compensation was not reported to the IRS by
2   certain recipients and payors of the compensation.
3           Do you understand that's what you're charged with in
4   Count 2?
5           THE DEFENDANT:  Yes, I do.
6           THE COURT:  Count 3 charges you with a violation of
7   Title 18 United States Code Section 1343, in connection with
8   your involvement in a scheme to defraud your employer, HVB, of
9   money and property.
10          Do you understand that's the charge in Count 3?
11          THE DEFENDANT:  Yes, I do.
12          THE COURT:  And, lastly, Count 4 charges you with
13  violation of the tax laws of the United States in connection
14  with personal income tax evasion on your part for tax years
15  1997 through 2001.
16          Do you understand that's what you're charged with in
17  Count 4?
18          THE DEFENDANT:  Yes, I do.
19          THE COURT:  As to penalties, Counts 1 and 2 each carry
20  a maximum sentence of five years' imprisonment, a maximum term
21  of three years of supervised release, and a maximum fine of the
22  greatest of $250,000 or twice the gross monetary gain derived
23  from the offense, or twice the gross loss monetary loss to the

```
24    United States, and there is a mandatory 100 dollar special
25    assessment.  In addition, I must order restitution with respect
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                    10
```
      58BMDEGP                    Plea
1     to those two counts.
2                   Do you understand that?
3                   THE DEFENDANT:  Yes, I do.
4                   THE COURT:  As to Count 3, it carries a maximum
5     sentence of 30 years' imprisonment, maximum term of five years
6     of supervised release, and a maximum fine of the greatest of
7     $250,000 or twice the gross mandatory gain derived from the
8     offense, or twice the gross monetary loss to the United States,
9     and there is a mandatory 100 dollar special assessment.  As
10    with Counts 1 and 2, I must also enter an order of restitution
11    with respect to that count.
12                  Do you understand that?
13                  THE DEFENDANT:  Yes, I do.
14                  THE COURT:  As to Count 4, there is a maximum sentence
15    of five years' imprisonment, maximum term of three years of
16    supervised release, maximum fine of the greatest of $250,000 or
17    twice the gross monetary gain derived from the offense, or
18    twice the gross monetary loss to the United States.  There is
19    also a mandatory 100 dollar special assessment.  And I will
20    also, by statute, be ordering restitution.
21                  I think you mean with respect to Count 4, do you not,
22    Mr. Okula?
23                  MR. OKULA:  Yes, your Honor.
24                  THE COURT:  With respect to Count 4.
25                  Do you understand those are the maximum possible
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                    11
```
      58BMDEGP                    Plea
1     penalties for Count 4?
2                   THE DEFENDANT:  Yes, I do.
3                   THE COURT:  Now, I mentioned supervised release.  That
4     means that when you are released from custody, if you receive a
5     prison term, you will be subject to monitoring.  There are
6     terms of supervised release with which you must comply.  And if
7     you do not comply with them, you can be returned to prison
8     without a jury trial for the full term of your supervised
9     release.
10                  Do you understand that?
11                  THE DEFENDANT:  Yes, I do.
12                  THE COURT:  I also indicated to you as part of your
13    sentence I will also be ordering restitution to the United
14    States based on the injury that has occurred as a result of
15    your criminal conduct.
16                  Do you understand that?
17                  THE DEFENDANT:  Yes, I do.
18                  THE COURT:  Now, you're pleading to four different
19    counts in this information.  Do you understand that the total
20    maximum sentence of incarceration on Counts 1 through 4 is 45
```

```
21  years' imprisonment?
22          THE DEFENDANT:  Yes, I do.
23          THE COURT:  Do you understand that I can order you to
24  serve these sentences concurrently, that would be at the same
25  time; or consecutively, meaning one after the other?
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                12
```
    58BMDEGP              Plea
1           THE DEFENDANT:  Yes, I do.
2           THE COURT:  Mr. DeGiorgio, do you also understand if I
3   accept your guilty plea you may be deprived of valuable civil
4   rights, such as the right to vote, the right to hold public
5   office, the right to serve on a jury, and the right to possess
6   any kind of firearm?
7           THE DEFENDANT:  Yes, I do.
8           THE COURT:  Under the current law there are sentencing
9   guidelines that are no longer mandatory but the judges must
10  consider in determining a sentence.
11          Have you spoken to your attorney about the sentencing
12  guidelines?
13          THE DEFENDANT:  Yes, I have.
14          THE COURT:  Do you understand that I have the
15  discretion, while taking into account the guidelines, to
16  sentence you to any period of incarceration between zero and
17  the maximum here of 45 years' imprisonment?
18          THE DEFENDANT:  Yes, I do.
19          THE COURT:  Mr. Okula, did the government provide the
20  defendant with a calculation of the guidelines sentence in this
21  case?
22          MR. OKULA:  Not in written form, your Honor, but
23  Mr. Brown and I have had extensive discussions about the
24  calculation of the guidelines, and it's been made clear to
25  Mr. Brown, and I understand to his client, that because the
```
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                13
```
    58BMDEGP              Plea
1   losses to the government and others are an aggregate of
2   hundreds of millions of dollars that it's basically at the top
3   or off the chart on the tax chart.  So it is somewhere north of
4   12 to 15 years as the maximum amount of the guidelines
5   calculation.
6           THE COURT:  Are you indicating to me that the
7   government has calculated at least roughly and has communicated
8   to the defendant, in consultation with counsel, that the range
9   here could be and likely is 12 to 15 years' incarceration?
10          MR. OKULA:  Yes, your Honor.
11          THE COURT:  Are you aware of that, Mr. DeGiorgio?
12          THE DEFENDANT:  May I have a moment?
13          THE COURT:  Yes, of course.
14          (Pause)
15          THE DEFENDANT:  Yes, your Honor, it has been explained
16  to me.
17          THE COURT:  I want you to understand that even though
```

```
18    the government has provided you with a calculation, I really
19    can't determine what your sentence will be until after I have
20    seen a presentence report from the probation department and you
21    and the government have had a chance to challenge any of the
22    facts in it.
23              Do you understand that?
24              THE DEFENDANT:  Yes.
25              THE COURT:  Do you understand that if your attorney or
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

14

```
      58BMDEGP              Plea
1     the government or anybody else has attempted to predict what
2     your sentence will be that their prediction could be wrong?
3               THE DEFENDANT:  Yes.
4               THE COURT:  Do you also fully understand that even if
5     your sentence is different from what anybody may have told you
6     it might be, or if it's different from what you hope for or
7     expect, you are still going to be bound to the guilty plea that
8     you entered today and you will not be allowed to withdraw your
9     plea?
10              THE DEFENDANT:  Yes, I do.
11              THE COURT:  Do you also understand -- I think it's
12    implicit in what I already said -- that the government's
13    position here today of a 12-, to 15-year guideline range
14    doesn't bind the probation department and it doesn't bind the
15    Court?
16              Do you understand that?
17              THE DEFENDANT:  Yes, I do.
18              THE COURT:  Has anybody made any promises to you other
19    than the plea agreement or forced you or threatened you in any
20    way to plead guilty?
21              THE DEFENDANT:  No.
22              THE COURT:  The only other question I have, is there
23    any provision or understanding, Mr. Okula, as to forfeiting or
24    waiving the right to appeal?
25              MR. OKULA:  No, your Honor.  Your Honor --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

15

```
      58BMDEGP              Plea
1               THE COURT:  Are there any other provisions that you
2     would like me to go over before I move on?
3               MR. OKULA:  I would just like to make two points, your
4     Honor.
5               First, the tax evasion statute, costs of prosecution
6     is one of the penalties that is mandatory under Title 26.  I
7     think the Court needs to advise the defendant of that.  And I
8     just wish to make clear that technically there is no
9     restitution as an aspect of the sentence that the Court can
10    enter just pursuant to the statute.  We are, pursuant to the
11    restitution statutes, reaching a separate agreement that the
12    defendant has acknowledged the Court could and should impose
13    restitution for the tax evasion charge.  That's why it's
14    appropriate here.
```

```
15              THE COURT:  Mr. DeGiorgio, I omitted telling you that
16    with respect to Count 4, is it, Mr. Okula?
17              MR. OKULA:  Yes, your Honor.
18              THE COURT:  That it's also mandatory that I assess
19    costs of prosecution as a part of the sentence.
20              Is that correct?
21              MR. OKULA:  Yes, your Honor.
22              THE COURT:  Anything else with respect to that?
23              MR. OKULA:  No, your Honor.
24              THE COURT:  Do you understand that?
25              THE DEFENDANT:  Yes, I do.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                   16
      58BMDEGP              Plea
 1              THE COURT:  With respect to restitution, Mr. Okula,
 2    are you telling me that restitution is going to be imposed here
 3    pursuant to agreement as opposed to a statute?
 4              MR. OKULA:  That's precisely -- yes, your Honor.
 5              THE COURT:  Do you understand, Mr. DeGiorgio, that
 6    you've agreed with the government that you're going to make
 7    restitution with respect to the losses in this case?
 8              THE DEFENDANT:  Yes, I have.
 9              THE COURT:  You acknowledge that you intend to do
10    that?
11              THE DEFENDANT:  Yes.
12              THE COURT:  Is that sufficient, Mr. Okula?
13              MR. OKULA:  I believe so, your Honor.
14              THE COURT:  Mr. Okula, would you state the elements of
15    each of the offenses for the four counts for each of the crimes
16    charged.
17              MR. OKULA:  Yes, your Honor.
18              With respect to Counts 1 and 2, the conspiracy charge,
19    under Title 18 United States Code Section 371, that statute has
20    three elements.  First, the existence of a conspiracy; second,
21    the defendant's knowing and willful participation in the
22    conspiracy; and, third, an overt act committed by a
23    coconspirator in furtherance of the conspiracy.
24              With respect to Count 3, the wire fraud charge, your
25    Honor, there are three elements:  First, the existence of a
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                   17
      58BMDEGP              Plea
 1    scheme and artifice to defraud a victim of money or property;
 2    second, the defendant's knowing and willful participation in
 3    that scheme and artifice; and, third, the sending of a wire
 4    communication in interstate or foreign commerce in furtherance
 5    or as part of the scheme and artifice to defraud.
 6              And, finally, Count 4, the tax evasion statute under
 7    Title 26 United States Code Section 7201 that has three
 8    elements:  First, the receipt of income giving rise to a tax
 9    deficiency; second, the commission of an affirmative act of
10    evasion by the defendant; and, third, willfulness.
11              THE COURT:  Thank you Mr. Okula.
```

```
12          Mr. DeGiorgio, you just heard the government describe
13     the elements of each of the crimes to which you're about to
14     plead guilty.  I've asked them to do that because the
15     government has to prove each and every one of those elements
16     beyond a reasonable doubt before you can be convicted.
17          Knowing this, do you still wish to go forward with
18     your plea?
19          THE DEFENDANT:  Yes, I do.
20          THE COURT:  Mr. Okula, would you summarize the
21     evidence against the defendant?
22          MR. OKULA:  Yes, your Honor.  In summary form, at
23     trial the United States would be able to prove, among other
24     things, the following:  That the defendant conspired with
25     others at an accounting firm and at investment advisory firms
```
SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

18

```
       58BMDEGP                    Plea
1      to implement fraudulent tax shelters.  The shelters we would be
2      able to prove were fraudulent because, among other things, they
3      depended on false and fraudulent claims regarding the facts of
4      the underlying transactions.
5          In furtherance of the scheme, the defendant and
6      others, including these individuals, as an accounting firm and
7      investment advisory firm prepared and caused to be prepared
8      false and fraudulent transaction documents, opinion letters,
9      factual representations, and tax returns.  The transactions in
10     which the defendant directly participated through his office in
11     New York caused the tax loss to the government in the hundreds
12     of millions of dollars.  That's with respect to Count 1 and the
13     United States proof would consist of, among other things, the
14     testimony of witnesses, transaction documents, and numerous
15     e-mails.
16          With respect to Count 2, the government would be able
17     to prove that the defendant conspired with others to defraud
18     the IRS by funneling fees collected by certain tax shelter
19     promotors offshore in the names of a nominee or nominees, all
20     in an effort to conceal that income from the IRS and cause the
21     participants, the recipients of those fees, ultimately, to
22     evade taxes.
23          Third, with respect to Count 3, the defendant, we
24     would be able to prove, unlawfully took money out of accounts
25     at his employer bank, HVB, that he was able to control, but
```
SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

19

```
       58BMDEGP                    Plea
1      which money did not belong to him, and he used that money for
2      his own purposes.  In so doing and in carrying out that scheme
3      to defraud, he caused various interstate wire transmissions.
4          And with respect to Count 4, your Honor, we would be
5      able to establish that the defendant, through various
6      affirmative acts committed by him, evaded his own taxes for the
7      tax years 1997 through 2000, through his receipt of income that
8      he failed to report on income tax returns that he subscribed to
```

```
 9        and filed with the Internal Revenue Service.
10               THE COURT:  Thank you, Mr. Okula.
11               Mr. DeGiorgio, would you tell me in your own words
12        what you did that makes you believe you're guilty of the four
13        charges in this information?
14               MR. OKULA:  Your Honor, before we do that, may I have
15        one moment to consult with Mr. Brown?
16               THE COURT:  Sure.
17               Are you ready, Mr. DeGiorgio?
18               THE DEFENDANT:  Yes, I am.
19               THE COURT:  Go ahead.
20               THE DEFENDANT:  With regard to Count 1, from 1996 to
21        2003, I was employed by the Manhattan branch office of Hypo und
22        Vereinsbank, also known as HVB.  My position with HVB was
23        cohead of the financial group.  My responsibilities with this
24        group included overseeing HVB's participation in various tax
25        transactions, including those known as bond linked issue
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
          58BMDEGP                    Plea
 1        premium structure, or BLIPS.  I understood that the objective
 2        of these transactions was to help wealthy clients of the BLIPS
 3        promotors to significantly reduce their tax liability to the
 4        United States Internal Revenue Service.
 5               My participation in BLIPS began in approximately
 6        October 1999, when one of the BLIPS promotors asked me whether
 7        HVB would be interested in serving as one of the banks for
 8        these transactions.  The transactions were somewhat
 9        complicated, but an essential part of creating reported tax
10        losses depended on the bank purporting to provide a loan
11        structured in a particular way.  The loan proposed by the BLIPS
12        promotors was a sham because, among other things, as designed,
13        no money ever left the bank and because HVB never set aside any
14        of its own money or procured funds from the banking market in
15        order to fund any of these loans.
16               At the time I participated in BLIPS I was well aware
17        of these facts.  I reviewed the draft BLIPS tax opinion letter
18        and knew that BLIPS was falsely described as involving an
19        important part of the transaction of these purported loans, and
20        I knew that this false description was created in order that
21        BLIPS clients would claim tax losses and for themselves money
22        that they should have paid in taxes.
23               I agreed to participate in these transactions, and in
24        furtherance of the scheme, I and others caused HVB to prepare
25        and execute various false documents that made it appear that
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
          58BMDEGP                    Plea
 1        HVB was providing real loans when in reality it was not.  I
 2        myself signed some of the documents on behalf of HVB that also
 3        made it appear that HVB provided loans.
 4               There were other false and misleading aspects of BLIPS
 5        that I recognized to be false and misleading at the time.
```

```
 6        Among other things, BLIPS was falsely represented to be a
 7   three-stage, seven-year investment program when, in reality, it
 8   was a short-term transaction designed to create tax losses.
 9   The promotors told me and others at the bank prior to the
10   execution of BLIPS transactions that the transaction was, in
11   reality, a short-term transaction, notwithstanding the
12   documentation created by the promotors, and by me on behalf of
13   HVB that claimed otherwise.
14        And BLIPS falsely claimed that the investment
15   component of the program was leveraged when it was not.  The
16   purported loan was not used in the relatively small trades
17   relating to two foreign currencies.  In reality, those trades
18   were all executed and secured by cash that was advanced by the
19   BLIPS clients.  Each Argentine peso and Hong Kong dollar trades
20   were not secured by the purported loan.  In fact, the purported
21   loan had nothing to do with those trades.
22        In the course of HVB's participation in BLIPS between
23   1999 and 2001, I had several meetings with the promotors of the
24   program in Manhattan and executed a number of HVB internal
25   documents in Manhattan.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                    22

```
     58BMDEGP              Plea
 1        With regard to Count 2, while employed at HVB, I had
 2   dealings with other promotors of certain tax-driven
 3   transactions.  In the course of these dealings I helped these
 4   individuals to conceal from the IRS various fees that they
 5   received for their participation from these transactions.
 6   Between 1996 and 2002, I did this by authorizing HVB in
 7   Manhattan to wire-transfer those fees to offshore nominees in
 8   order to conceal those U.S. promotors' income from the IRS.
 9        Between 1997 and 2002, I received funds indirectly
10   from one of those promotors who was based in California.  At my
11   direction the promotor arranged for the payment of some of my
12   personal bills and obligations to New York.  These payments
13   totaled several hundred thousand dollars.  I did not declare
14   these payments as income on my tax returns for the years in
15   which I received the benefits of those payments, even though I
16   knew that I was legally obligated to do so.
17        With regard to Count 3, between 1991 and 2001, in
18   connection with the tax-driven transaction which HVB was
19   participating, I took for my own personal use certain funds
20   that were supposed to be payments to HVB.  I did that by taking
21   these funds out of HVB's bank accounts in Manhattan and using
22   them to pay various personal bills.  Among other things, I
23   directed HVB to make a wire transfer of approximately $312,000
24   in June 1999 from HVB's Manhattan branch to National
25   Westminster Bank in New Jersey.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                    23

```
     58BMDEGP              Plea
 1        With regard to the last count, Count 4, I did not
 2   declare as income on my federal personal tax returns the
```

```
 3        payments I have described, including those made on my benefit
 4        from the California-based tax promotor for the funds I took
 5        from HVB.  I filed federal income tax returns for the tax years
 6        1997, 1998, 1999, and 2000, each of which falsely omitted
 7        substantial amounts of income, resulting in my paying
 8        substantial less tax than I was obligated to pay.  I understood
 9        that I was legally obligated to accurately report my income
10        tax, my income on my tax returns, and intentionally failed to
11        disclose the same.
12                That concludes my statement.
13                THE COURT:  Mr. Okula, is there any element that was
14        not covered by the defendant in his allocution?
15                MR. OKULA:  I don't think so.
16                May I have one moment to confer with Mr. Brown, your
17        Honor?
18                THE COURT:  Yes.
19                MR. OKULA:  Your Honor, if I may, I'm familiar with,
20        obviously, the proof supporting all of the counts.  When I
21        heard the defendant allocute to Count 3, he noted a start date
22        of 1991, but I think that he misspoke and I think he's going to
23        note that on the record.
24                THE COURT:  Mr. DeGiorgio.
25                THE DEFENDANT:  Yes, that's correct.  The date should
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    24

```
     58BMDEGP                    Plea
 1   be 1999 and not 1991.
 2                THE COURT:  I didn't even hear you say '91.  Fine.
 3   1999?
 4                THE DEFENDANT:  Yes.
 5                MR. OKULA:  Beyond that, your Honor, I think the
 6   defendant has covered all of the elements of all of the charges
 7   in the information.
 8                THE COURT:  Mr. DeGiorgio, when you were involved in
 9   these conspiracies and in failing to report your own income and
10   the scheme to defraud your employer, did you know that what you
11   were doing was wrong and illegal?
12                THE DEFENDANT:  Yes, I did.
13                THE COURT:  Are you pleading guilty to the crimes
14   charged in the information because you are guilty of those
15   crimes?
16                THE DEFENDANT:  Yes.
17                THE COURT:  How do you now plead to Counts 1, 2, 3,
18   and 4 of the information, guilty or not guilty?
19                THE DEFENDANT:  Guilty, your Honor.
20                THE COURT:  Mr. DeGiorgio, you've acknowledged to me
21   that you are in fact guilty as charged in the information.  I'm
22   satisfied you know your rights and that you're waiving them
23   knowingly and voluntarily.  Because of that, I find that your
24   plea is knowing and voluntary and supported by an independent
25   basis in fact containing each of the essential elements of the
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    25

```
        58BMDEGP                    Plea
   1    offense.  I accept your guilty plea and enter a judgment of
   2    guilty on the information on all four counts.
   3               I'm not going to order a customary presentence report
   4    at this time.
   5               Are there any other matters that need to be dealt
   6    with?
   7               MR. OKULA:  I don't think so, your Honor.  The bail
   8    has been set for the defendant and was set by the magistrate a
   9    number of months ago.  We respectfully request that the
  10    conditions originally set by the magistrate be continued.
  11               THE COURT:  What are they?
  12               MR. OKULA:  The defendant had to surrender his
  13    passport and he had to have other sureties sign, cosign the
  14    bond.  The defendant has made all the appearances that we
  15    believe that he was required to make.  And based on the
  16    sureties that underlie his current bond, we think that's
  17    sufficient, your Honor.
  18               THE COURT:  His bail is continued.
  19               Anything else?
  20               MR. OKULA:  Nothing.  Thank you for taking us on such
  21    short notice.
  22                                 o0o
  23
  24
  25
```

Exhibit 3

BAYERISCHE HYPO- UND VEREINSBANK

November 1, 2001

Mr Michael Malone

Seattle, Washington 00100

Dear Mr Malone:

We understand that you may participate in an investment strategy (the "Transaction") proposed and organized by MultiNational Strategies LLC. As part of the Transaction, Braxton Management, Inc. ("Braxton") will borrow funds from HVB Structured Finance, Inc. pursuant to a loan agreement (the "HVB Loan"). As a further part of the Transaction, Braxton will then on lend the proceeds from the HVB Loan to you (the "Individual Loan"), and it is understood that you will invest the proceeds of the Individual Loan in a corporation wholly owned by you, as agreed with Braxton.

You hereby acknowledge to us that (a) neither we nor any of our affiliates have or has played any role whatsoever in advising you with respect to any part of the Transaction, whether described above or not, or marketed any part of the Transaction to you, and (b) while affiliates of ours may act as lender or bank in one or more of the transactions contemplated in the Transaction, neither we nor any of our affiliates are or is committed to participate in any part of the Transaction.

In consideration for us or our affiliate making the HVB Loan, you hereby represent, warrant and acknowledge to us, Bayerische Hypo- und Vereinsbank AG, and to our affiliates (collectively, "HVB"), in connection with the your participation in the Transaction, that:

1. HVB has had no involvement in, and accepts no responsibility for, the establishment, promotion or marketing of the Transaction;

2. HVB makes no guarantee or representation whatsoever as to the expected performance or results of the Transaction (including the legal, tax, financial or accounting consequences thereof), and you have not engaged in or entered into the Transaction in reliance upon any such guarantee or representation;

3. You have been independently advised by your own legal counsel and will comply with all Internal Revenue Laws of the United States; and

4. Neither you nor any member of your immediate family was approached by HVB to enter into any transaction contemplated by the Transaction.

These representations, warranties and acknowledgments are in addition to any made by you in any documentation evidencing any part of the Transaction.

In addition, you agree that HVB shall not be liable to you for any losses, liabilities, costs, expenses, or other amounts relating to any transaction involved in the Transaction, including any losses, liabilities, costs, expenses, or other amounts arising out of the failure of any such transaction to achieve your legal, regulatory, tax, business, investment, financial or accounting or other objectives.

You further agree that you will not (a) commence or agree to or join in the commencement of any bankruptcy, insolvency or similar proceeding by or against you, Braxton, Braxton's parent, the wholly owned corporation in which you invest proceeds of the Individual Loan, or any entity in which your wholly owned corporation makes an investment or any other entity that participates in the Transaction, or (b) interfere with the exercise by us of any of our rights or remedies under any of the financing documents entered into in connection with the Transaction, and that you will indemnify and hold us harmless from and against any and all losses and liabilities incurred by us as a result of, in connection with or arising out of (i) any insolvency, bankruptcy or similar proceeding involving any entity listed in (a) above and commenced, agreed to, or joined by you or (ii) the failure of any of your representations and warranties contained in this letter to be materially accurate when made or your failure to observe or perform any of your agreements contained in this letter.

Please indicate your agreement to the above by countersigning and returning to us a copy of this letter, which shall be governed by, and construed in accordance with, the internal laws of the State of New York.

Very truly yours,

BAYERISCHE HYPO- UND
VEREINSBANK AG

By:

Name:
Title:

_____

Agreed to and acknowledged:

By:
Name: Michael Malone
Title:

Notarized by:

Michael Malone
Seattle, WA

HypoVereinsbank
150 East 42nd Street
New York, NY  10017

Dear Sirs:

I have entered into this specific transaction in an effort to realize earnings over an extended period of years.  I anticipate some capital appreciation over the life of the investment and fell this investment includes the proper relationship of risk and reward that fit my personality.

Very truly yours,

Michael Malone

# HypoVereinsbank

## CUSTOMER AGREEMENT
## ACCOUNT TERMS AND CONDITIONS

### INTRODUCTION

We are pleased to have you as a customer of HypoVereinsbank ("HVB"). This document, together with any enclosures, contains the general rules, regulations, terms and conditions ("Terms and Conditions") and other disclosures for the accounts and services which you may select, and constitutes an agreement between you and HVB. References to "you" and "your" in these Terms and Conditions mean the agency, association, bank, corporation, municipality, partnership, organization or other entity to whom accounts and services are being provided by HVB. Should any of these Terms and Conditions change, HVB will notify you at your primary address shown on HVB's records and the new terms will, as outlined below, become part of the agreement between you and HVB. We suggest that you circulate a copy of these Terms and Conditions, and of any subsequent changes or supplements, to all persons who initiate transactions to and from your account(s) at HVB.

These Terms and Conditions supersede and replace any terms and conditions previously sent to you and any proposals or representations previously made by you or HVB. Together with any executed appendices hereto, these Terms and Conditions constitute the entire agreement between you and HVB. These Terms and Conditions may be supplemented by existing or future written agreements, acknowledgements, terms and conditions and notices including, but not limited to, those regarding specific types of accounts maintained with HVB and regarding specialized funds transfer and check processing services offered by HVB. Any term of any such agreement, conditions or notice that is inconsistent with a provision of these Terms and Conditions shall supersede such provision for purposes of the particular account or service which is the subject of the agreement, conditions or notice.

Please contact your Account Officer if you require additional information.

I.  Scope and Governance of These Terms and Conditions

1.  Scope of Terms and Conditions. These Terms and Conditions apply to all types of accounts and deposits with the New York Branch of HVB. The relevant branch is referred to herein as the "Bank," "we," "HVB" or "us." The Bank will maintain one or more accounts (an "Account" or "Accounts") for you and will credit and debit your Accounts in accordance with the procedures described in these Terms and Conditions.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax:    (212) 672-5500

1

2.     **Terms and Conditions Govern.** These Terms and Conditions, together with all applicable laws, customs and practices, govern the relationship between you and HVB. For your convenience, some of the relevant laws, customs and practices are described below. Any of these laws, customs, and practices, of course, may change without prior notice from HVB.

## II.    Account Transactions

### A. *Credits*

1.     **Types of Credits.** The types of credits that can be made to your Account include, but are not limited to, deposits in the form of: i) checks (including Depository Transfer Checks and Preauthorized Checks), drafts, notes, acceptance or other instruments (collectively "Items"); ii) cash; iii) transfers of funds from other accounts or from other institutions or parties; and iv) credits of proceeds from the sale, redemption or payment of securities.

2.     **Funds Credited in U.S. Dollars.** All funds received for credit to your Accounts will be credited in U.S. Dollars, unless you have i) established a foreign currency account, or ii) given us written instructions to the contrary. Foreign exchange settlement shall be made at the rate being used by the Bank when the transaction is quoted.

### B. *Debits*

1.     **Types of Debits.** The types of debits that can be charged to your Account include, but are not limited to: i) payments of Items; ii) withdrawals of cash; iii) interest and principal on loans; iv) transfers of funds to other accounts or to other financial institutions or parties; v) debits to cover the purchase of securities, charges of fees, commissions and other expenses of any nature; and vi) all Account service charges and fees.

2.     **Timing of Debits.** Your Account may be debited on the day an Item is presented, certified or accepted, or at such earlier time as notification is received by the Bank by any means that an Item drawn on your Account has been deposited for collection in another financial institution. A determination of your Account's balance for purposes of making a decision to dishonor an Item for insufficiency of available funds may be made at any time between the receipt of such presentment or notice and the time of return of the Item, and no more than one such determination need be made.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax:    (212) 672-5500

2

3. **All Debits Authorized.** The Bank is authorized to debit your Account and honor and pay Items and transfers of funds without limitation of amount and without inquiry as to the circumstances of issue, negotiation or indorsement or as to the disposition of the proceeds thereof, even if drawn, indorsed or payable to cash, bearer or to the individual order of any signing officer, director, agent or other authorized signatory or tendered in payment of that individual's obligations.

4. **Withdrawal Limitations.** The Bank may refuse to allow a withdrawal from any Account in certain cases including, but not limited to, cases where: i) there is a dispute about the Account (unless a court or other competent authority has ordered the Bank to allow the withdrawal); ii) a legal garnishment or attachment is served, including, but not limited to, a levy, restraining notice or court order; iii) the Account is being used as collateral to secure a debt; iv) any required documentation has not been presented; or v) you fail to repay a Bank loan or other debt or obligation to the Bank on time.

5. **Items Transferred Outside the United States.** In the event you negotiate or otherwise transfer an Item outside the United States which is subsequently sent to the Bank for deposit, collection or payment in the United States, you shall be deemed to make the same warranties on transfer and presentment, pursuant to the Uniform Commercial Code, as if such Item were negotiated or otherwise transferred by you in the United States.

## C. Security Procedures

1. **Transactions Authorized.** By establishing an Account with the Bank, you have authorized us to honor instructions or transfer funds from your Account on our books to any bank or other financial institution or other party, either for your account or the account of any other party you designate, and to otherwise honor instructions regarding the transaction of business for your Account even if the instructions are for the benefit of the party delivering them.

2. **Joint Accounts.** If your Account is a held jointly by more than one person with right of survivorship (a "Joint Account"), we may accept instructions from any Account owner for the conduct and disposition of the Account or the credit or disposition of funds on deposit. We may, at our discretion, require the consent of all Account owners before making any such disposition or following the instructions of a single owner or group of owners. Deposits received from any Account owner may be credited to that Joint Account. Until receipt by the Bank of written notice to revoke any authorizations made by the holders of a Joint Account, the Bank shall be protected in relying upon all such authorizations.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax:    (212) 672-5500

3

3.    **Obligation to Set and Follow Security Procedures.** Prior to use of your Account you will agree with us on the security procedure(s) to be used to verify your payment orders, whether such orders are received in writing, by means of facsimile transmission, oral communication, computer, telecommunications or other method.

4.    **Alternate Security Procedures.** We may offer to you and agree with you upon different security procedures for each communication method and you may, at your option, waive any such secondary procedure. You agree that any security procedures agreed upon by you and us constitute commercially reasonable methods of providing security against unauthorized transfers. Unless otherwise agreed, if the Security Procedures in the attached appendix are substantially followed, you expressly agree to be bound by any payment order, whether or not accurate, issued on your behalf, and you agree to indemnify us in full for any losses, expenses or liabilities of any kind resulting therefrom, including reasonable attorneys' fees.

5.    **Responsibility To Safeguard Security Devices.** You must safeguard any test keys, passwords, identification codes, mnemonics, or other security or authentication devices and any facsimiles and make them available only to persons who are authorized to give instructions using them. Subject to your rights under applicable law to challenge the enforceability of a payment order, a payment order identifying you as sender and received by us shall be deemed effective as your order, whether or not authorized and regardless of the actual identity of the transmitter thereof, if such payment order is accepted by us in good faith and in accordance with the security procedures that we and you agree upon.

6.    **Powers of Attorney.** A Power of Attorney is an authorization for someone else to handle account transactions. The Bank may require that the form granting the authority be signed by every one of the holders of an Account. The person to whom the authority is granted must also provide verifiable signature exemplars for the Bank's records. The Bank may require a person acting under a power of attorney to provide evidence satisfactory to the Bank that the power of attorney is still effective, and may refuse to permit a transaction if it has reasonable cause to believe that the power of attorney is ineffective or invalid.

7.    **Notice of Change in Authorizations.** You must provide immediate written notice of any changes in persons authorized to give instructions regarding your Accounts. We may continue to act on the instructions of persons previously authorized until we have received such notice and have had a reasonable opportunity to act upon it.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax:    (212) 672-5500

4

8.     Other Security Measures. We may, at our option, use any means to verify payment orders and related instructions in addition to any security procedures or authentication methods otherwise required or agreed upon.

9.     Surety Bonds. If any person authorized to transact business for your Account asks the Bank to follow instructions which the Bank believes exposes it to potential liability under the law, the Bank may refuse to follow those instructions or may require a surety bond or other protection, such as your indemnity, satisfactory to the Bank, before following those instructions.

## D. Funds Transfer Instructions

1.     Methods of Transmitting Instructions. You may issue payment orders orally, electronically or in writing, as arranged, against your Accounts, subject to the Bank's acceptance. Payment orders will be received and processed only on the Bank's funds business days, and within its established cut-off hours. The exchange of S.W.I.F.T. keys will be initiated by the Bank for banks which are on S.W.I.F.T. The Bank shall debit your Account for the amount of each payment order accepted by the Bank. No restrictions upon the acceptance of payment orders by the Bank or upon the Accounts which the Bank may debit shall be binding unless agreed by the Bank in writing.

2.     Funds Transfer Systems. We have no duty to accept or execute any payment order unless such acceptance or execution is required by the rules of a Funds Transfer System (i.e. a wire transfer network, automated clearing house or other communication system of a clearing house or other association of banks, including the Federal Reserve banks), through which a payment order may be transmitted.

3.     Specifying a Funds Transfer System. You may request that we use a specific funds transfer system (FedWire, CHIPS, etc.) or a specific intermediary bank. Whether you or we choose the funds transfer system, you agree to be bound by the rules of the system through which the transfer is sent. If for any reason we are unable to use the funds transfer system you request we may use any system to execute your payment order without prior notification to you. However, if for any reason we are unable to use an intermediary bank you specifically requested, we will not execute your payment order but will notify you and will thereafter execute such transfer only upon receiving further instructions.

4.     Written Instructions. We may honor any written instructions regarding your Accounts including, but not limited to: checks, notes, drafts, bills of exchange, acceptances, undertakings, authorizations, letters or other instruments, orders or items, if the instructions bear or purport to bear the signature of a person authorized

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax:   (212) 672-5500

5

to deliver such instructions to us, or if such instructions are received in accordance with any security procedures that we and you agree upon, or in accordance with any other agreements we may have with you regarding the acceptance of instructions.

5.  **Facsimile Signatures.** We may honor any pay Items, whether preauthorized, signed by hand or by facsimile signature, including, but not limited to, computer generated signatures. In the case of a facsimile signature, we may honor and pay Items that bear or purport to bear the facsimile signature of any person authorized to sign Items or deliver such instructions to the Bank in such a manner, regardless of by whom or by what means the actual or purported facsimile signature may have been affixed to the Items or the instructions, if such facsimile signature resembles the facsimile signature specimen on file with the Bank.

6.  **Telecopier Instructions.** We may honor any instructions received by telecopier, facsimile or "fax," computer or other electronic transmissions, if we reasonably believe such instructions to be genuine or if such instructions are received in accordance with any security procedures agreed upon by you and us, or in accordance with any other agreements we may have with you regarding the acceptance of such instructions.

7.  **Oral Instructions.** We may, but are not obligated to honor any oral instructions regarding your Account if the instructions are given or purport to be given by any person authorized to give such instructions to the Bank, or are received in accordance with any security procedures agreed upon by you and us, or in accordance with any other agreements we may have with you regarding the acceptance of such instructions.

8.  **Other Methods of Transmittal.** We may honor any other instructions regarding your Account, whether communicated by computer, wire service, tape, electronic transfer or any other method of initiating transactions that you may use, if they are received in accordance with any security procedures agreed upon by you and us or in accordance with any other agreements we may have with you regarding the acceptance of such instructions.

*E.  Responsibility For the Specifications and Indorsement of Checks and Items.*

1.  **Responsibility For the Back of a Check.** As a paying bank, and as a bank of first deposit, the Bank is required by federal regulation to place its indorsement stamp in prescribed and restricted positions on the back of a check.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax:    (212) 672-5500

6

Due to these prescribed and restricted indorsement positions, you shall avoid indorsement locations reserved for the Bank and shall further place your indorsement on the bank of a check in the area from 0.0 to 1.5 inches from the trailing edge of a check. The trailing edge of the check is defined as the left side of the check looking at it from the front. You further authorize us to accept checks for deposit without your indorsement. You assume all responsibility and liability for any claim or loss that you or the Bank may suffer as a result of your i) failure to indorse a check; ii) issuance of a check in such a manner that information, marks or bands on the back of a check obscure indorsements; or iii) placement of an indorsement on the back of a check which obscures other indorsements, and which thereby causes a delay in the forward processing and/or return processing of the check. The Bank retains the right to refuse to accept a check for deposit when the back of the check is unreasonably obscured.

2.   **Check Specifications.** You agree that all Items used in connection with your Accounts shall be produced in accordance with the Bank's check printing specifications and industry standards. The Bank shall not be responsible for damages or losses due to any delay or failure in processing, collecting or paying Items not conforming to such specifications or standards. The Bank is authorized to debit your Account, without further notice to you, for any damages, losses or expenses (including attorneys' fees) which the Bank may incur as a result of the handling of Items not produced in accordance with such specifications or standards.

3.   **Legends.** The Bank shall not be liable for complying with conditions, restrictions or legends, pre-printed or otherwise, on Items drawn on your Account.

4.   **Encoding.** If the Bank accepts Items for deposit from you that you or your agent have encoded with MICR encoding, the Bank may rely upon the accuracy and completeness of such encoding in processing the Items for collection or payment. You shall be solely responsible for any encoding errors or defects, including, without limitation, amount errors, and shall indemnify and hold the Bank harmless from and against any and all claims, damages, demands, judgments, liabilities, losses, settlements and expenses (including attorneys' fees) resulting directly or indirectly from such encoding.

5.   **Receipt of Notice of Claim.** In the event the Bank receives notice concerning any claim of unauthorized, improper, or missing indorsement or drawer's signature or of alteration on or of any other claim of improper deposit or cashing of any Item deposited or cashed by you, the Bank is authorized to charge any of your Accounts in the amount of the claim or any portion thereof and hold such amount in a separate account pending resolution of the claim.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax   . (212) 672-5500

7

In the event that the Bank determines to charge any of your Accounts, the Bank shall, in a timely manner, notify you of such charges. The Bank may exchange information with others concerning any claim of unauthorized, improper, or missing indorsement or alteration on any Item that is deposited or cashed by you.

6. Post-Dated Items. You shall not date an Item later than the day it is written. The Bank shall not be liable for: i) returning a post-dated Item unpaid; ii) certifying or paying a post-dated Item before its date; or iii) dishonoring and returning other Items drawn, accepted or made by you as a consequence of the Bank's having certified or paid a post-dated Item.

## F. Final Payment of Items

1. Provisional Payments. All payments are provisional and subject to settlement if the rules of a Funds Transfer System so provide. This provision shall survive the termination of these Terms and Conditions.

2. Bank As Agent. All Items deposited into your Account will be handled by the Bank as agent and are subject to charge back or refund if, for any reason, final payment is not received by the Bank in cash or acceptable unconditional credit. The Bank will use ordinary care in accepting checks on your behalf that are remitted to the Bank in settlement of an Item forwarded for collection.

3. Obtaining Final Payments. In general, we choose the method of obtaining final payment of Items. We may use other banks in the process without prior notification to you. We are not responsible for actions taken by other banks, nor for the loss or destruction of any Items in the possession of other banks or in transit. We are not responsible for any act or failure to act that is reasonable under the circumstances or that is taken or omitted pursuant to these Terms and Conditions. To the extent permitted by law, we may agree with other banks to vary procedures and deadlines regarding the collection or return of Items.

4. Collection Agents. Unless you provide specific instructions as to collection agents or banks, the Bank will use due diligence in selection of collection agents or correspondent banks, but it will not be liable for their insolvency, negligence, misconduct, errors or default, or for the loss or destruction of an item in transit or in possession of others. The Bank or any of its collection agents or correspondent banks may waive presentment, notice of dishonor and protest on all Items for which credit or value is given at least in part or which are received for deposit or collection.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax:    (212) 672-5500

8

The Bank or any of its collection agents or correspondent banks may send any Item to any bank, including the drawee or payor bank, or to a non-bank payor. You will have to pay fees due either the Bank or other financial institutions for collecting an Item.

5.    Payments in Foreign Currency.  If your payment order involves a foreign currency conversion, we will debit your Account for the U.S. Dollar equivalent or otherwise arrange for payment from you, and then enter into a foreign exchange spot transaction and purchase on your behalf the foreign currency needed to execute your payment order. The foreign currency will be made available and your payment order will be executed two business days after the foreign currency purchase is made.

## G.  *Cut-Off Times and Requirements for Receipt and Execution of Instructions*

1.    Cut-Off Time.  Payment orders will be received and processed only on a business day for the Bank.  The Bank has established a deadline for receipt of deposits, Items for collection, and instructions regarding your Account as 2:30 p.m. ET (the "Cut-Off Time").  If the Bank receives account instructions after this Cut-Off Time, we may execute them, but are not required to do so.  If instructions received after 2:30 p.m. ET are not executed on the day received, they shall be executed during the next business day on which we are open.

2.    Items Received After the Cut-Off Time.  All Items received for collection and all deposits made after the Cut-Off Time, or on a Saturday, a Sunday, or any other day the Bank is closed for regular business, shall be deemed to have been received or made on the next business day on which we are open.

3.    Foreign Currency Transactions.  To facilitate foreign exchange conversion, payment instructions pertaining to foreign exchange items must be received by the Bank before the Cut-Off Time two business days prior to the desired execution date.

## H.  *Requests to Reverse Previously Executed Instructions*

1.    No Obligation to Reverse Transactions.  We shall have no obligation to cancel or amend a payment order that we have executed or for which we have entered into a foreign exchange transaction.  If we attempt to honor your request to do so, you shall be liable to us for any costs, losses and expenses, including reasonable attorneys' fees, sustained or incurred by us as a result of such attempt to cancel or amend, regardless of whether or not the attempt was successful.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax     (212) 672-5500

9

2.    **All Parties Must Consent.** Other than requests to stop payment on checks, we will not honor a request to reverse previously executed instructions without the consent of all other necessary parties.

III.    **Stop Payment Orders**

1.    **In General.** Generally, you may request the Bank to stop payment on an Item that you have issued or authorized. In order for you to give the Bank a valid stop payment order on an Item, you must provide the Bank with a reasonable opportunity to act on such a stop payment order. A stop payment order must be given by a person authorized on your Account and must specify i) the account number; ii) payee; iii) date; iv) precise amount; and v) Item number. A stop payment order will not be effective on an Item that has been certified, issued or paid by the Bank. Where permitted by law, the Bank may, in its sole discretion, stop payment on a certified Item or Bank official check if and only if the certified Item or Bank official check has been lost, stolen or destroyed and upon your provision of an affidavit of fact and a surety bond or other form of security acceptable to the Bank.

2.    **Limitation on Liability.** The Bank shall not be liable for failure to effectuate a stop payment order if: i) you do not provide the Bank with all the information enumerated above and a reasonable opportunity to effectuate the order; ii) the Bank determines, as permitted by law, not to stop payment on a certified Item or Bank official check; or iii) the Item in question is a post-dated Item.

3.    **Fee Applies.** The Bank will charge you a fee for effecting a stop payment order.

4.    **Means of Transmitting Instructions.** An oral stop payment order is valid for fourteen calendar days. It must be confirmed in writing before the expiration of that period; otherwise the Item may be paid. A written stop payment order (or written confirmation of an oral stop payment order) is valid for six months from the date such written order is received by the Bank, provided that if such written order constitutes the Bank's first notice of your stop payment order, the Bank must, as provided above, be given a reasonable time to act on it.

5.    **Handling of Certified/Official Checks.** Because certified Items and Bank official checks are the direct obligations of the Bank on which payment cannot generally be stopped, the Bank urges you to use special care in assuring that certified Items and Bank official checks are properly handled and delivered.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax:     (212) 672-5500

10

IV.    Cash Management Services

A.    *Zero Balance Account; Concentration Account*

1.    All Liabilities, Costs, Indemnities, Termination, Governing Law, Amendments and Assignments clauses as defined in the Customer Account Terms and Conditions are valid and binding for all services described herein.

2.    You will establish a ZBA with the Bank in accordance with the Bank's procedures for the establishment of a corporate demand deposit account as described previously. You agree that any debits (or credits) to the ZBA may be made only by check or other instrument for payment of money or funds transfer as agreed by the Bank. You must also designate and maintain a Concentration Account at the Bank authorized to fund the ZBA on a daily basis.

3.    The Bank will link the ZBA(s) to the Concentration Account in order to provide for the daily coverage of all debits posted to the ZBA during end-of-day processing. At the end of every Business Day i) a debit to the Concentration Account will automatically be generated in an amount equal to the total amount of debits posted to the ZBA (the "Offsetting Amount") and ii) the Offsetting Amount will be transferred as a credit to the ZBA. If the ZBA is in a surplus at end of day, reverse entries will occur.

4.    You agree to maintain at all times sufficient immediately available funds in the Concentration Account to cover all debits to the ZBA(s) and all other of your obligations arising in connection with the Concentration Account. Except as otherwise permitted or excused in this Agreement, if on any business day you shall fail to fund the Concentration Account in immediately available funds in the full offsetting amount on such day, the Bank may at its sole discretion do any of the following:

a)    pay all Items drawn or debited against any of your Accounts at the Bank;
b)    pay only those Items which you have funded and return other Items, levying any or all appropriate fees;
c)    return all items if no item has been funded, levying any or all appropriate fees; or
d)    pay all items and charge your interest at 16% per annum on the unauthorized overdraft.

5.    You acknowledge that should the Bank pay an item against insufficient funds, you must pay the amount of such item, together with any interest and fees, to the Bank in immediately available funds.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax:    (212) 672-5500

11

B.    *Wholesale Lockbox Processing*

1.    The Bank, through its processor Mellon Bank, N.A. ("Processor") provides certain payment processing services for its customers. You agree to direct your customers to send their remittances to the Post Office at such location specified by the Bank. You authorize and direct the Bank to rent such post office boxes on your behalf, and agree to reimburse the Bank for any and all post office box rental payments.

2.    If you request these services:

   a)    You authorize the Bank's Processor to collect the mail addressed to you at the Post Office Box identified as belonging to your company.

   b)    The Bank and you shall execute a Wholesale Lockbox Processing Setup form defining the details of the processing to be performed on your behalf by the Processor.

   c)    The Bank's Processor shall open all remittances and process them according to the instructions set forth in the Wholesale Lockbox Setup Form.

   d)    If you so request, the Bank's Processor shall attempt to forward to you any Item received hereunder that bears the typed or handwritten notation "payment in full" or similar language, but does not promise to do so. The parties agree that the Bank shall not be liable for any loss in the event that the Bank processes such an Item.

   e)    The Processor is hereby authorized to endorse checks received on your behalf as follows:

         CREDIT THE ACCOUNT OF
         THE WITHIN NAMED PAYEE
         PAYMENT ACCEPTED WITHOUT PREJUDICE
         ABSENCE OF ENDORSEMENT GUARANTEED
         Mellon Bank, N.A.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax:    (212) 672-5500

12

f)     The Bank shall credit your account at the Bank (the "Customer's Account") the total of all remittance checks processed for you each day. The parties agree that the credit and collection of such checks shall be subject to the terms and conditions as would apply to deposits received by the Bank directly from you.

C.     *Automated Services*

1.     The Bank's Processor shall, on each Business Day, capture data according to the instructions set forth by you at the time of agreement. The Processor shall transmit the data captured in a format mutually agreed to by the Bank and you.

2.     The Bank's Processor shall transmit remittance data to you in a mutually agreeable format on a daily basis. This shall occur no later than 4:00 p.m. ET each Business Day. Weekend activity shall be included in the transmission on the following Business Day. In the event a transmission cannot be received or the Processor is unable to make a transmission, all processed remittance data shall be held at the Processor until the problem has been rectified or until the parties have made other mutually agreeable arrangements.

D.     *Account Analysis Billing Procedure*

You will pay the Bank the charges established by the Bank and in effect from time to time for the services provided to you. Payment for such charges shall either be made by you in the form of compensating balance equivalent to the fee amount, calculated at the Bank's current earnings credit rate a provided by the Bank to you, or in the form of a direct payment. Charges are payable monthly and will be charged to your DDA maintained with the Bank. The Bank may change its charges from time to time by providing you with at least 60 days prior written notice of such changes.

E.     *Indemnification*

You agree to relieve the Bank and its processor from any and all liability to you in connection with the Bank's performance of this Lockbox Agreement and to indemnify the Bank, and hold the Bank harmless, from any claims, actions, liabilities, losses, damages or costs (including reasonable attorneys fees), incurred by the Bank as a result of claims, demands, lawsuits, or judgements arising from or in connection with the Bank's performance in this agreement, unless the Bank or its Processor engages in willful misconduct or does not exercise ordinary care in its performance of this Agreement. In the event the Bank or its Processor breaches the standard of care set forth in this section, the Bank's liability shall be limited to the actual damages sustained by you. In no event shall the Bank be liable for any incidental, consequential, special or punitive damages under this Agreement.

Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Telephone: (212) 672-6000
Telefax:     (212) 672-5500

13

Exhibit 4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL MALONE, *et al.*,

    Plaintiffs,

    v.

CLARK NUBER, P.S., *et al.*,

    Defendants.

Case No.  C07-2046RSL

ORDER GRANTING IN PART
MOTIONS TO DISMISS AND
GRANTING LEAVE TO AMEND

16

## I.  INTRODUCTION

17       This matter comes before the Court on five motions to dismiss filed by the following

18 "moving defendants:" (1) Clark Nuber P.S. and two of its employees, Thomas Joseph Sedlock,

19 an attorney, and James Dubeck, a certified public accountant (collectively, "Clark Nuber"); (2)

20 the Seattle law firm of Ahrens & DeAngeli, PLLC and one of its partners, Edward Ahrens

21 (collectively, "A&D"); (3) Enterprise Financial Services and the former president of one of its

22 subdivisions, Paul Vogel (collectively, "Enterprise"); (4) Multi National Strategies, LLC,

23 Coastal Trading LLC, Michael N. Schwartz, and David Schwartz (collectively, the "MNS

24 defendants"); and (5) the "HVB entities," which include Bayerische Hypo- und Vereinsbank AG

25 ("HVB-AG"), Bayerische Hypo- und Vereinsbank AG – New York Branch ("HVB-New

26 York"), and HVB US Finance f/k/a HVB Structured Finance ("HVB-Finance," which plaintiffs

27

28 ORDER REGARDING
MOTIONS TO DISMISS - 1

1    sued as "Bayerische Hypo- und Vereinsbank US Finance"). Plaintiffs are Michael and Barbara

2    Malone, a married couple, their wholly owned corporation, Belmar Trading, Inc., and Belmar

3    Investment Trust. Plaintiffs allege that the defendants, who include the moving defendants and

4    other entities and individuals too numerous to list, designed, promoted, and defrauded them into

5    participating in an abusive tax shelter called the "Coastal Trading Common Trust Fund Series

6    III" and the "Coastal Trading Common Trust Fund Series IV" (collectively, "CTF"). The IRS

7    ultimately disallowed CTF and imposed penalties and interest on plaintiffs, which they now seek

8    to recover from defendants. Plaintiffs also seek to recover the fees they paid to defendants for

9    professional services that, accordingly to plaintiffs, were performed negligently or not at all.

10          For the reasons set forth below, the Court grants the moving defendants' motions in part

11   and denies them in part.[1]

12                                   **II. DISCUSSION**

13   **A.   Background Facts.**

14          The First Amended Complaint alleges that Michael Malone ("Malone") is a "successful

15   businessman" who, in 2001, received substantial income and capital gains from the sale and

16   merger of his company, AEI. Malone subsequently sought investment and tax planning advice

17   from Clark Nuber, which had been his accounting firm for approximately ten years. Sedlock

18   and Dubeck advised Malone to invest in CTF. Clark Nuber represented to Malone "that if he

19   were to invest in CTF, there was a reasonable likelihood that he would make a profit, but if he

20   lost money in CTF, he could use the losses from CTF to offset his 2001 capital gains and

21   ordinary income." Amended Complaint at ¶ 43. Clark Nuber sent plaintiffs a memorandum on

22   October 31, 2001 (the "Memorandum") summarizing CTF, explaining the transaction, and

23   outlining the risks. The Memorandum informed Malone that he would "receive a

---

[1] The Court heard oral argument in this matter on May 12, 2008.

ORDER REGARDING
MOTIONS TO DISMISS - 2

1    comprehensive tax opinion from Sidley Austin[2] a highly respected large international law firm

2    that you can rely on. The tax opinion will prevent the imposition of penalties in the event of a

3    successful IRS challenge." First Declaration of Michael Malone, (Dkt. #36) ("First Malone

4    Decl."), Ex. 1. The Memorandum also informed plaintiffs that the "principals have a mixed

5    history as tax shelter promoters" and stated that the "promoters and legal counsel predict a 50-

6    60% chance of success [in the event of an IRS audit]. Practically, the chance of success is

7    somewhat higher since estimates of this nature are usually very conservative." Id.

8        Because the mechanics of CTF are largely irrelevant for purposes of this motion, they are

9    summarized only very briefly. The investment scheme used a loan from HVB-Finance to

10   purchase foreign currency options in simultaneous "straddle" and "strangle" positions. CTF was

11   set up to generate both losses and gains. The gains would be allocated to charitable trusts,

12   which were tax-indifferent entities, and the losses were allocated to the investors on a pro rata

13   basis. Amended Complaint at ¶ 105. Plaintiffs allege that the loan was a sham and the loan

14   funds never left the bank. Nevertheless, they were charged interest and management fees on the

15   loan.

16       The Amended Complaint alleges that "[i]n order to protect itself and insulate itself from

17   liability . . . Clark Nuber falsely claimed that Ed Ahrens was Malone's attorney and Malone's

18   independent adviser pertaining to CTF." Amended Complaint at ¶ 85. It alleges that in fact,

19   Ahrens was one of the promoters of CTF, and he had an undisclosed conflict of interest in

20   representing Malone. Id. The Amended Complaint further alleges that Clark Nuber falsely

21   promised that Ahrens and another defendant would provide an insurance policy for the recourse

22   financing. Id. at ¶ 90.

23       Plaintiffs allege that Coastal Trading LLC "designed, implemented, and executed the CTF

24   transaction." Amended Complaint at ¶ 141. They further allege that the MNS defendants,

25   _____

26       [2] The law firm of Sidley Austin LLP ("Sidley Austin") was a named defendant but has
     settled its claims with plaintiffs.
27

28   ORDER REGARDING
     MOTIONS TO DISMISS - 3

1    "acting through Clark Nuber, solicited Malone to investment [sic] in [CTF]."  Id. at ¶ 106.

2        In November 2001, plaintiff wrote a letter to Enterprise asking if it would create and act

3    as trustee for a common trust fund in connection with CTF.  Enterprise Trust agreed to create

4    and administer CTF.  Enterprise earned fees from the CTF transaction.  Id. at ¶ 142.

5        Plaintiffs allege that in reliance on defendants' advice and recommendations, Malone

6    invested in the CTF program by committing $1.7 million in cash and $15 million in borrowed

7    funds.  Amended Complaint at ¶ 102.  Malone invested the funds on November 14, 2001, id. at

8    ¶¶ 104, 107, and entered into the CTF transaction "[d]uring the last quarter of 2001."  Id. at ¶¶

9    69, 110.  CTF allocated nearly $13 million in losses to Malone via Belmar Trading.

10       In March 2002, plaintiffs received the promised letter from Sidley Austin partner and

11   defendant R. J. Ruble.  Sidley Austin charged $50,000 for the letter.  Amended Complaint at

12   ¶ 101.  The letter stated, "There is a greater than 50 percent likelihood that the tax treatment of

13   the transactions would be upheld if challenged by the IRS."  Id. at 126(j).

14       The IRS ultimately disallowed the CTF tax shelter.  Malone paid a tax deficiency of over

15   $3.5 million because he "lost any offset to his capital gains tax obligation;" he also "paid interest

16   and penalties of nearly $365,000 to the IRS."  Amended Complaint at ¶¶ 162, 166.  Plaintiffs

17   allege that defendants knew, but concealed from them, that CTF "was an abusive tax shelter,

18   consisting of a sham loan, totally lacking in economic substance,[3] with little or no likelihood of

19   either making a profit or, if it lost money and the investor claimed a tax write-off on his income

20   tax return, of having the loss deduction upheld by the IRS in the event of an audit."  Id. at ¶ 46.

21       Plaintiffs filed their complaint in King County Superior Court.  Defendants removed the

22   action to this Court pursuant to 18 U.S.C. § 1441(b).  Plaintiffs assert claims for fraud,

23   conspiracy, material misrepresentation and omission, professional negligence, breach of

24   contract, breach of fiduciary duty, unjust enrichment, constructive trust, and rescission.  They

25

26

27       [3] The IRS does not allow deductions for investments that lack economic substance.

28   ORDER REGARDING
     MOTIONS TO DISMISS - 4

1    also assert claims for violations of the Securities Exchange Act of 1933, the Securities Exchange

2    Act of 1934, the Investment Advisers Act of 1940, the Washington State Securities Act (the

3    "WSSA"), the Washington Criminal Profiteering Act, and the Washington Consumer Protection

4    Act (the "CPA").

5    **B.    Personal Jurisdiction and Venue.**

6        Enterprise, Vogel, the MNS defendants, and the HVB entities allege that plaintiffs have

7    not established that this Court has personal jurisdiction over them. Plaintiffs have the burden of

8    making a prima facie showing of personal jurisdiction. See, e.g., Bourassa v. Desrochers, 938

9    F.2d 1056, 1057 (9th Cir. 1991) (internal citation omitted). Personal jurisdiction and venue in

10   this case are governed by Section 27 of the 1934 Act. Section 27 confers jurisdiction in the

11   district courts over violations of federal securities law. 15 U.S.C. § 78aa. However, both HVB-

12   NY and HVB-Finance included provisions in their contracts with Malone that require that

13   actions against them be brought in New York. Declaration of John Gallagher, (Dkt. #79), Ex. A

14   at p 22, Ex. C at p. 18. Plaintiffs have not argued that those provisions should be disregarded or

15   shown any justification for doing so. This Court is therefore not the proper venue for plaintiffs'

16   claims against HVB-NY and HVB-Finance and those claims are dismissed for improper venue.

17   The Court will not transfer the case against those entities to New York because plaintiffs have

18   not requested that it do so.

19       As for the other defendants, this district is a proper venue because an "act or transaction

20   constituting the violation occurred" in this district. 15 U.S.C. § 78aa. The Ninth Circuit has

21   explained that under the coconspirator venue theory, where an action is brought against multiple

22   defendants alleging a common scheme of acts or transgressions in violation of the securities

23   statutes, as long as venue is established for any defendant in the forum district, venue is proper

24   as to all defendants. Securities Investor Prot. Corp. v. Vigman, 764 F.2d 1309, 1314 (9th Cir.

25   1985). In addition, "where a claim of federal securities violations is brought in a proper district,

26   the test for whether the district court has personal jurisdiction over a defendant is whether the

27

28   ORDER REGARDING
     MOTIONS TO DISMISS - 5

1    defendant had minimum contacts with the United States." <u>Bourassa</u>, 938 F.2d at 1057 (citing

2    <u>Vigman</u>, 764 F.2d at 1314).  The court in <u>Vigman</u> explained, "So long as a defendant has

3    minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction

4    over the defendant in any federal district court." <u>Vigman</u>, 764 F.2d 1316.  Except HVB-AG,

5    these defendants all have minimum contacts with the United States, and the Court has personal

6    jurisdiction over them.

7        However, plaintiffs have not alleged any facts to show that HVB-AG, a bank organized

8    under the laws of Germany with its principal place of business in Germany, has minimum

9    contacts with the United States.  Accordingly, HVB-AG's motion to dismiss for lack of personal

10   jurisdiction is granted.

11   **C.**    **Applicable Dismissal Standards.**

12        Defendants have filed 12(b)(6) motions for failure to state a claim upon which relief can

13   be granted.  The complaint should be liberally construed in favor of the plaintiff and its factual

14   allegations taken as true.  <u>See, e.g.</u>, <u>Oscar v. Univ. Students Coop. Ass'n</u>, 965 F.2d 783, 785 (9th

15   Cir. 1992).  The Supreme Court has explained that "when allegations in a complaint, however

16   true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at

17   the point of minimum expenditure of time and money by the parties and the court." <u>Bell</u>

18   <u>Atlantic Corp. v. Twombly</u>, ___ U.S. ___, 127 S. Ct. 1955, 1966 (2007) (internal citation and

19   quotation omitted).

20        "A district court ruling on a motion to dismiss may consider documents whose contents

21   are alleged in a complaint and whose authenticity no party questions, but which are not

22   physically attached to the plaintiff's pleading." <u>Parrino v. FHP, Inc.</u>, 146 F.3d 699, 705 (9th

23   Cir. 1998) (internal citation and quotation omitted).  Both parties have submitted additional

24   documents for the Court to consider, and the Court has considered the additional documents.

25   However, the Court will not accept plaintiffs' invitation to take judicial notice of the facts

26   alleged in complaints filed in two other cases. Declaration of Brian Isaacson, (Dkt. #35), Exs. 3,

27

28   ORDER REGARDING
     MOTIONS TO DISMISS - 6

1   4. The allegations in complaints are, of course, merely allegations. The Court also declines to

2   take judicial notice of the facts in the unpublished opinions in <u>Williams v. Sidley Austin Brown</u>

3   <u>& Wood LLP</u> although it takes notice of the fact that those opinions exist. The Ninth Circuit has

4   explained that "taking judicial notice of findings of fact from another case exceeds the limits of

5   Rule 201." <u>Wyatt v. Terhune</u>, 315 F.3d 1108, 1114 (9th Cir. 2003). The Court has considered

6   the Senate Report because it was referenced in the Amended Complaint.

7       During oral argument on these motions, plaintiffs requested that they be granted leave to

8   amend any of their claims found to be deficient. Accordingly, in analyzing each claim, the

9   Court also considers the propriety of granting leave to amend.

10  **D.    Claims of the Belmar Plaintiffs.**

11      Clark Nuber argues that plaintiffs have not stated any claims on behalf of Belmar

12  Trading, Inc. and Belmar Investment Trust. They argue that the Amended Complaint does not

13  allege that defendants had any duties to those entities or any contracts with them. Plaintiffs have

14  not responded to or disputed those contentions. Accordingly, the claims brought by Belmar

15  Trading, Inc. and Belmar Investment Trust are dismissed.

16  **E.    Federal Securities Claims.**

17      Defendants allege that most of plaintiffs' claims are time barred. Plaintiffs filed their

18  complaint on September 7, 2007, approximately five and a half years after they invested in CTF.

19      Plaintiffs assert claims under Sections 12 and 15 of the Securities Act of 1933 and claims

20  under SEC Rule 10b-5 and Sections 10(b)[4] and 20 of the Securities Exchange Act of 1934

21  ("Exchange Act"). Section 13 of the Securities Act of 1933 provides that any claim under

22  Section 12 of the act must be brought "[i]n no event . . . more than three years after the . . . sale."

23  15 U.S.C. § 77m; <u>see also</u> <u>Dodds v. Cigna Sec., Inc.</u>, 12 F.3d 346, 349 n.1 (2d Cir. 1993)

24

25      [4] To prevail on a cause of action for violations of Section 10(b) of the Exchange Act and

26  SEC Rule 10b-5, an investor must establish fraud "in connection with the purchase or sale of

27  any security." 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78j(b).

28  ORDER REGARDING
    MOTIONS TO DISMISS - 7

1   ("Since Section 15 merely creates a derivative liability for violations of Sections 11 and 12,

2   Section 13 applies to it as well"); In re Alstom, 406 F. Supp. 2d 402, 409-410 (S.D.N.Y. 2005).

3   The Ninth Circuit has held that the limitations period is "absolute." See, e.g., SEC v. Seaboard

4   Corp., 677 F.2d 1301, 1308 (9th Cir. 1982).

5          Similarly, claims involving "fraud, deceit, manipulation, or contrivance in contravention

6   of a regulatory requirement concerning the securities laws" under the Exchange Act must be

7   brought "not later than the earlier of (1) 2 years after the discovery of the facts constituting the

8   violation, or (2) 5 years after such violation." 28 U.S.C. § 1658(b); see also Johnson v. Alijian,

9   490 F.3d 778, 783 (9th Cir. 2007) (explaining that the period of limitations "is measured from

10  the point of violation"); In re Heritage Bond Litig., 289 F. Supp. 2d 1132, 1147-48 (C.D. Cal.

11  2003) (applying the statute of limitations to claims under Sections 10(b) and 20(a)). The five-

12  year statute of repose "is an absolute limitation which applies whether or not the investor could

13  have discovered the violation." Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d

14  697, 704 (2d Cir. 1994).

15         The Amended Complaint states that the securities transaction was completed no later than

16  December 28, 2001.[5] Amended Complaint at §§ 104-110. Plaintiffs, however, did not file their

17  complaint until approximately six years later. Although plaintiffs argue about when they

18  discovered the violations, they do not address the statutory absolute bars, which run from the

19  date of the transaction. The absolute nature of the bars also defeats plaintiffs' argument that

20  Washington's continuous representation rule[6] tolls the statute of limitations. Moreover, plaintiff

21

22         [5] Plaintiffs contend that their *state* securities claim is not barred in part because they did

23  not learn that the loan was fraudulent until 2007. Plaintiffs have not argued that the loan is a
    security for purposes of the federal securities laws, nor does it appear to fall within the

24  definition of a security. See, e.g., McNabb v. SEC, 298 F.3d 1126 (9th Cir. 2002) (citing

25  Reeves v. Ernst & Young, 494 U.S. 56 (1990)).

26         [6] Washington's continuous representation rule tolls the statute of limitations for some
    claims until representation on the matter ends. See, e.g., Burns v. McClinton, 134 Wn. App.

27

28  ORDER REGARDING
    MOTIONS TO DISMISS - 8

1   has not cited any authority to show that Washington's continuous representation rule tolls the

2   limitations period for federal securities claims. Similarly, plaintiffs argue that they paid some of

3   the defendants' fees within the limitations period. However, they have not cited any authority to

4   show that the payment of professional fees, rather than the purchase or sale of securities, triggers

5   the statute. Accordingly, plaintiffs' federal securities claims are time barred and dismissed with

6   prejudice.

7   **F.      Federal Investment Advisers Act Claim.**

8           Plaintiffs allege that defendants violated the federal Investment Advisers Act of 1940, 15

9   U.S.C. § 80b-1 *et seq*. (the "IAA"). The IAA prohibits the following transactions by investment

10  advisers: "(1) employ[ing] any device, scheme, or artifice to defraud any client or prospective

11  client; (2) engag[ing] in any transaction, practice, or course of business which operates as a

12  fraud or deceit upon any client or prospective client; or . . . (4) engag[ing] in any act, practice, or

13  course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6.

14          The Amended Complaint describes only the MNS defendants as investment advisers.

15  Amended Complaint at ¶¶ 204, 243. None of the other defendants is described as an investment

16  adviser, and they do not appear to be covered by the statute. An "investment adviser" is defined

17  in the statute as a "person who, for compensation, engages in the business of advising others . . .

18  as to the value of securities or as to the advisability of investing in, purchasing, or selling

19  securities, . . . but does not include . . . any lawyer, accountant . . . whose performance of such

20  services is solely incidental to the practice of his profession." 15 U.S.C. § 80b-2(11)(B).

21  Although the Amended Complaint broadly alleges that all defendants "were engaged in the

22  business of advising Plaintiff and others," such a conclusory statement without any factual

23  support is insufficient. Amended Complaint at ¶ 245; Twombly, 127 S. Ct. at 1964-65

24  (explaining that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief'

25

26  ────────────

27  285, 295 (2006).

28  ORDER REGARDING
    MOTIONS TO DISMISS - 9

1  requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

2  of action will not do"). The statute specifically exempts entities whose investment advice is

3  "solely incidental" to their tax, accounting, and legal professions respectively. The Amended

4  Complaint does not allege any facts to show that the statutory exemption is inapplicable.

5  Accordingly, plaintiffs have not shown that the IAA covers any of the defendants other than the

6  MNS defendants.

7      Any amendment of the IAA claims would be futile. The IAA does not provide a private

8  right of action for damages. The sole private remedy available under the IAA is "to void an

9  investment advisers contract" under § 80b-15, a claim plaintiffs have not asserted. Transamerica

10  Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 24-25 (1979). Plaintiffs' claim for damages

11  under the IAA is untenable and fails as a matter of law.

12      Also, it appears that plaintiffs' IAA claim is time barred. The IAA does not include a

13  statute of limitations. When Congress has failed to provide a statute of limitations for a federal

14  cause of action, courts generally borrow the state statute of limitations most analogous to the

15  case at hand. See, e.g., Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350,

16  355 (1991). The Supreme Court has recognized a "closely circumscribed exception" when it

17  finds that "a state limitations period would frustrate the policies embraced by the federal

18  enactment." There is a dearth of case law on the applicable limitations period, perhaps because

19  the statute affords such a limited private remedy. Two published cases both applied the

20  limitations period applicable to claims under the Exchange Act. See Brown v. Producers

21  Livestock Loan Co., 469 F. Supp. 27, 33 (D. Utah 1978) (explaining that the "language of the

22  [IAA] is strikingly similar to that of § 10(b) and, therefore, the court finds it appropriate to apply

23  the same limitations periods as applies to § 10(b) actions");[7] Kahn v. Kohlberg, Kravis, Roberts

24

25      [7] Brown was decided before there was an express federal statute of limitations applicable

26  to Section 10(b) actions. Therefore, the Brown court applied the state statute of limitations
applicable to claims under Section 10(b).

27

28  ORDER REGARDING
MOTIONS TO DISMISS - 10

1    & Co., 970 F.2d 1030, 1039 (2d Cir. 1992) (finding, after detailed analysis, that the "period used

2    in the Securities Acts is the most appropriate since it reflects the accepted balancing of the same

3    interests and is consistently applied to claims posing similar factual and legal issues"); see also

4    In re Am. Funds Fees Litig., 2005 U.S. Dist. LEXIS 41884 at *23-24 (C.D. Cal. 2005)

5    (following Kahn). Following the reasoning set forth in Kahn, the Court also finds that the

6    statute of limitations in the Exchange Act is applicable.[8] As the court explained in Kahn, a

7    uniform federal statute of limitations is preferred to "avoid uncertainty and an excess of useless

8    litigation." Kahn, 970 F.2d at 1036. In addition, claims under the IAA are most analogous to

9    claims under the Exchange Act. See id. (explaining that the IAA and the Exchange Act

10   "regulate the honesty and integrity of those who deal commercially in the national securities

11   markets"); see also SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963)

12   (explaining that "Congress intended the [IAA] to be construed like other securities litigation

13   enacted for the purpose of avoiding frauds") (internal citations omitted). Because plaintiffs'

14   federal securities claims are time barred, their claims under the IAA are also barred.

15   **G.    Supplemental Jurisdiction.**

16          The dismissal of the federal securities claims and claims under the IAA eliminates federal

17   questions from this case. The parties are not diverse. The Malones reside in Washington, and

18   Clark Nuber is alleged to be a Washington corporation. The Court must therefore determine

19   whether to exercise supplemental jurisdiction over plaintiffs' remaining state law claims.

20          "A federal district court with power to hear state law claims has discretion to keep, or

21   decline to keep, them under the conditions set out in § 1367(c)." Acri v. Varian Assocs., 114

22

23          [8] Even if the Court found that another statute of limitations is more closely analogous,
     plaintiffs' claim would still be time barred. As set forth more fully in the text below, claims for
24   fraud, misrepresentation, breach of fiduciary duty and claims under the WSSA involve a three-
     year statute of limitations. See also Transamerica Mortgage Advisors, Inc., 444 U.S. at 17
25   (noting that in enacting the IAA, "Congress intended to impose enforceable fiduciary
     obligations"). The federal Investment Company Act, 15 U.S.C. § 80a-1 et seq., which regulates
26   the conduct of investment companies, includes a five-year statute of limitations.

27

28   ORDER REGARDING
     MOTIONS TO DISMISS - 11

1  F.3d 999, 1000 (9th Cir. 2000) (en banc).  If the federal claims are dismissed before trial, the

2  state law claims "should" be dismissed.  United Mine Workers v. Gibbs, 383 U.S. 715, 726

3  (19666).  Courts also consider the values "of economy, convenience, fairness, and comity."

4  Acri, 114 F.3d at 1001.  Although the Court has dismissed all claims over which it had original

5  jurisdiction, this case does not present novel or complex issues of state law.  In addition, this

6  Court is very familiar with the facts and law presented after reading the parties' voluminous

7  filings and the relevant authority and holding a half-day hearing on the pending motions.  In

8  addition, during oral argument, all parties stated that if the Court were to dismiss the federal

9  claims, they would prefer to continue to litigate the case before this Court.  Accordingly, the

10  Court will exercise supplemental jurisdiction over plaintiffs' remaining state law claims.

11  **H.    Statute of Limitations Issues Regarding State Law Claims.**

12          Defendants allege that all of plaintiffs' state law claims, except their claim for breach of a

13  written contract,[9] are time barred.  The majority of plaintiffs' state law claims have three-year

14  statutes of limitations.  See RCW 4.16.080 (three-year statute of limitations for claims based on

15  negligence, fraud, misrepresentation, conspiracy, and breach of oral contract); RCW

16  9A.82.100(7) (three-year statute of limitations under the Washington Criminal Profiteering Act);

17  RCW 21.20.430(4)(b) (three-year statute of limitations for Washington State Securities Act

18  claims); Hudson v. Condon, 101 Wn. App. 866, 873 (explaining that breach of fiduciary duty

19  claims are subject to a three-year statute of limitations); Goodman v. Goodman, 128 Wn.2d 366,

20  373 (1995) (explaining that a constructive trust claim has a three-year statute of limitations);

21  SPEEA v. Boeing Co., 139 Wn.2d 824, 847-38 (explaining that an unjust enrichment claim has a

22  three-year statute of limitations).  The claim for a violation of the CPA has a four-year statute of

23  limitations pursuant to RCW 19.86.120.  Plaintiffs do not dispute these limitations periods.

24  However, they contend that their claims are not time barred because they did not discover the

25

26          [9] Plaintiffs' claim of breach of a written contract has a six-year statute of limitations
    pursuant to RCW 4.16.040.
27

28  ORDER REGARDING
    MOTIONS TO DISMISS - 12

1    facts giving rise to the violations until years later.

2         Under Washington law, a statute of limitations begins to run when a plaintiff "discovers,

3    or in the exercise of reasonable diligence should have discovered the facts which give rise to his

4    or her cause of action." Johnson v. Reehoorn, 56 Wn. App. 692, 695 (1990) (internal citation

5    and quotation omitted). Plaintiffs are not required to have notice of all of the relevant facts to

6    trigger the statute of limitations. Instead,

7         The general rule in Washington is that when a plaintiff is placed on notice by some
          appreciable harm occasioned by another's wrongful conduct, the plaintiff must make
8         further diligent inquiry to ascertain the scope of the actual harm. The plaintiff is charged
          with what a reasonable inquiry would have discovered. One who has notice of facts
9         sufficient to put him upon inquiry is deemed to have notice of all acts which reasonable
          inquiry would disclose.
10
     Green v. A.P.C., 136 Wn.2d 87 (1998) (internal citations and quotation omitted).
11
          Plaintiffs admit that they "were first alerted to the possibility of Defendants['] misconduct
12
     during an audit of the Malone's [sic] 2001 tax return." Amended Complaint at ¶ 164. The same
13
     paragraph goes on to state that in April and June 2005, the IRS issued summonses to two of the
14
     defendants, both financial institutions, regarding the Malones. However, plaintiffs actually had
15
     notice even earlier. In August 2003, the IRS issued a notice entitled "Common Trust Fund
16
     Straddle Tax Shelter" (the "IRS notice") which stated that "the claimed tax benefits purportedly
17
     generated by these transactions are not allowable for federal income tax purposes." Amended
18
     Complaint at ¶ 52. That notice specifically disallowed the CTF shelter. Malone was also
19
     personally notified of the issue. By letter dated December 22, 2003, CTF President Michael
20
     Schwartz advised Malone to file an amended tax return and to retain an attorney. Amended
21
     Complaint at ¶ 161; Second Declaration of Michael Malone, (Dkt. #61) ("Second Malone
22
     Decl."), Ex. 6 (the "CTF letter"). The CTF letter explained that the IRS notice stated "that the
23
     IRS intended to challenge the tax benefits associated with" CTF, the transaction plaintiffs
24
     "entered into in 2002." The CTF letter further stated that some of Schwartz's clients were
25
     currently under IRS investigation. "This has led me to conclude that the IRS will shortly begin
26
     an investigation of my company as well, ultimately requiring me to provide them with a list of
27
     ORDER REGARDING
28   MOTIONS TO DISMISS - 13

1    all clients that have entered into listed transactions. As such it is almost certain that you will

2    [be] audited at some time in 2004." In addition, contrary to Clark Nuber's assertion that the

3    Sidley Austin opinion letter would preclude penalties, the CTF letter explicitly stated, "The IRS

4    recently has been taking the very aggressive position that tax opinions do not necessarily provide

5    penalty protection on the basis that the taxpayer did not reasonably rely in good faith on the

6    opinion." Malone subsequently retained an attorney.

7          The CTF letter and the IRS notice put plaintiffs on notice of nearly all of the facts that

8    defendants allegedly concealed from them and that give rise to their claims, including the fact

9    that CTF lacked economic substance, that the IRS would not allow the deductions, that the IRS

10   would audit plaintiffs, and that the Sidley Austin letter would not necessarily prevent the

11   imposition of penalties. In addition, by December 2003, plaintiffs had already paid at least a

12   portion of defendants' fees, which they claim as part of their damages. Amended Complaint at ¶

13   290 ("Malone has suffered injury in his business and property in that he has paid Defendants

14   [sic] fees and has incurred losses and interest in an amount to be proven at trial, but believed to

15   be in excess of $2 million").

16         Plaintiffs argue that their claim for breach of the written contract is not time barred,

17   which defendants concede. They also contend that their claims are timely under the continuous

18   representation rule because defendants continued to represent them. The Amended Complaint

19   does not contain that allegation, nor is it supported by the document plaintiffs cite. Accordingly,

20   plaintiffs' state law claims for negligence, breach of oral contract, fraud, misrepresentation,

21   conspiracy, constructive trust, unjust enrichment, breach of fiduciary duty, and for violations of

22   the Washington Criminal Profiteering Act are all time barred to the extent that they are based on

23   theories that defendants misled them into believing that CTF had economic substance, that the

24   related tax deductions would be allowed by the IRS, and that the Sidley Austin letter would

25   prevent the imposition of penalties. Plaintiffs may amend their claims to allege continuous

26   representation.

27

28   ORDER REGARDING
     MOTIONS TO DISMISS - 14

1    During oral argument, plaintiffs argued an additional theory of liability, that defendants

2    charged them interest and management fees on a loan that never existed, a point they did not

3    stress in their briefing or in the Amended Complaint. Plaintiffs allege that they did not learn that

4    the loan was a sham until March 2007. Defendants have not offered any evidence at this point

5    to counter that assertion. Nor can the Court conclude as a matter of law that notice that the IRS

6    was disallowing the tax deductions constituted notice that the loan was sham. It appears that

7    any claims based on the alleged sham nature of the loan would not be time barred. Accordingly,

8    plaintiffs will be permitted to amend their complaint to clarify that theory. However, they

9    cannot continue to allege wrongdoing generally by "all defendants." Instead, they must specify

10   the alleged wrongdoing by each specific defendant, including which defendant, if any, was

11   responsible for the loan, made the misrepresentations about it, and charged the allegedly

12   wrongful fees.

13   I.    **Merits of the State Law Claims.**

14   Defendants argue that even if plaintiffs' state law claims are timely, they are subject to

15   dismissal on the merits.

16   1.    **Washington Criminal Profiteering Act.**

17   RCW 9A.82.010(12) provides that "it is a condition to civil liability under RCW

18   9A.82.100 that the defendant has been convicted in a criminal proceeding of fraud in the

19   purchase or sale of securities." Plaintiffs concede that none of the moving defendants has been

20   convicted. Nevertheless, they urge the Court to consider "whether the existence of a conspiracy

21   makes a fellow conspirator's conviction applicable to serve as a conviction for purposes of RCW

22   9A.82.010(12)." Plaintiffs' Opposition at p. 20. However, the statutory language is clear and

23   unambiguous, and the Court declines to expand it. Plaintiffs request that the Court dismiss the

24   claim without prejudice so they can refile if a conviction is obtained in the future. That request

25   is granted, and the criminal profiteering claim is dismissed without prejudice.

26   2.    **Washington Consumer Protection Act.**

27

28   ORDER REGARDING
     MOTIONS TO DISMISS - 15

1    A successful private CPA claim requires the establishment of the following elements: (1)

2  an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) affecting the

3  public interest; (4) that injures the plaintiff in his or her business or property; and (5) a causal

4  link between the unfair or deceptive act and the injury suffered. Hangman Ridge Training

5  Stables, Inc. v. Safeco Title Ins. Co., 105 Wn. 2d 778 (1986). In a factually similar case

6  involving a tax shelter, the Ninth Circuit affirmed the dismissal of a CPA claim because plaintiff

7  had failed to establish two of the necessary elements. Swartz v. KPMG LLP, 476 F.3d 756 (9th

8  Cir. 2007) ("Swartz II") (affirming in relevant part Swartz v. KPMG, LLC, 401 F. Supp. 2d

9  1146 (2004) ("Swartz I")). First, the trial court noted that an act or practice is "unfair or

10  deceptive" under the CPA only if it has the capacity to deceive "a substantial portion" of the

11  public. Swartz I, 401 F. Supp. 2d at 1153 (quoting Henery v. Robinson, 67 Wn. App. 277, 289-

12  91 (1992)). The trial court found:

13       The number of consumers who could conceivably find themselves in plaintiff's
         circumstances -- looking for a tax savings on millions of dollars of capital gains -- is
14       extremely small and unable to qualify as "a substantial portion of the public" under any
         reasonable definition of that term. As a matter of law, conduct directed toward a small
15       group cannot support a CPA claim.

16  Swartz I, 401 F. Supp. 2d at 1153-54. Second, the trial court also found that the public interest

17  was not affected: "The tribulations of multimillionaires are not the focus of the legislative intent

18  behind the CPA; as a (very small) group, the extremely wealthy are neither unsophisticated nor

19  easily subject to chicanery." Swartz I, 401 F. Supp. 2d at 1154. The Ninth Circuit adopted the

20  trial court's opinion and affirmed dismissal of the CPA claim with prejudice because amendment

21  would be futile. Swartz II, 476 F.3d at 761 ("We note that a scheme marketed to a 'select

22  audience' of persons with millions of dollars of capital gains to shield from taxation lacks the

23  capacity to deceive a substantial portion of the public").

24    Plaintiffs argue that Swartz is inapplicable and the public interest element is satisfied

25  because the Washington State Accountancy Act includes a specific declaration of public interest.

26

27

28  ORDER REGARDING
    MOTIONS TO DISMISS - 16

1  That contention was not raised in <u>Swartz</u>.[10]  However, in this case, plaintiffs did not plead a

2  violation of the CPA based on the Washington Accountancy Act and any amendment to add

3  such a claim would be futile.  The Washington Supreme Court emphasized in <u>Hangman</u> that

4  "when a statute containing a legislative public interest pronouncement can be shown to have

5  been violated, only the public interest requirement is satisfied per se.  The other four elements of

6  a private CPA action must be separately established."  <u>Hangman</u>, 105 Wn. 2d at 791-92.

7  Therefore, even if plaintiffs alleged a claim based on the Washington Accountancy Act, they

8  would still have to show that defendants' conduct had the capacity to deceive "a substantial

9  portion" of the public.  For the reasons set forth in <u>Swartz</u>, they cannot do so.[11]

10      Plaintiffs contend that the <u>Swartz</u> courts "did not consider evidence of whether the unfair

11  and deceptive promotion of illegal tax schemes is limited to millionaires."  Plaintiffs' Opposition

12  at p. 8 (citing other tax shelter schemes such as the "Slavery Reparations Credit").  The Court,

13  however, must focus on this particular tax shelter, not on the multitude of other shelters and

14  schemes that no doubt exist.

15      Finally, plaintiffs argued during oral argument that defendants' acts of charging them

16  interest and fees for a loan that did not exist violated the CPA.  That claim is not in plaintiffs'

17  Amended Complaint.  Any such amendment would be futile because plaintiffs cannot meet the

18

---

19      [10] Similarly, plaintiffs argue that the <u>Swartz</u> courts did not consider a subsequently issued
20  report by a Senate subcommittee regarding KPMG's and other professional entities' roles in
     actively promoting abusive tax shelters.  The report, however, did not address the moving
21  defendants other than the HVB entities.

22      [11] In addition, although the Amended Complaint alleges that defendants marketed CTF to
23  other customers, it does not allege that any of defendants' other clients were deceived or
     participated in CTF.  <u>See, e.g.</u>, <u>Burns</u>, 135 Wn. App. at 302 (dismissing CPA claim where
24  plaintiff's accountant overcharged him, but there was no evidence that his other clients were
     deceived or that they had a similar relationship with him that facilitated the overcharges); <u>Segal</u>
25  <u>Co., Inc. v. Amazon.com</u>, 280 F. Supp. 2d 1229, 1232-33 (W.D. Wash. 2003).  The lack of
26  those allegations further undermines plaintiffs' claims that defendants' conduct had the capacity
     to deceive a substantial portion of the public.
27

28

1   required public interest element.  The scheme, regardless of whether one focuses on the loan or

2   some other aspect, lacks the capacity to deceive a substantial portion of the public.  For these

3   reasons, plaintiffs' CPA claim must be dismissed with prejudice.

4       **3.    Breach of Contract.**

5       Plaintiffs allege that defendants "entered into oral and written contracts to provide

6   Plaintiffs with professionally competent . . . services, to exercise the reasonable standard of care,

7   loyalty and honesty, and to comply with all applicable rules of professional responsibility and

8   industry standards and regulations."  Amended Complaint at ¶ 286.  They also contend that

9   defendants provided them "with advice that these Defendants either knew or should have known

10  to be wrong and illegal" and breached their duty of good faith and fair dealing by withholding

11  information, among other things.  Id. at ¶¶ 288-289.  As an initial matter, plaintiffs' allegation of

12  breach of the duty of good faith and fair dealing is too general and conclusory to state a claim

13  under Twombly.  Instead, plaintiffs allege a laundry list of allegations against all defendants

14  without tying any of the allegations to specific defendants.  Id. at ¶ 289.  Similarly, plaintiffs'

15  claim for breach of an oral contract fails because they have not identified any actionable oral

16  contract or oral promises defendants made to them.[12]  Instead, the Amended Complaint broadly

17  and vaguely alleges that "Defendants" breached contracts with them.  Amended Complaint at ¶¶

18  286-288.  Therefore, plaintiffs' claims for breach of an oral contract and breach of the duty of

19  good faith and fair dealing are dismissed with leave to amend.

20      In addition, defendants argue that the claims for breach of a written contract must be

21  dismissed because the claim duplicates the professional negligence claim and defendants

22  "promised no specific result at all."  Swartz I, 401 F. Supp. 2d at 1154.  This argument has

23  merit.  With the exception of Clark Nuber, plaintiffs have not alleged any specific promises by

24

25      [12] The Amended Complaint alleges that Clark Nuber made an oral promise to provide tax

26  advice.  Of course, they did provide tax advice, so that promise was not breached.  Because they
    did not orally promise specific results, the claim fails under Swartz.

27

28  ORDER REGARDING
    MOTIONS TO DISMISS - 18

1    any of the moving defendants.  For example, plaintiffs allege that A&D breached their contract

2    by failing to adequately review the transaction documents and failing to provide sound

3    professional advice, but those claims merely duplicate a professional negligence claim.  The

4    failure to identify specific promises dooms plaintiffs' breach of contract claim against the other

5    moving defendants.  Nor can plaintiffs save their inadequate pleading by asserting allegations in

6    their memoranda that do not appear in their complaint.[13]

7        However, Clark Nuber specifically promised plaintiffs that the Sidley Austin letter "will

8    prevent the imposition of [IRS] penalties," when in fact, it did not. First Malone Decl., Ex. 1.

9    Clark Nuber counters that it informed plaintiffs in the engagement letter that it would take "no

10   responsibility [for the] consequences of the investment." Engagement Letter at p. 1. The letter

11   is not integrated, and Clark Nuber had already provided advice that they did not subsequently

12   disavow. Therefore, the breach of contract claim against Clark Nuber is not subject to dismissal

13   as a matter of law at this stage in the litigation. The Court dismisses the breach of contract claim

14   against the other moving defendants with leave to amend.

15       **4.    Breach of Fiduciary Duty.**

16       Defendants argue that plaintiffs' breach of fiduciary duty claim must be dismissed

17   because the parties dealt with each other at arms length, and no fiduciary relationship existed.

18   However, plaintiffs allege that Sedlock, Ahrens, and A&D acted as their attorneys. "A fiduciary

19   relationship arises as a matter of law between an attorney and his client." Liebergesell v. Evans,

20   93 Wn.2d 881, 890 (1980).  The Amended Complaint alleges that although A&D purported to

21   provide neutral legal advice to Malone, they were actually promoters and participants in CTF,

22   which they concealed from Malone. Amended Complaint at ¶ 85. Those allegations are

23   sufficient to state a claim against A&D.

24   ――――――――――――――――

25       [13] For example, plaintiffs allege that Enterprise breached a contract with Malone by
     "explicitly contracting to serve as fiduciary" but failing to do so, and by failing to set up CTF to
26   comply with applicable law. Plaintiffs' Response at p. 6. Those allegations do not appear in the
     Amended Complaint.
27

28   ORDER REGARDING
     MOTIONS TO DISMISS - 19

1    In addition, the Amended Complaint describes the MNS defendants as investment

2   advisors, and investment advisors are fiduciaries. See, e.g., SEC v. Capital Gains Research

3   Bureau, 375 U.S. 180, 194 (1963) (recognizing that financial advisers are fiduciaries with a duty

4   to disclose material facts).  Plaintiffs allege that the MNS defendants, "acting through Clark

5   Nuber, solicited Malone to investment [sic] in the Fund," Amended Complaint at ¶ 106, even

6   though they knew that the loan was a sham and that CTF lacked economic substance.  These

7   allegations are sufficient to state a claim for breach of fiduciary duty against the MNS

8   defendants. See, e.g., Tokarz v. Frontier Fed. Sav. & Loan Ass'n, 33 Wn. App. 456, 459 (1982)

9   (explaining that "one who speaks must say enough to prevent his words from misleading the

10   other party; one who has special knowledge of material facts to which the other party does not

11   have access may have a duty to disclose these facts to the other party; and one who stands in a

12   confidential or fiduciary relation to the other party to a transaction must disclose material

13   facts").

14    As for Clark Nuber, the Court considers whether it and Malone had a relationship that

15   "allows an individual to relax his guard and repose his trust in another." Liebergesell, 93 Wn.2d

16   at 889 (quoting Restatement of Contracts § 472(1)(c) (1932), which describes a fiduciary

17   relationship as one in which one party "occupies such a relation to the other party as to justify

18   the latter in expecting that his interests will be cared for").  Comment c to the Restatement

19   explains, "A fiduciary position . . . includes not only the position of one who is a trustee,

20   executor, administrator, or the like, but that of agent, attorney, trusted business advisor, and

21   indeed any person whose relation with another is such that the latter justifiably expects his

22   welfare to be cared for by the former").  Plaintiffs allege that Clark Nuber was the Malones'

23   trusted tax advisor for ten years, which is sufficient at this stage to bring the claim within the

24   ambit of the Restatement.  In contrast, in Swartz, there was no evidence that the plaintiff had any

25   pre-existing relationship with the accounting firm. 401 F. Supp. 2d at 1156 (explaining that

26   plaintiff was referred to the accounting firm by his broker).  Clark Nuber argues that no

27

28   ORDER REGARDING
     MOTIONS TO DISMISS - 20

1  fiduciary relationship existed because they expressly warned plaintiffs of the potential pitfalls of

2  CTF and informed plaintiffs that they would not verify facts represented by the promoters. The

3  engagement letter stated that an attorney would advise plaintiffs on the legal aspects of the

4  transaction so "Clark Nuber takes no responsibility therefore for the legal advice or

5  consequences of the investment. Specifically, the legal viability of the 'insurance' contract has

6  been approved by Mr. Ahrens." Second Malone Decl. Ex. 2. A party may contractually limit its

7  participation and disclaim any special relationship. Tokarz, 33 Wn. App. at 462-63. However,

8  the import of the disclaimer is unclear at this time. Also, Clark Nuber did opine on the tax and

9  legal consequences of the investment by opining that the Sidley Austin letter "will prevent the

10  imposition of penalties in the event of a successful IRS challenge." First Malone Decl., Ex. 1.

11      Plaintiffs allege that Clark Nuber knew that CTF was an abusive tax shelter, lacked

12  economic substance, was unlikely to make money, and would be disallowed by the IRS.

13  Amended Complaint at ¶¶ 46. Nevertheless, plaintiffs contend that Clark Nuber used its

14  position of trust to actively promote the shelter and prepared and signed a tax return claiming

15  losses from CTF, which led to plaintiffs' IRS penalties. Id. at ¶¶ 43, 75, 99-102, 199. Certainly,

16  discovery may reveal that defendants did not actively promote CTF or know of its pitfalls. At

17  this stage in the proceedings, however, these allegations are sufficient to state a claim for breach

18  of fiduciary duty against Clark Nuber.

19      However, plaintiffs have not alleged any facts to show that Enterprise was a fiduciary.[14]

20  Nor have they cited any authority to show that a bank that acts as the trustee for a common fund

21  is a fiduciary. Therefore, the breach of fiduciary duty claim against Enterprise is dismissed.

22      Plaintiffs also contend that defendants aided and abetted other defendants' breach of

23  fiduciary duties. In Washington, "a person who knowingly assists another in the commission of

24  a tort, or who knowingly assists another in violating his fiduciary or trust obligation, is liable for

25

26      [14] In their memorandum, plaintiffs allege that Enterprise "explicitly contracted to serve as
   a fiduciary." Plaintiffs' Opposition at p. 6. That allegation is not in the Amended Complaint.

27

28  ORDER REGARDING
   MOTIONS TO DISMISS - 21

1  losses proximately caused thereby." LaHue v. Keystone Investment Co., 6 Wn. App. 765, 783

2  (1972). Plaintiffs contend that defendants conspired with Clark Nuber to conceal and

3  misrepresent facts regarding the investment. Amended Complaint at ¶ 211. The Amended

4  Complaint also contains numerous allegations that the defendants were aware of and actively

5  participated in the scheme. Although the allegations on this issue are sparse, they are sufficient

6  to withstand the motion. Therefore, to the extent the claims are not time barred, plaintiffs may

7  pursue claims against all defendants for aiding and abetting a breach of fiduciary duty, and a

8  claim for breach of fiduciary duty against Clark Nuber, A&D, and the MNS defendants.

9        **5.    Constructive Trust and Unjust Enrichment.**

10       Equity allows a court to impose a constructive trust in favor of a party, who may reclaim

11  his or her property from one that used fraud, misrepresentation, or other similar wrongdoing to

12  acquire it. See, e.g., Bangasser & Assoc., Inc. v. Hedges, 58 Wn.2d 514, 516-17 (1961). Under

13  Washington law, constructive trust is an equitable remedy imposed by the court at law,

14  principally to prevent unjust enrichment. See, e.g., Thor v. McDearmid, 63 Wn. App. 193, 207

15  (1991). Defendants argue that constructive trust is a remedy, not a cause of action. Plaintiffs

16  have not responded to that argument. Nor has the Court found any authority that would permit

17  plaintiffs to assert an equitable remedy as a cause of action. Accordingly, plaintiffs'

18  constructive trust claim against all defendants is dismissed.

19       Plaintiffs also allege that all defendants unjustly enriched themselves by "[c]harging and

20  collecting unreasonable, excessive, and unethical fees." Amended Complaint at ¶ 186(c). They

21  also accuse Clark Nuber of "maximizing the fees they could earn through the CTF transaction, at

22  the expense of Plaintiffs." Id. at ¶ 200(d). However, in their briefing, plaintiffs appear to have

23  abandoned those allegations and now allege that defendants charged fees for services that

24  essentially had no value. That allegation, however, is not in plaintiffs' Amended Complaint.

25       Moreover, plaintiffs had written contracts with the defendants, and a party to an express

26  contract may not bring an action under a theory of an implied contract relating to the same

27

28  ORDER REGARDING
    MOTIONS TO DISMISS - 22

1   matter. <u>Chandler v. Wash. Toll Bridge Auth.</u>, 17 Wn.2d 591, 604-05 (1943). The Amended

2   Complaint does not identify any implied contract with any of the defendants. Accordingly,

3   plaintiffs's unjust enrichment claim is dismissed with leave to provide amendments that cure

4   these deficiencies.

5       **6.     Washington State Securities Act.**

6       Defendants argue that plaintiffs' WSSA claim is inadequately pled, and the Court agrees.

7   The Amended Complaint alleges a series of actions, misstatements, and material omissions by

8   "defendants" without specifying the wrongdoing of each individual defendant. Although the

9   claims are deficient, the Court grants plaintiffs leave to amend rather than dismissing the claim

10  with prejudice for the following reasons.

11      First, Enterprise and A&D did not move to dismiss plaintiffs' WSSA claim on the merits.

12  Second, Clark Nuber argues that plaintiffs' WSSA claim is time barred. However, plaintiffs

13  allege that they learned for the first time that the loan was a sham in March 2007. Amended

14  Complaint at ¶ 167. In addition, none of the defendants disputes that unlike under federal law,

15  the loan may be a security under Washington law. Accordingly, the WSSA claim appears

16  timely.

17      Third, the MNS defendants argue that plaintiffs' WSSA claim fails because they cannot

18  show the required reasonable reliance. <u>See, e.g.</u>, <u>Stewart v. Estate of Steiner</u>, 122 Wn. App.

19  258, 264 (2004) (explaining that WSSA plaintiffs must show that the defendant made material

20  misrepresentations or omitted material facts about the security and that the purchaser relied on

21  those misrepresentations or omissions). The CTF subscription agreements, signed by Malone,

22  contain declarations that the investor "has not received from, nor has the Investor relied upon,

23  Coastal . . . or any of their affiliates, agents or employees for any tax advice or any tax opinion

24  with respect to an investment in the Program." Declaration of Michael Schwartz, (Dkt. #73),

25  Ex. 1. The MNS defendants argue that this case is factually similar to <u>Stewart v. Estate of</u>

26  <u>Steiner</u>, in which the investor signed a subscription agreement with a similar nonreliance

27

28  ORDER REGARDING
    MOTIONS TO DISMISS - 23

1  provision. However, the <u>Stewart</u> court dismissed the claim on a motion for summary judgment,

2  not a Rule 12(b)(6) motion. In addition, the court explained that "the fact that one signs a

3  nonreliance provision in a subscription agreement is not necessarily dispositive" of the issue of

4  reasonable reliance. <u>Stewart</u>, 122 Wn. App. at 274. Rather, a court must consider several

5  factors including:

> (1) the sophistication and expertise of the plaintiff in financial and securities matters, (2) the existence of longstanding business or personal relationships, (3) access to the relevant information, (4) the existence of a fiduciary relationship, (5) concealment of the fraud, (6) the opportunity to detect the fraud, (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction, and (8) the generality or specificity of the misrepresentations.

<u>Id.</u> At this point, the record is insufficiently developed to evaluate these factors or to determine

as a matter of law that plaintiffs' reliance was not reasonable.

Clark Nuber also moved to dismiss the WSSA claim regarding "controlling person"

liability under RCW 21.20.430(3). Plaintiffs did not respond to that argument. Therefore,

plaintiffs' claim under the WSSA based on controlling person liability is dismissed. Otherwise,

plaintiffs are granted leave to amend the claim.

**7.    Fraud, Misrepresentation, and Civil Conspiracy.**

The moving defendants argue that plaintiffs' allegations do not meet the requirements of

Rule 9. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake

shall be stated with particularity." <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1107 (9th

Cir. 2003). A claim for conspiracy to commit fraud is subject to the heightened pleading

requirements of Federal Rule of Civil Procedure 9(b). <u>Id.</u> Rule 9(b) requires that plaintiffs

allege "the who, what, when, where, and how" of the misconduct alleged. <u>Cooper v. Pickett</u>,

137 F.3d 616, 627 (9th Cir. 1997). They also argue that even if the claims are sufficiently pled,

they fail as a matter of law.

**a.    Clark Nuber.**

Plaintiffs allege that Clark Nuber made affirmative misrepresentations including (1)

stating in the Memorandum that there was a better than 60% chance that the IRS would uphold

ORDER REGARDING
MOTIONS TO DISMISS - 24

1    the deductions, when, according to plaintiffs, Clark Nuber knew that CTF lacked economic

2    substance, (2) stating that the Sidley Austin letter would prevent the imposition of penalties, and

3    (3) preparing and signing a tax return for the Malones knowing that the representations regarding

4    CTF were false. Amended Complaint at ¶¶ 81, 82, 89. Knowledge and "other conditions of a

5    person's mind may be alleged generally." Fed. R. Civ. P. 9(b). These allegations are sufficient

6    to state claims for fraud and misrepresentation against Clark Nuber.

7          Clark Nuber argues that plaintiffs did not adequately plead the necessary justifiable

8    reliance because of the disclaimers in the 2001 engagement letter. "Whether a party justifiably

9    relied upon a misrepresentation is an issue of fact." Swartz II, 476 F.3d at 761 (internal citation

10   and quotation omitted). Reliance is justified only when it is "reasonable under the surrounding

11   circumstances." ESCA Corp. v. KPMG Peat Marwick, 135 Wn.2d 820, 824 (1998). In this

12   case, plaintiffs have adequately pled reliance. Whether the disclaimers are effective, particularly

13   in light of the representations in the Memorandum, is a question more appropriately resolved at a

14   later stage in the proceedings. Clark Nuber also argues that it had no duty to disclose obvious

15   risks to plaintiffs. Certainly, plaintiffs may ultimately have a high hurdle to overcome to show

16   that they justifiably relied on representations describing an obviously risky tax shelter.[15]

17   However, Clark Nuber has not shown that, as a matter of law, it was obvious that CTF lacked

18   economic substance or that the Sidley Austin letter would not ward off the imposition of

19   penalties, particularly when Clark Nuber made contradictory representations. Therefore, the

20   Court will not dismiss the fraud and misrepresentation claims against Clark Nuber.

21         **b.**    **The Other Moving Defendants.**

22         The Amended Complaint fails to set forth any false statements by the other moving

23   defendants. Nor does it explain their roles in the allegedly fraudulent scheme with particularity.

24

25        [15] Similarly, the MNS defendants argue that plaintiffs cannot show the necessary reliance
because of the disclaimers contained in the signed subscription agreements. As set forth more

26   fully above regarding the WSSA claim, a determination that plaintiffs' reliance was
unreasonable as a matter of law would be premature.

27

28   ORDER REGARDING
MOTIONS TO DISMISS - 25

1   Instead, the Amended Complaint repeatedly refers to actions, misrepresentations and omissions

2   by "defendants," even when the allegations could not plausibly refer to all defendants. The

3   pleading requirement cannot be met by general allegations concerning all defendants. Swartz II,

4   476 F.3d at 764-65 ("Rule 9(b) does not allow a complaint to merely lump multiple defendants

5   together but requires plaintiffs to differentiate their allegations when suing more than one

6   defendant and inform each defendant separately of the allegations surrounding his alleged

7   participation in the fraud"). Similarly, regarding plaintiffs' conspiracy claim, conclusory

8   allegations without factual support are insufficient to state a conspiracy claim. Swartz II, 476

9   F.3d at 765. During oral argument, plaintiffs appeared to concede that their fraud,

10  misrepresentation, and conspiracy claims were deficient and requested leave to amend. That

11  request is granted.

12  **J.     Damages.**

13          Clark Nuber requests that, with the exception of plaintiffs' claims for actual damages

14  based on a tax penalty, plaintiffs' damages claims be stricken as untenable. Plaintiffs' claims for

15  treble damages and attorney's fees are stricken because their CPA and Criminal Profiteering

16  claims have been dismissed, and none of their remaining claims provides for treble damages or

17  fees. Plaintiffs are not entitled to recover the amount they paid in back taxes, or the loss of the

18  value of whatever benefit they may have received from CTF. Swartz I, 401 F. Supp. 2d at 1155

19  n.2. Similarly, Washington follows "the majority of jurisdictions holding that interest owed to

20  the IRS is not recoverable" from defendants. Leendertsen v. Price Waterhouse, 81 Wn. App.

21  762, 768 (1996). Accordingly, plaintiffs' request to recover the amount they paid in back taxes

22  or interest is also stricken. However, the Court will not otherwise strike plaintiffs' claim for

23  other damages, including the amount of fees and interest they paid on a loan that allegedly never

24  existed and fees for services that had no value.

25          Plaintiffs also request damages for "emotional and mental suffering, anxiety and

26  distress." However, their Amended Complaint does not set forth the basis of those damages.

27

28  ORDER REGARDING
    MOTIONS TO DISMISS - 26

1   Accordingly, plaintiffs may amend their complaint to assert those allegations. Otherwise, their

2   claim for emotional distress damages will be dismissed.

3       Finally, plaintiffs request rescission and restitution. Clark Nuber requests that those

4   claims be stricken because plaintiffs have not stated claims for unjust enrichment and

5   constructive trust. However, the Court has granted plaintiffs leave to amend their claim for

6   unjust enrichment, so dismissal of the equitable remedies would be premature. In addition, the

7   Amended Complaint generally requests rescission of "all agreements entered into with

8   Defendants pertaining to any of the [tax shelter] transactions." Amended Complaint at ¶¶ 301-

9   02. That allegation is impermissibly vague. Plaintiffs may amend their complaint to specify the

10  alleged agreements and with whom they were made. Otherwise, their rescission claim will be

11  dismissed.

12                      **III. CONCLUSION**

13      For all of the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART

14  Clark Nuber's motion to dismiss (Dkt. #9), Ahrens & DeAngeli's motion to dismiss (Dkt. #10),

15  Enterprise's motion to dismiss (Dkt. #21), and the MNS defendants' motion to dismiss (Dkt.

16  #72). The Court GRANTS the HVB entities' motion to dismiss (Dkt. #79), dismisses the claims

17  against HVB-AG for lack of personal jurisdiction, and dismisses the claims against HVB-NY

18  and HVB-Finance for improper venue. The Court dismisses with prejudice plaintiffs' claims for

19  federal securities violations, violations of the IAA, and their Consumer Protection Act claims, as

20  well as the claims brought by the Belmar plaintiffs. As set forth above, the Court dismisses

21  additional claims without prejudice with leave to amend.

22      Plaintiffs are granted leave to file a second amended complaint within thirty days of this

23  order that remedies the deficiencies set forth above. The amendments must specify each

24  defendant's allegedly wrongful conduct rather than referring to "defendants" collectively.

25  Because the complaint is unusually lengthy, any changes must be designated in bold type. The

26  second amended complaint shall not include any of the causes of action that the Court has

27

28  ORDER REGARDING
    MOTIONS TO DISMISS - 27

1    dismissed with prejudice.

2        In addition, in any further motions, the defendants must not simply join or adopt

3    arguments made by other defendants (including filing notices "joining" in the briefing of another

4    defendant). Instead, each defendant must state fully the grounds on which it is moving in its

5    own memorandum.

6        Finally, the parties have notified the Court that plaintiffs have settled their claims against

7    Sidley Austin. Accordingly, the Clerk of the Court shall remove Sidley Austin's motion to

8    dismiss (Dkt. #25) from the Court's motions calendar. The parties are reminded that Sidley

9    Austin remains a party in this matter until the parties file a stipulation and proposed order of

10   dismissal and an order of dismissal is signed by the Court.

11

12        DATED this 23rd day of June, 2008.

13

14                         *Mr S Lasnik*

                            Robert S. Lasnik

15                         United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28   ORDER REGARDING
      MOTIONS TO DISMISS - 28